ELLEN F. ROSENBLUM
Attorney General
CHRISTINA L. BEATTY-WALTERS #981634
CARLA A. SCOTT #054725
Assistant Attorneys General
Department of Justice
1515 SW Fifth Ave, Suite 410
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Email: Tina.BeattyWalters@doj.state.or.us
        Carla.A.Scott@doj.state.or.us

Attorneys for Defendants Bruce McIntosh, Scott Patterson and Oregon Department of Fish and Wildlife

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| MCKENZIE FLYFISHERS;<br>STEAMBOATERS,<br><br>         Plaintiffs,<br><br>    v.<br><br>BRUCE MCINTOSH, SCOTT PATTERSON,<br>OREGON DEPARTMENT OF FISH AND<br>WILDLIFE, JOHN EISENHAUER, U.S.<br>ARMY CORPS OF ENGINEERS,<br><br>         Defendants. | Case No.  6:13-cv-02125-TC<br><br>DECLARATION OF BRUCE MCINTOSH IN<br>SUPPORT OF STATE DEFENDANTS'<br>OBJECTIONS TO THE ENTRY OF THE<br>PROPOSED CONSENT DECREE |

I, Bruce McIntosh, declare:

1.       I am the Deputy Fish Division Administrator for Inland Fisheries at the Oregon

Department of Fish and Wildlife and a named defendant in this case. I make this declaration

from personal knowledge and would testify from the following if called as a witness.

Page 1 -    DECLARATION OF BRUCE MCINTOSH IN SUPPORT OF STATE DEFENDANTS'
        OBJECTIONS TO THE ENTRY OF THE PROPOSED CONSENT DECREE
        TBW/mjo/5853195-v1

Department of Justice
1515 SW Fifth Ave, Suite 410
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

2.      Attached as Exhibit 101 is a copy of the Cooperative Agreement between the U.S. Army Corps of Engineers ("Corps") and the Oregon Department of Fish and Wildlife ("ODFW"), effective August 1, 2012.

3.      Pursuant to the Cooperative Agreement, ODFW is currently utilizing the excess capacity at the McKenzie River Hatchery to raise hatchery fish at the expense of the state of Oregon, over and above the mitigation production that the Corps has funded.

4.      At the McKenzie River Hatchery currently, ODFW is raising approximately 840,000 smolts that it is preparing for release in early 2015.  ODFW is also collecting eggs from returning hatchery fish that it will raise and release as smolts in early 2016.  ODFW is collecting the number of eggs that will allow it to release 787,000 smolts in 2016.

5.      The Corps has funded its full mitigation production for release in 2015.  The Corps is also funding and is committed to fully fund the full contractual mitigation production for release in 2016.  For the fish to be released in 2015 and 2016, the time for making changes to the level of production for which the Corps is responsible, to the extent that changes are permitted at all under the Cooperative Agreement, has already passed.  Cooperative Agreement, ¶ 2.2.3.  The Corps has not invoked the collaborative process that the Cooperative Agreement requires the parties to follow in order to propose changes to mitigation production levels after 2016 releases.  *See* Cooperative Agreement, ¶ 2.2.2.

**I declare under penalty of perjury that the foregoing is true and correct.**

EXECUTED on September 22, 2014.

BRUCE A. MCINTOSH

Page 2 -    DECLARATION OF BRUCE MCINTOSH IN SUPPORT OF STATE DEFENDANTS' OBJECTIONS TO THE ENTRY OF THE PROPOSED CONSENT DECREE
TBW/mjo/5853195-v1

## COOPERATIVE AGREEMENT

| AGREEMENT NUMBER: W9127N-12-2-0004 | EFFECTIVE DATE: 1 August 2012 |
|---|---|

| ISSUED BY: | ISSUED TO: |
|---|---|
| The United States of America<br>US Army Corps of Engineers, Portland District<br>333 SW First Ave<br>Portland, OR  97204-3495 | The State of Oregon<br>Oregon Department of Fish and Wildlife<br>3406 Cherry Avenue Northeast<br>Salem, OR  97303-4924 |

CONCERNING: Operation and Maintenance of Willamette Valley, Cole Rivers, and Bonneville Hatcheries within the US Army Corps of Engineers, Portland District Hatchery Mitigation Program.

AUTHORIZED BY: House Document 531, 81st Congress, 2nd session (John Day Project: Flood Control Act of 1950; Willamette Valley Project: Flood Control Acts of 1938, 1950, & 1960; Rogue River Project: Flood Control Act of 1963)

| CFDA NUMBER: 12.XXX | DUNS NUMBER: 085283252 |
|---|---|

RECIPIENT TYPE: ☒Government Entity  ☐Non-Profit Organization  ☐Hospital  ☐ University  ☐Other (specify): _____

| AMOUNT: Determined per task order | COST SHARE: Not Applicable |
|---|---|
| PROJECT PERIOD: 1 July 2012 – 30 June 2017 | BUDGET PERIOD: 1 July – 30 June or determined per task order |

ADMINISTERED BY:    Karen Dailey (503)808-4615
Karen.J.Dailey@usace.army.mil

### TABLE OF CONTENTS

| Section | Title | Section | Title |
|---|---|---|---|
| 1 | Administrative Information | 5 | Property Management |
| 2 | Programmatic Requirements | 6 | Claims, Disputes, and Appeals |
| 3 | Term | 7 | Compliance with Laws |
| 4 | Financial Matters | 8 | Indemnification |

NOTICE OF ELECTRONIC FUNDS TRANSFER (EFT):  Pursuant to DoDGARS 22.810, it is a Governmentwide requirement to use EFT in the payment of any grant or cooperative agreement for which an application or proposal was submitted or renewed on or after 26 July 1996, unless the recipient has obtained a waiver by submitting to the head of the pertinent Federal agency a certification that it has neither an account with a financial institution nor an authorized payment agent. To be paid, recipient must submit a Payment Information Form (Standard Form SF-3881) to the responsible DoD payment office.

IN WITNESS WHEREOF, the parties by their authorized representatives execute this Cooperative Agreement and agree to the terms and conditions contained herein, all assurances and certifications made in the application, and all applicable federal statutes, regulations, and guidelines.  The Recipient agrees to administer the funded program in accordance with the approved application and budget(s), supporting documents, and other representations made in support of the approved application.

| SIGNATURE OF RECIPIENT | DATE | UNITED STATES OF AMERICA (SIGNATURE OF GRANTS OFFICER) | DATE |
|---|---|---|---|
| *[signature]* | 7/31/12 | *[signature]* | 30 JUL 2012 |
| NAME AND TITLE OF SIGNER<br>Debbie Colbert<br>Deputy Director for Administration<br>(503)947-6044<br>debbie.l.colbert@state.or.us | | NAME OF GRANTS OFFICER<br>Ralph P. Banse-Fay<br>(503)808-4600<br>ralph.p.banse-fay@usace.army.mil | |

EXHIBIT 101 TO MCINTOSH DECLARATION
Page 1 of 54

1. **Administrative Information**

  1.1. Parties to the Agreement

    This agreement is entered into between the US Army Corps of Engineers, Portland District (USACE), hereinafter referred to as GOVERNMENT, and Oregon Department of Fish and Wildlife (ODFW), hereinafter referred to as RECIPIENT. The parties to this agreement act in their independent capacities in their performance of their respective functions under this agreement and neither party is to be considered the officer, agent, or employee of the other.

  1.2. Administrative Personnel

    1.2.1. Government Representatives:

      Grants Officer:
Ralph Banse-Fay, Chief, Contracting Division
USACE, Portland District    Tel:  503-808-4600
ATTN: CENWP-CT    Fax:  503-808-4605
333 SW 1st Avenue    E-mail: ralph.p.banse-fay@usace.army.mil
Portland, OR 97204

      Agreement Administrator:
Karen Dailey, Grants Specialist, Contracting Division
USACE, Portland District    Tel:  503-808-4615
ATTN: CENWP-CT-S    Fax:  503-808-4605
333 SW 1st Avenue    E-mail: karen.j.dailey@usace.army.mil
Portland, OR 97204

      Government Program Manager:
Bernard Klatte, Chief, Fisheries Section
USACE, Portland District    Tel:  503-808-4318
ATTN: CENWP-OD-T    Fax:  503-808-4329
333 SW 1st Avenue    E-mail: bernard.a.klatte@usace.army.mil
Portland, OR 97204

    1.2.2. Recipient Representatives:

      Recipient Administrators:
Debbie Colbert, Deputy Director for Administration
Oregon Department of Fish and Wildlife  Tel:  503-947-6044
3406 Cherry Avenue NE    Fax:  503-947-6042
Salem, OR 97303    Email:  debbie.l.colbert@state.or.us

      Jessica Perkins, Procurement & Contract Specialist
Oregon Department of Fish and Wildlife  Tel:  503-947-6197
3406 Cherry Avenue NE    Fax:  503-947-6156
Salem, OR 97303    Email:  jessica.g.perkins@state.or.us

      Recipient Program Manager
Scott Patterson, Fish Propagation Program Manager
Oregon Department of Fish and Wildlife  Tel:  503-947-6218
3406 Cherry Avenue NE    Fax:  503-947-6202
Salem, OR 97303    Email:  scott.d.patterson@state.or.us

**EXHIBIT 101 TO MCINTOSH DECLARATION
Page 2 of 54**

1.3. Administrative Requirements and Order of Precedence

    1.3.1. Governing Regulations: This agreement will be administered in accordance, and recipients shall comply, with the applicable requirements of DoD 3210.6-R, The DoD Grant and Agreement Regulations (DoDGARS), 13 Apr 1998 (codified at 32 CFR Parts 21-37 and 1125).

    1.3.2. Order of Precedence: In the event of a conflict between the terms of this agreement and other governing documents, the conflict shall be resolved by giving precedence in descending order as follows: (1) The DoDGARS; (2) the articles of this agreement; and (3) the attachments to this agreement if any.

## 2. Programmatic Requirements

2.1. Scope of the Agreement

The Government and the Recipient are bound to each other by a duty of good faith and best effort to achieve the goals of the agreement. This agreement is not intended to be, nor shall it be construed as, by implication or otherwise, a partnership, a corporation, or other business organization.

This agreement details the operation and maintenance of Government owned hatcheries (Bonneville, Cole Rivers, Leaburg, Marion Forks, McKenzie, South Santiam, and Willamette) to meet mitigation requirements for projects of USACE, Portland District (hereinafter referred to as HATCHERIES), and also includes provisions for baseline hatchery monitoring, fish marking, routine fish health, and fish liberations.

Under this agreement separate task orders will be issued by the Government to the Recipient for each hatchery, routine fish health, baseline hatchery monitoring, fish marking, and fish liberations in accordance with Section 2.2.

Task orders for individual hatcheries and specific hatchery activities:

1. Bonneville Hatchery (Operation and Maintenance, Routine/Baseline Monitoring, Fish Marking/ID, Fish Transportation)
2. Cole M. Rivers Hatchery (Operation and Maintenance of Hatchery and Applegate Adult Fish Trapping Facility)
3. Leaburg Hatchery (Operation and Maintenance)
4. Marion Forks Hatchery (Operation and Maintenance)
5. McKenzie Hatchery (Operation and Maintenance)
6. South Santiam Hatchery (Operation and Maintenance of Hatchery and existing Foster Adult Fish Trapping Facility)
7. Willamette Hatchery (Operation and Maintenance of Hatchery and existing Dexter Adult Fish Trapping Facility)
8. Fish Health Services (Willamette Valley, Cole Rivers, and Bonneville Hatcheries)
9. Baseline Monitoring
10. Fish Marking/ID (Willamette Valley)
11. Fish Transportation and Release (Willamette Valley, Rogue River, and Columbia River Fish Liberations)

During this agreement period, future task orders may be issued separately for the new adult fish trapping facilities listed below:

1. Minto Adult Trapping Facility
2. Foster Adult Trapping Facility
3. Dexter Adult Trapping Facility
4. Other facilities

EXHIBIT 101 TO MCINTOSH DECLARATION
Page 3 of 54

This agreement contains general provisions applicable to the entire program as well as separate specific provisions for each hatchery and adult fish trapping facilities. Provisions for adult fish trapping facilities, baseline hatchery monitoring, fish marking, fish health, and fish liberations performed by the Recipient are also presented in this agreement.

2.1.1. General Provisions
    2.1.1.1. The Recipient will:
        2.1.1.1.1. Operate and maintain the hatcheries and associated facilities in a manner that will satisfy the terms and conditions of this agreement.

        2.1.1.1.2. Manage the fiscal budget, including, upon written Government approval, the transfer of funds between hatcheries. It is understood and agreed that such responsibility shall include but not be limited to, compliance with all applicable State and Federal laws and regulations including the Endangered Species Act (ESA).

        2.1.1.1.3. Release the hatchery mitigation production of fish into the waters of the United States for meeting mitigation responsibilities of the Government as designated for each hatchery.

        2.1.1.1.4. Furnish biological or pathological services (i.e. routine fish health services), or both as the Recipient determines necessary, for the operation of hatcheries. Charges for such services will be included in a task order issued specifically for routine fish health. Routine fish health activities include only those annual biological or pathological services deemed necessary by the Recipient for the production of fish to meet mitigation purposes specified in annual task orders and do not include fish health services necessary for research projects funded under separate agreements.

        2.1.1.1.5. Perform baseline hatchery monitoring to monitor the performance of the hatchery program as agreed upon through process in 2.2 "Annual Task Order Process and Changes."

        2.1.1.1.6. Furnish routine maintenance services with the Recipient's hatchery maintenance staff and/or contractors, as the Recipient determines necessary for the maintenance of hatcheries within budgetary constraints. Charges for such services will be included in the total annual operation and maintenance costs for the respective hatchery. Routine maintenance is defined as any maintenance that will not materially increase the value or materially extend the useful life of a capital asset. Any repairs beyond routine maintenance are considered a capital improvement. Capital improvements as defined by 2 CFR Part 225 Appendix B Section 15(a)(1) require prior approval (see Section 5.6.2.2) and will be authorized via other procurement instruments.

        2.1.1.1.7. Support the Government in its effort to update lease agreements for federally owned real estate. See Appendix A for summary of land ownership.

        2.1.1.1.8. Maintain flexibility of hatchery operations by producing and rearing fish at several hatcheries at various life stages as the Recipient deems necessary to effectively accomplish production objectives for meeting Government fish mitigation responsibilities to the extent such practices comply with applicable State and Federal law (i.e. ESA, CWA, etc).

EXHIBIT 101 TO MCINTOSH DECLARATION
Page 4 of 54

2.1.1.1.9. Retain flexibility in hatchery operations such that production can be moved or reduced at facilities undergoing construction.

2.1.1.1.10. For Willamette Valley Project hatcheries, abide by the most current Willamette Fish Operations Plan (WFOP) once approved by WATER and National Marine Fisheries Service (NMFS). For hatcheries associated with John Day Dam or the Rogue River Project, Recipient shall abide by comparable USACE Fish Operations plan where applicable.

2.1.1.1.11. Implement and follow Hatchery Genetic Management Plans (HGMP) for Government funded production once approved by the NMFS.

2.1.1.1.12. Count grade-out fish released into any body of water towards Government mitigation responsibilities at a 10% rate of pounds released.

2.1.1.2. The Government will:
2.1.1.2.1. Provide the share of each hatcheries water supply set forth in the hatchery specific provisions (see Section 2.1.2). If at any time during the term of this agreement the water supply is determined to be inadequate for hatchery operations, a water assessment will be performed and levels will be adjusted as deemed necessary.

2.1.1.2.2. Issue task orders to obligate federal funding for the operation and maintenance of hatcheries in accordance with Section 2.2 of this agreement. Further, task orders will be issued separately for activities at hatcheries associated with baseline hatchery monitoring, fish marking, routine fish health, and fish liberations.

2.1.1.3. Production to meet USACE mitigation requirements and compliance with ESA
2.1.1.3.1. If there is additional fish production capacity at a hatchery beyond the Government's mitigation responsibility, it may be used by the Recipient subject to compliance with State and Federal laws (i.e. ESA, CWA, etc). Additional rearing costs shall be borne solely by the Recipient and fish production and funding information shall be clearly documented in the annual report completed by the Recipient required by Section 2.3 of this agreement.

2.1.1.3.2. It is recognized that, in order to achieve the best production and cost efficiencies, the Recipient may need to transfer Government mitigation adults, eggs, or juveniles to or from various hatcheries. The Recipient shall be permitted to do so, provided records, with the hatchery of origin and funding hatchery, clearly delineated, are kept of such transfers and the Government is credited with the resulting production as presented in the annual report completed by the Recipient required by Section 2.3 of this agreement.

2.1.1.3.3. If the Recipient expands a facility or in any way increases its production capacity, the Recipient is responsible to bear the additional cost of operation and maintenance.

2.1.1.4. Baseline Hatchery Monitoring
Baseline hatchery monitoring will be conducted under this agreement and will be detailed in a specific task order. The scope for baseline hatchery monitoring will be developed in accordance with Section 2.2 of this agreement.

EXHIBIT 101 TO MCINTOSH DECLARATION
Page 5 of 54

2.1.1.5. Fish Marking

Fish marking of juvenile fish will be performed by the Recipient and includes adipose fin clipping of juvenile fish, insertion of coded wire tags, and associated activities. Coded wire tags may be purchased by the Government and shipped to the Recipient for annual marking activities. Coded wire tags used for research projects performed by the Recipient will be detailed in other agreements.

2.1.1.6. Fish Health

Pathology services shall be provided by the Recipient. Pathology services consist of diagnostic fish health services including, but not limited to, fish health monitoring, examinations, treatment recommendations during disease outbreaks, and pre-release fish health checks.

2.1.1.7. Fish Liberations/Outplanting

Fish transportation and releases of juvenile fish to meet Government mitigation will be performed by the Recipient in accordance with HGMPs for Government funded production and WFOP. Fish transportation and releases of juvenile fish to meet ODFW's separate fish production goals will be in accordance with ODFW's approved, separate HGMP.

The task order issued for fish liberations will require NO funds to be obligated by the Government. Program income generated from carcass sales will be used for this activity as detailed in Section 2.6 of this agreement.

2.1.1.8. Cooperative Agreement Monitoring

At reasonable times at state-owned facilities and at any time at federally-owned facilities during the period this agreement is in effect, authorized Government representatives may conduct:

- Coordinated site visits and inspections concerning hatchery production, operation, maintenance, and cooperative agreement administration.
- Annual environmental and safety inspections in addition to inspections currently performed by state environmental and safety programs.
- Real Property accountability and compliance inspections of hatchery and trapping facilities.

2.1.1.9. Environmental and Safety Regulations

The Recipient is required to abide by all state and federal environmental and safety regulations and have appropriate programs and plans (e.g. Spill Prevention, Countermeasures, and Control Plan) in place. In addition to inspections currently done under state programs, environmental and safety inspections shall be performed and/or coordinated by the Government. Periodic (annual & every 5 years) inspections by the Government at hatcheries will examine environmental factors related to air emissions, cultural resources, hazardous materials, hazardous waste, natural resources, other environmental issues, pesticides, solid waste, storage tanks, toxic substances, wastewater, and environmental health and safety factors that are examined under specific protocols in the Environmental Review Guide for Operations (ERGO) supplement, The Environmental Assessment and Management (TEAM) Guide, the appropriate Oregon state supplement developed by the Department of Defense, or other official Government documents. This may be performed by an individual or team assembled by USACE, Portland district. For documented findings, corrective action plans shall be

EXHIBIT 101 TO MCINTOSH DECLARATION
Page 6 of 54

developed.  An appropriate timetable for correcting findings of non-compliance shall be developed by the Government in consultation with the Recipient.  After corrective action is taken, the Recipient shall submit signed documentation that demonstrates actions taken to address findings of non-compliance.  The Recipient will need to generate records for submittal to the Government regarding activities related to sustainability required by federal law.  The Recipient will maintain records regarding energy use, solid waste disposal, recycling, and procurement of energy efficient items and submit the records annually to the Government.

2.1.2. Hatchery Specific Provisions
   2.1.2.1. Bonneville Fish Hatchery
      2.1.2.1.1. Responsibilities of the Recipient
         The Recipient will release the hatchery mitigation production of fall Chinook into the Columbia River Basin consistent with the Government mitigation responsibilities.

      2.1.2.1.2. Responsibilities of the Government
         The Government will assure the hatchery has an acceptable (quality and quantity) water supply of 17,500 g.p.m. (39 c.f.s.).

   2.1.2.2. Cole M. Rivers Fish Hatchery
      2.1.2.2.1. Responsibilities of the Recipient
         The Recipient will release the hatchery mitigation production into the Rogue River Basin for fulfilling Government mitigation requirements for William L. Jess (Lost Creek) and Applegate Projects.  Maximum levels for mitigation must not exceed levels in Table 1.

Table 1.  Maximum production levels at Cole M. Rivers Hatchery for meeting USACE mitigation requirements.

| Species | Project of Mitigation | Pounds at Release (maximum) |
|---|---|---|
| Spring Chinook (*O. tshawyscha*) | William L. Jess Dam | 263,000 |
| Summer Steelhead (*O. mykiss*) | William L. Jess Dam | 14,300 |
| Rainbow trout (*O. mykiss*) | William L. Jess Dam | 45,420 |
| Coho (*O. kisutch*) | Applegate Dam | 3,000 |
| Winter Steelhead (*O. mykiss*) | Applegate Dam | 28,700 |
| Rainbow trout (*O. mykiss*) | Applegate Dam | 10,700 |
|  | Total | 365,120 |

The Government recognizes the Recipient's need for fish management flexibility for the Rogue River Basin, therefore the above schedule serves only as an agreement guideline for the various species to be reared.

      2.1.2.2.2. Responsibilities of the Government
         The Government will assure the hatchery has an acceptable (quantity and quality) water supply of 300 c.f.s./134,640 g.p.m. from the William L. Jess (Lost Creek) Dam tailrace and 60 c.f.s./26,928 g.p.m. from the Lost Creek Dam forebay.

   2.1.2.3. Leaburg Hatchery
      2.1.2.3.1. Responsibilities of the Recipient
         The Recipient will release the native hatchery resident trout (*O. mykiss* and *O. clarkii*) production for mitigation of Willamette Valley projects in the Willamette River Basin in

EXHIBIT 101 TO MCINTOSH DECLARATION
Page 7 of 54

a manner that minimizes impacts to naturally produced fish, especially those federally listed under the authority of the Endangered Species Act. Maximum levels for mitigation must not exceed 277,000 pounds including brood stock.

2,1.2.3.2. Responsibilities of the Government
The Government will assure the hatchery has as acceptable (quality and quantity) water supply of 125 c.f.s./56,100 g.p.m.

2.1.2.4. Marion Forks Hatchery
2.1.2.4.1. Responsibilities of the Recipient
The Recipient shall release hatchery mitigation production of spring Chinook (*O. tshawytscha*) and/or steelhead (*O. mykiss*) into the North Santiam River or other water bodies pertinent to fulfilling Government mitigation requirements for said projects (Detroit and Big Cliff Dams). Maximum levels for mitigation must not exceed 84,000 pounds.

2.1.2.4.2. Responsibilities of the Government
The Government will assure the hatchery has as acceptable (quality and quantity) water supply of 21 c.f.s./9,380 g.p.m.

2.1.2.5. McKenzie River Hatchery
2.1.2.5.1. Responsibilities of the Recipient
The Recipient shall release hatchery mitigation production of spring Chinook (*Oncorhynchus tshawytscha*) into the McKenzie River or other water bodies pertinent to fulfilling Government mitigation requirements for said projects (Cougar and Blue River Projects). Maximum levels for mitigation shall not exceed 80,800 pounds.

2.1.2.5.2. Responsibilities of the Government
The Government will assure the hatchery has an acceptable (quality and quantity) water supply of approximately 35 c.f.s./15,709 g.p.m. (50 percent of water supply required by the hatchery).

2.1.2.6. South Santiam Hatchery
2.1.2.6.1. Responsibilities of the Recipient
The Recipient shall release hatchery mitigation production of spring Chinook (*O. tshawytscha*) and/or steelhead (*O. mykiss*) into the South Santiam River or other water bodies pertinent to fulfilling Government mitigation requirements for said project (Foster). Maximum levels for mitigation must not exceed 71,000 pounds. Mitigation requirements for Green Peter Dam are undetermined.

2.1.2.6.2. Responsibilities of the Government
The Government will assure the hatchery has as acceptable (quality and quantity) water supply of13 c.f.s./5,800 g.p.m.

2.1.2.7. Willamette Hatchery
2.1.2.7.1. Responsibilities of the Recipient
The Recipient shall release hatchery mitigation production of spring Chinook (*O. tshawytscha*) and/or steelhead (*O. mykiss*) into the Middle Fork Willamette River or other water bodies pertinent to fulfilling Government mitigation requirements for said

EXHIBIT 101 TO MCINTOSH DECLARATION
Page 8 of 54

projects (Lookout Point and Dexter Projects).  Maximum levels for mitigation must not exceed 235,000 pounds.

2.1.2.7.2. Responsibilities of the Government
The Government will assure the hatchery has as acceptable (quality and quantity) water supply of 33.5 c.f.s./15,034 g.p.m. at the Oakridge facility and 85 c.f.s./38,250 g.p.m. at the Dexter facility.

2.1.2.8. Adult Fish Trapping Facilities
Existing adult fish trapping facilities will be operated and maintained by the Recipient.

New adult fish trapping facilities will be maintained by the Government and may be operated by the Recipient.  The Government may operate new facilities in the future if it is determined to be to be in the best interest of the program.  In this event, the Government will notify the Recipient at least 365 days in advance of the budget period in which the Government will take over operations of the facility.

As new facilities are constructed, operation and maintenance of facilities must follow the Operation and Maintenance Manual of the facility.  Further, operation and maintenance must be consistent with the WFOP and other applicable Federal laws, policies, and plans the Government determines applicable.

2.2.  Annual Task Order Process and Changes
2.2.1. General
Task orders will be issued separately for activities at hatcheries associated with operation and maintenance of hatcheries, baseline hatchery monitoring, fish marking, routine fish health, and fish liberations.  These task orders will include appropriate budget detail, planned annual fish production, and any special items.

Although general provisions for the scope of this agreement including maximum poundage levels for mitigation are provided in this agreement, actual production and cost responsibility information will be detailed in annual task orders.

2.2.2. Changes
Production to meet mitigation requirements for each specific hatchery is set forth in the hatchery specific provisions (see Section 2.1.2).  These requirements may be reviewed and revised if new information or changes in applicable law or regulatory requirements indicates such adjustments are necessary.  Scope, mitigation, or production changes will be made through a collaborative process between both parties. Hatchery program changes in the Willamette, including those related to production and mitigation may be vetted through the Willamette Action Team for Ecosystem Restoration (WATER), the regional forum providing recommendations for implementing the Willamette biological opinion (BiOp), or in other venues for changes proposed in the Rogue and Columbia Rivers.  When all efforts to achieve consensus have been made and cannot be achieved, the member or agency with authority will make the final decision and explain the rationale.

ODFW and USACE will meet annually to review and adjust (as appropriate) mitigation production levels. Adjustments will be made in order to:
- Reduce and minimize effects on ESA listed fish;
- Meet mitigation program goals, adjusted to account for given improvements for fish passage at WVP dams, and to comply with ESA.

EXHIBIT 101 TO MCINTOSH DECLARATION
Page 9 of 54

- Support ESA listed fish re-introduction efforts above WVP dams.

Hatchery reform activities will also be implemented in the Columbia and Rogue River basins where appropriate as management needs arise and may entail revision of HGMPs or the implementation of an operations plan.

2.2.3. Schedule for Changes

| | |
|---|---|
| August | The Government and the Recipient discuss changes in scope or production for the subsequent brood year. Changes are vetted the appropriate regional forum, and agreed upon with sufficient time for the Recipient to develop budgets and production plans for the subsequent performance period's task orders. Changes in production will be made prior to the brood year for fish. For example, changes made in August 2012 regarding salmon production will not affect production releases until Spring 2015. |
| October 31st | Final date for proposed changes to scope or production for the subsequent performance period. |
| March 31st | The Recipient's budget and final production plan submitted to the Government along with supplemental information required per Section 4.7.2 of this agreement. |
| June 1st | Task Orders issued for next performance period (1 July through 30 June). |
| September 30th | Final invoices and applicable reports submitted to the Government by the Recipient (90 days after end of performance period). |

2.3. Performance Reports

Recipient shall submit progress reports quarterly to the Government's Agreement administrator. Quarterly reports shall be submitted within 30 days of the end date of the reporting period. A final report shall be submitted to the Government Agreement Administrator within 90 days of the expiration date of the task order.

2.3.1. Quarterly and final reports regarding operation and maintenance of the hatcheries, fish health, and fish liberations within the Hatchery Mitigation Program will follow the outline in Appendix B. Various aspects of the outline will be completed dependent upon hatchery activities that have been accomplished to date.

2.3.2. Quarterly baseline/routine monitoring quarterly reports will contain information as required by 32 C.F.R.§33.40. The Annual Report (which is also the deliverable for this project) will be developed from a modified outline from Peven and Keefe (2011) and will be detailed per task order.

2.4. Modifications

2.4.1. Modifications to this agreement may be proposed by either party, but neither party shall implement a change until the change has been approved by the Government's Grants Officer. Change proposals shall be submitted in writing to either the Government's or the Recipient's Agreement Administrator and shall detail the technical, schedule, and financial impacts of the proposed

**EXHIBIT 101 TO MCINTOSH DECLARATION
Page 10 of 54**

modification. Only the Grants Officer has the authority to act on behalf of the Government to change this agreement.

2.4.2. Revision of budget or program plans: Recipient shall request prior approval for changes in budgets or programs in accordance with 32CFR§33.30.

2.4.3. The Grants Officer may unilaterally issue modifications for minor or administrative matters, such as changes in key personnel, paying office, etc.

2.5. Subawards
2.5.1. The Recipient shall apply to each subaward the administrative requirements of the DoDGARS applicable to the particular type of subrecipient. DoDGARS Part 32 shall be applied to awards to universities or other non-profit organizations, DoDGARS Part 33 shall be applied to awards to State and local Governments, and DoDGARS Part 34 shall be applied to for-profit entities.

2.5.2. Recipients shall assure that contracts awarded under this agreement contain, at a minimum, the provisions in 32 CFR§33.36.

2.6. Procurement
The Recipient's systems for acquiring goods and services under this agreement shall comply with 32 CFR§33.36.

2.7. Program Income
2.7.1. Housing Rental
Income generated by the Recipient from the hatchery housing rental program will be credited to a maintenance account at each respective hatchery. These funds will be utilized specifically for the maintenance of hatchery housing at that facility. Costs for routine maintenance of hatchery housing shall be covered solely by this separate account. Funds budgeted for hatchery operation and maintenance shall not be used for routine maintenance of hatchery housing without prior written approval on the Government. In the event sufficient funds are not available in the separate account for routine maintenance, the Recipient shall request additional funding.

Capital improvements to hatchery housing require prior approval and will be authorized through issuance of a separate task order or modification to an existing task order. Hatchery operation and maintenance funds shall not be used for capital improvements to hatchery housing.

2.7.2. Carcass Sale
Income generated by the Recipient from the sale of Government funded fish will be used to supplement fish transportation efforts (i.e. fish liberations) for Government hatcheries. The sale of these carcasses for these purposes can only be completed after adult outplanting goals are maximized and broodstock needs are met. Both the Government and the Recipient recognize priority of meeting mitigation and ESA-recovery needs prior to the sale of carcasses.

3. **Term**
3.1. Term of Agreement
The term of this cooperative agreement is 1 August 2012 through 30 June 2017 with task orders issued as needed. Task orders will have project and budget periods that are specific to the requirement and available funding.

EXHIBIT 101 TO MCINTOSH DECLARATION
Page 11 of 54

3.2. Unsatisfactory Performance/Non-Compliance with Award Provisions

Failure to perform work in accordance with the terms of the agreement or failure to comply with any or all of the provisions of the agreement may result in designation of the Recipient as high risk and assignment of special award conditions or other actions such as withholding payment, suspension of award, or termination in accordance with 32 CFR §12 and 32 CFR§33.43.

3.3. Termination

3.3.1. The Grants Officer may terminate this agreement in accordance with 32 C.F.R. §§33.43 or 33.44,

3.3.1.1. by written notice to the Recipient upon a finding that the Recipient has failed to comply with the material provisions of this agreement,; or

3.3.1.2. with the consent of the Recipient, in which case the Government and the Recipient shall agree upon the termination conditions, including the effective date and in the case of partial termination, the portion to be terminated.

3.3.2. This agreement may be terminated by either party upon written notice to the other party. Such notice shall be preceded by coordination between the parties. Such notice must be issued at least 30 days prior to the requested effective date. If the Recipient requests to terminate the agreement before work is completed and the Grants Officer determines that the reduced or modified portion of the award will not accomplish the purpose for which the award was made, the Grants Officer may terminate the award in its entirety.

3.3.3. The Government and Recipient will negotiate in good faith an equitable adjustment for work performed toward accomplishment of program goals. The Government will allow full credit to the Recipient for the Government share of the obligations properly incurred by the Recipient prior to termination and those non-cancelable obligations that remain after termination.

3.3.4. If the agreement is incrementally funded, it may be terminated in the absence of additional funding.

3.4. Closeout Procedures

Closeout, subsequent adjustments, continuing responsibilities, and collection of amounts due are subject to requirements in 32 CFR §§33.50-33.52.

4. **Financial Matters**

4.1. Method of Payment

4.1.1. The Government will reimburse Recipient up to the negotiated amount for performance under each cost-reimbursable task order. The Government is not liable for any expenditure in excess of the amount stated in each task order unless the Government has issued a written modification of the task order signed by the Grant's Officer. All obligations are subject to the availability of appropriations from Congress.

4.1.2. Payments will be on a reimbursable basis for actual costs incurred in accordance with the Prompt Payment Act. Recipient shall submit an SF-270 Request for Advance or Reimbursement to the Government's Agreement Administrator (see paragraph 1.2.1) no more frequently than monthly. The SF-270 shall contain a list of all invoices included in the request. The Government may request a copy of one of more invoices listed on the SF-270. Payments will be made in accordance with 32 CFR§33.21.

4.2. Cost Principles

EXHIBIT 101 TO MCINTOSH DECLARATION
Page 12 of 54

Cost principles for this agreement are governed by 2 CFR Part 225 (OMB Circular A-87).

4.3.  Standards for Financial Management Systems
The Recipient shall establish or use existing financial systems that comply with Generally Accepted Accounting Principles and with 32 CFR§33.20.

4.4.  Audit
4.4.1.  Organization-wide or program-specific audits shall be performed in accordance with the Single Audit Act Amendments of 1996, as implemented by OMB Circular A-133, "Audits of States, Local Governments, and Non-Profit Organizations." Recipients that are subject to the provisions of OMB Circular A-133 and that expend $500,000 or more in a year in Federal awards shall have an audit conducted for that year in accordance with the requirements contained in OMB Circular A-133.

4.4.2.  The Recipient shall provide a copy of the Single Audit Report for the State of Oregon for audits completed for Fiscal Years during the term of this agreement to the Government's Agreement Administrator.

4.5.  Retention and Access to Records
Recipient's financial records, supporting documents, statistical records and all other records pertinent to this agreement shall be retained and access to permitted in accordance with 32 CFR§33.42.

4.6.  Cost Responsibility
4.6.1.  Operation and Maintenance
Cost responsibilities of the Government and the Recipient for the operation and maintenance of hatcheries for the subsequent budget period will be determined based on the planned production of each party. Each party's cost responsibility for covering the costs of their share of production will be determined by dividing that party's production by the total planned production at the hatchery.

Example:
Government Cost Responsibility =

$$\frac{\text{Government Planned Production}}{\text{Government Planned Production} + \text{Recipient Planned Production}}$$

Recipient Cost Responsibility =

$$\frac{\text{Recipient Planned Production}}{\text{Government Planned Production} + \text{Recipient Planned Production}}$$

A separate cost responsibility calculation will be determined using the formula for Bonneville and Cole Rivers Hatcheries. One cost responsibility will be applied using the same formula for all five Willamette Valley Hatcheries (McKenzie, Marion Forks, Leaburg, South Santiam, and Willamette Hatcheries) and excluding trapping facilities.

4.6.2.  The Government and the Recipient agree that it is allowable and reasonable for the Recipient to allocate actual costs associated with operation and maintenance of each hatchery based on the cost responsibility identified in each task order.

4.6.3.  Baseline Monitoring/Fish Marking/ Fish Health

**EXHIBIT 101 TO MCINTOSH DECLARATION
Page 13 of 54**

Separate task order will be issued for baseline hatchery monitoring, fish marking, and fish health. Monitoring, fish marking, and fish health performed as part of the Government's mitigation responsibilities will be 100% funded by the Government.

4.6.4. Nothing in this agreement shall be construed as obligating the Oregon Legislature to make any appropriation of funds.

4.7. Budget

4.7.1. SF-424A Budget Information – Non-construction Programs

The budget periods for this agreement will be annual from 1 July through 30 June to coincide with the State of Oregon fiscal year. Budget periods will be funded through issuance of task orders. The recipient will submit an SF-424A for each hatchery and fish facility, baseline hatchery monitoring, fish marking, fish health, and fish liberations no later than 31 March for each prospective year, except for the first year, where budgets will be submitted after establishment of the cooperative agreement.

4.7.2. Supplemental Information

In addition to the SF-424A the Recipient will submit:

4.7.2.1. A Project Description which will be either:

4.7.2.1.1. An operation and maintenance plan outlining planned operation and maintenance activities for the upcoming year including planned fish production. The level of production will be expressed in poundage and/or by quantity of fish, by species, and release size with the Government's mitigation production identified. Operation and maintenance plan will also include estimated fish feed usage (pounds of fish feed and type of fish feed). Both poundage and fish per pound for release should be presented in production plans and final reports for each task order.

4.7.2.1.2. A detailed project description of activities for baseline hatchery monitoring to be performed during the upcoming year.

4.7.2.2. An itemized list of planned equipment purchases for the subsequent budget period. Per 2 CFR 225 equipment means an article of nonexpendable, tangible personal property having a useful life of more than one year and an acquisition cost which equals or exceeds the lesser of the capitalization level established by the governmental unit for financial statement purposes, or $5,000.

4.7.2.3. A five-year budget summary with estimated annual costs for the hatchery program. The budget must present estimated costs separately for operation and maintenance of each hatchery, adult trapping facility, fish health, fish marking/ID, fish liberations, and baseline hatchery monitoring.

4.7.2.4. A rehabilitation and renovation plan. Estimated costs for capital improvements for hatchery housing and hatchery facilities must be included in the plan. See Section 5.6.2.2 for information regarding prior approval for capital expenditures.

4.8. Financial Reporting

4.8.1. The Recipient shall submit an SF-425 Federal Financial Report for each task order issued under this agreement on a quarterly basis. Reports are due no later than 30 days following the end of each

EXHIBIT 101 TO MCINTOSH DECLARATION
Page 14 of 54

reporting period. A final SF-425 shall be submitted within 90 days after the expiration date of each task order.

4.8.2. Program income shall be reported on the SF-425 utilizing the additive method in accordance with 32 CFR §33.25(g)(2).

4.8.3. Financial reports shall be submitted to the Government's Agreement Administrator.

**5. Property Management**

The Recipient's property management system shall comply with 32 CFR §§33.31 – 33.34.

5.1. Real Property

Title for real property acquired under the cooperative agreement shall vest in the recipient. In accordance with 32 CFR §33.31, real property shall be used for the originally authorized purpose for as long as it is needed. When real property is no longer needed for the originally authorized purpose, the recipient shall request disposition instructions from the Government.

5.2. Equipment

Equipment purchased under the cooperative agreement shall vest with the recipient, and its use, management, and disposition shall be in accordance with 32 CFR §33.32.

5.3. Supplies and Other Expendable Property

Title to supplies and other expendable property shall vest in the recipient. Disposition of supplies in excess of $5000 shall be in accordance with 32 CFR §33.33.

5.4. Intangible Property / Copyrights

The Federal awarding agency reserves a royalty-free, nonexclusive, and irrevocable license to reproduce, publish, or otherwise use, and to authorize others to use copyrighted work, for Federal Government purposes in accordance with 32 CFR §33.34.

5.5. Government Furnished Property

Title to federally owned property remains vested in the Federal Government and its use, management, and disposition shall be in accordance with 32 CFR §33.32(f) . Federally furnished equipment is not-in-kind assistance.

5.6. Reporting Requirements

The following forms shall be utilized to meet DoDGARs reporting requirements.

5.6.1. SF-428 Tangible Personal Property Report

5.6.1.1. SF-428A – Annual Report (reporting Federally-owned property)

The Recipient shall submit an SF-428 Cover Page and Attachment A annually for all Federally-owned personal property. The Recipient shall indicate in Block 8 of the SF-428 Cover Page if no Federally-owned property is currently in their custody.

5.6.1.2. SF-428 B – Final Report

The Recipient shall submit an SF-428 Cover Page and Attachment B within 90 days of expiration of the cooperative agreement.

5.6.1.3. SF-428 C – Disposition Request

The Recipient shall submit an SF-428 Cover Page and Attachment C as needed for disposition instructions.

**EXHIBIT 101 TO MCINTOSH DECLARATION**
**Page 15 of 54**

5.6.2. SF-RPSR Real Property Status Report
    5.6.2.1. RPSP Attachment A – General Reporting
        The Recipient shall submit an SF-RPSR Cover Page and Attachment A annually for each task order. The due date of the annual report will be within 90 days of expiration of the task order to coincide with the due date of the SF-428 annual report.

    5.6.2.2. RPSR Attachment B – Request to Acquire, Improve or Furnish
        The Recipient shall submit an SF-RPSR Cover Page and Attachment B as needed to request instructions for acquisition or improvement of real property.

    5.6.2.3. RPSR Attachment C – Disposition Request
        The Recipient shall submit an SF-RPSR Cover Page and Attachment C as needed for disposition instructions.

    5.6.2.4. Inventory of "high risk" supplies
        The Recipient shall annually report all supplies from their list of "high risk assets" that were purchased during the budget period.

6. **Claims, Disputes, and Appeals**
    6.1. General
        Parties shall communicate with one another in good faith and in a timely and cooperative manner when raising issues under this article. Department of Defense policy is to resolve issues through discussions and mutual agreement at the Grants Officer's level, either through unassisted negotiations or through a mutually agreeable means of Alternative Dispute Resolutions.

    6.2. Claims Resolution Process
        When a claim cannot be resolved by the parties under the process identified in 6.1, the parties agree to use the procedures identified in DoDGARS 22.815 as the administrative process to resolve claims, disputes and appeals. Under DoDGARS 22.815, a recipient the claim must: (1) be submitted in writing; (2) specifying the nature and basis for the relief requested; and (3) include all data that supports the claim. Claims by a DoD component shall be the subject of a written decision by a Grants Officer. Within 60 calendar days of receipt of a written claim, the Grants Officer shall either 1) prepare a written decision or 2) notify the Recipient of a specific date when he or she will render a written decision if more time is required to do so. The decision of the Grants Officer is final. The recipient has the right to appeal the decision to the Grant Appeal Authority within 90 days of receiving the decision. Particulars concerning the appeal process are specified in DoDGARS 22.815(e).

    6.3. Non-exclusivity Remedies
        Nothing in this section is intended to limit the recipient's right to any remedy under the law.

7. **Compliance with Laws**
    7.1. Applicable Federal Laws
        By signing or accepting funds under this agreement, Recipient agrees that it will comply with all applicable federal, state and local laws, codes, regulations, rules and orders.

    7.2. Statutory Authority
        The US Army Corps of Engineers, Portland District hatchery mitigation program was authorized by House Document 531, 81st Congress, 2nd Session. Subsequent federal legislation directs and authorizes the Government to operate and maintain the hatcheries in compliance with federal laws for the protection and

**EXHIBIT 101 TO MCINTOSH DECLARATION**
**Page 16 of 54**

enhancement of fish and wildlife, water quality, the human environment, and other federally authorized purposes.  See Attachment C for a summary of legal requirements applicable to the program.

7.3.  Certification Regarding Lobbying
By signing or accepting funds under this agreement, the recipient is providing the certification at Appendix A to 32 CFR Part 28 regarding lobbying.

7.4.  National Policy Matters and Assurances
By signing or accepting funds under this agreement, the recipient assures that it will comply with the applicable provisions of the following national policies on (DoDGARS Part 22 Appendix B):
7.4.1. Nondiscrimination
7.4.2. Live Organisms
7.4.3. Debarment and Suspension
7.4.4. Hatch Act
7.4.5. Environmental Standards
7.4.6. Drug-Free Workplace
7.4.7. National Preservation
7.4.8. Officials Not to Benefit
7.4.9. Relocation and Real Property Acquisition

8.  **Indemnification**
To the extent permitted by the Oregon Tort Claims Act (ORS 30.260-300), Recipient shall indemnify the Government against any liability for damage to life or property arising from the actions or omissions of Recipient's employees, contractors, or agents.  Such protection from damages may be provided by commercial insurance or self-insurance.  The Government shall be liable for its actions and omissions in accordance with the Federal Tort Claims Act, as applicable, and other applicable Federal law.

**EXHIBIT 101 TO MCINTOSH DECLARATION**
**Page 17 of 54**

## APPENDIX A

Summary of lands occupied by hatcheries within the USA Army Corps of Engineers, Portland District Hatchery Mitigation Program.

1. **Bonneville**
   All lands occupied by Bonneville Fish Hatchery are owned by USACE.

2. **Cole M. Rivers Fish Hatchery**
   All lands occupied by Cole M. Rivers Fish Hatchery are owned by USACE.

3. **Leaburg Hatchery**
   All lands occupied by Leaburg Fish Hatchery are owned by USACE.

4. **Marion Forks Hatchery**
   Total Acreage of the Project:
   40.00 acres    U.S. Forest Service M/U (Marion Forks Hatchery)
   21.32 acres    Fee (Minto Egg Collection Station)

   Memorandum of Understanding Supplemental No. 1 dated 17 February 1949 between the Forest Service, Department of Agriculture and the Army Corps of Engineers, Department of Army, grants the Army Corps of Engineers use of said 40.0 acre parcel for construction, operation and maintenance of a fish hatchery for the above mitigation.

   An agreement exists which provides a private citizen with water for their domestic use. The agreement is based upon a special use permit between the private citizen and the Forest Service covering a right of way for a water pipeline.

5. **McKenzie River Hatchery**
   All lands occupied by McKenzie River Hatchery are owned by USACE.

6. **South Santiam Hatchery**
   All lands occupied by the South Santiam Fish Hatchery are owned by USACE. All facilities constructed on said lands are the property of the State. Any additional facilities which are constructed in the future by the State within the confines of the Bypass Road, County Road No. 908, the Northside Road, the east bank of the Diversion Channel and the South Santiam River shall be the property of the State and permitted to remain thereon as long as the area is used for hatchery purposes and does not interfere with the ability to produce USACE mitigation requirements.

7. **Willamette Hatchery**
   Memorandum of Understanding dated 1 May 1950 between the Forest Service, Department of Agriculture and the Army Corps of Engineers, Department of Army, grants the USACE use of the identified parcel for construction, operation and maintenance of a fish hatchery for the above mitigation. All lands occupied by the Dexter Egg Collection Station are owned by USACE.

**EXHIBIT 101 TO MCINTOSH DECLARATION**
**Page 18 of 54**

APPENDIX B

Performance Progress Report Outline:

I.   Table of Contents

II.  Introduction

III. Goals

IV.  Objectives

V.   Hatchery Operations
    A.  Fish Stock(s)
        1.  Adult Collection and Disposition Table
            a.  Collection
            b.  Spawning
            c.  Disposition

        2.  Rearing Table
            a.  Egg Take
            b.  Incubation Data
            c.  Ponding
            d.  Mortality
            e.  Transfers and Liberations
            f.  Feed and Conversion

VI.  Appendices
    A.  Transfers and Liberations
    B.  Feed Usage
    C.  Chemical Usage
    D.  Production Flow Charts

EXHIBIT 101 TO MCINTOSH DECLARATION
Page 19 of 54

# APPENDIX C

LEGAL MEMORANDUM RE: PORTLAND DISTRICT FISH AUTHORITIES

INTRODUCTION:

PURPOSE: Portland District Corps of Engineers (CENWP) is unique among the Corps districts in the volume and diversity of fish programs both authorized and required by its civil works programs and projects.

Because the applicable statutory and case law keeps changing, it is critical to provide legal clients of Portland District Office of Counsel with an updated summary of the legal requirements applicable to the CENWP fish programs.

BACKGROUND DATA:

GEOGRAPHICAL:

The 9th Circuit Court of Appeals in San Francisco covers the States of California, Oregon, Washington, Alaska, Hawaii, Idaho, Montana, Nevada, and Arizona. The 10th Circuit Court of Appeals in Denver covers the remaining western states of Colorado, Wyoming, Utah, and New Mexico. The 8th Circuit Court of Appeals in St. Paul, Minnesota, covers the Missouri River states of North and South Dakota, Nebraska, and Kansas.

These same states are within the Corps Northwestern Division (Oregon, Washington, Idaho, Montana, North and South Dakota, Nebraska, and Kansas – plus the parts of Wyoming and Nevada within the Columbia River and Missouri River basins), the South Pacific Division (California, Arizona, New Mexico, Nevada, and Utah – Pacific coastal rivers whose mouths are south of the Oregon-California border and the Colorado River Basin – and New Mexico's part of the Rio Grande River basin), and the Pacific Ocean Division (Alaska and Hawaii).

The dominant boundaries, however, for Corps civil works operations are the river boundaries: Columbia and Missouri River Basins in Northwestern Division; and Colorado River Basin and the upper Rio Grande River Basin in South Pacific Division.

History and geography have determined the principal characteristics of each river basin in terms of Corps missions:

(1) Columbia River: navigation, flood control, hydropower, fish passage & protection, irrigation, water supply, recreation, and environmental protection;
(2) Missouri River: navigation (lower river only), flood control, hydropower, irrigation, water supply, recreation, and environmental protection;

1

EXHIBIT 101 TO MCINTOSH DECLARATION
Page 20 of 54

(3) Colorado River: flood control, very little navigation , irrigation, water supply, recreation, and environmental protection – the hydropower management of the Colorado River has been entrusted to the Bureau of Reclamation (BOR) and others under FERC hydropower licenses and

(4) Sacramento (and San Joaquin) Rivers: flood control, navigation to Stockton and Sacramento, irrigation, water supply, recreation, and environmental protection – with all hydropower in the hands of others (BOR, State of California, and other FERC hydropower licenses).

ANADRAMOUS FISH

On the Pacific Coast of the United States, there are several species of fish that are "anadromous" – not only migrating long distances, but splitting their life cycles between salt ocean waters of the Pacific Ocean and the fresh water streams of rivers flowing into the Pacific Ocean.

Currently, both anadromous salmon and steelhead in the western United States are listed under the Endangered Species Act (ESA) as threatened or endangered. In addition Pacific Lamprey are also attracting ESA attention.

To further confuse matters, both a residential rainbow trout and anadromous steelhead are the same species (*Oncorhynchus mykiss*).

MAJOR ON-GOING ESA FISH LITIGATION "CLUSTERS"

The impact of the ESA on the management of the Nation's fish resources has spawned clusters of ESA litigation:

(1) Pacific Ocean – in which the federal ocean management conferences chaired by the National Marine Fisheries Service (NMFS) of the Dept. of Commerce have the federal lead;

(2) Puget Sound, Washington – jointly managed by federal agencies and the State of Washington;

(3) Columbia River, Oregon, Washington, Idaho, and Montana – jointly managed by federal agencies and the Pacific Northwest Power Planning Council – a federal statutory interstate compact of the listed 4 states; also known as the FCRPS litigation (Federal Columbia River Power System);

(4) Klamath River Basin, California and Oregon – jointly managed by federal agencies and interstate compacts between Oregon and California;

(5) Sacramento River, California (including San Joaquin River tributaries) – jointly managed by federal agencies and the State of California; also known as the Delta litigation for the focus on the impacts of federal operations on the lower Sacramento River delta.

Since all of these basins have anadromous fish, share the same 9th Circuit Court of Appeals jurisdiction, and share the same collection of federal agency managers, the case law decisions dealing with these

2

EXHIBIT 101 TO MCINTOSH DECLARATION
Page 21 of 54

anadromous fisheries are generally followed by the federal judges in the district courts within California, Oregon, and Washington.

1855 FISH TREATIES WITH NATIVE AMERICAN TRIBES

In addition, about 25 tribes of the Puget Sound area and the Columbia River share special legal rights under a generic form of separate 1855 treaties negotiated with these tribes when Washington's first territorial governor sought to restrict the tribes to federal reservations in lieu of their much larger territorial land holdings  blanketing Washington Territory and parts of nearby Oregon and Idaho. Because the State of Washington has contested these tribal off-reservation fishing rights extensively, there are a total of 7 US Supreme Court decisions on these treaties, the last being rendered in 1979 in *Washington v. Washington State Commercial Passenger Fishing Vessel Assn*. (*Fishing Vessel Assn.*), 443 US 658 (1979).[1]  There is extensive and long-lived associated litigation in the federal courts in Portland and Seattle covering the Columbia River (*US v. Oregon*) and Puget Sound waters (multiple separate cases with different tribes).  On the Columbia River, the 4 treaty tribes (Yakama Nation, Confederated Tribes of the Umatilla Indian Reservation (CTUIR), Confederated Tribes of the Warm Springs Reservation (CTWSR), and the Nez Perce Tribe of McCall, Idaho) have formed a joint entity to represent their interests, the Columbia River Inter-Tribal Fish Council (CRITFC), which plays a huge role in federal and state fish management operations on the Columbia River.

ESA (PARTICULARLY SECTION 7, 16 USC 1536)

One of the latest 9th Circuit ESA cases dealing with hatcheries is:

## WILD FISH CONSERVANCY v. SALAZAR, 628 F 3d 513 (9th Cir. 2010):

 Section 7(a)(2) of the ESA requires federal agencies to consult with either the Fish and Wildlife Service or the National Marine Fisheries Service to "insure that any action authorized, funded, or carried out by [the] agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species." 16 U.S.C. § 1536(a)(2). The duty to consult applies to "ongoing agency action[s]," Pac. Rivers Council v. Thomas, 30 F.3d 1050, 1053 (9th Cir.1994), as well as future actions. An "ongoing agency action" exists if the action "comes within the agency's decisionmaking authority and remains so." W. Watersheds Project v. Matejko, 468 F.3d 1099, 1109 (9th Cir.2006) (internal quotation omitted).

 Formal section 7 consultation begins when the "action agency" (here, the Service in its capacity as the operator of the Hatchery) transmits a written request to the "consulting agency" (here, the Service in its consulting capacity). See 50 C.F.R. § 402.14(c); Salmon Spawning & Recovery Alliance v. Gutierrez, 545 F.3d 1220, 1223 (9th Cir.2008). The consulting agency then issues a biological opinion evaluating the "current status of the listed species" and the "effects of the action and cumulative effects on the listed species," and offering a conclusion "as to whether the

---

[1] In 1979 the Supreme Court handed down its decision in Washington v. Washington State Commercial Passenger Fishing Vessel Assn. (Fishing Vessel Assn.), 443 US 658 (1979). This decision modified  earlier treaty decisions, which affirmed the right to fish at customary locations, to also add a treaty right to a 50% share of the harvest at the usual and customary fishing locations due to the massive decreases of fish since the 1855 treaties were signed.

3

EXHIBIT 101 TO MCINTOSH DECLARATION
Page 22 of 54

action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species." 50 C.F.R. § 402.14(g). To "jeopardize the continued existence" of a species is to "engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." Id. § 402.02. "[T]he jeopardy regulation requires [the Service] to consider both recovery and survival impacts." Nat'l Wildlife Fed'n, 524 F.3d at 931.

Aside from making a jeopardy determination, the consulting agency must also consider whether the action will implicate another ESA provision, the general prohibition on "tak[ing]" of endangered species. ESA § 9, 16 U.S.C. § 1538. The ESA defines "take" as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). As authorized by ESA section 4(d), 16 U.S.C. § 1533(d), the Service has issued regulations extending the take prohibition to threatened species, with certain exceptions.

[628 F.3d 519]

See 50 C.F.R. § 17.31. The take prohibition applies generally to bull trout in Washington, although fishing activities authorized under state, federal, or tribal laws and regulations are exempted. See id. § 17.44(w).[2] [There is no similar USFWS special rule for other ESA listed fish of interest to the CRITFC treaty tribes.]

If the consulting agency concludes that an action is likely to jeopardize a listed species, it must recommend any "reasonable and prudent alternatives" that will avoid jeopardy. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(3). Also, if the consulting agency concludes that the action will not jeopardize the continued existence of a listed species but is likely to result in incidental takings, then it must issue an "incidental take statement" with the biological opinion. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i). An incidental take statement exempts a specified number of incidental takings from the take prohibition of section 9.

Given this statutory structure, once the bull trout was listed as threatened, the Hatchery was obligated to consult with the Service to ensure that its operations were not jeopardizing the continued existence of the species, and also for authorization of any incidental takings. See Pac. Rivers Council, 30 F.3d at 1053. In its request for

---

2
(w) What species are covered by this special rule? Bull trout ( Salvelinus confluentus ), wherever found in the coterminous lower 48 States, except in the Jarbidge River Basin in Nevada and Idaho (see 50 CFR 17.44(x)).

(1) What activities do we prohibit? Except as noted in paragraph (w)(2) of this section, all prohibitions of 50 CFR 17.31 and exemptions of 50 CFR 17.32 shall apply to the bull trout in the coterminous United States as defined in paragraph (w) of this section.

(i) No person may possess, sell, deliver, carry, transport, ship, import, or export, by any means whatsoever, any such species taken in violation of this section or in violation of applicable State, National Park Service, and Native American Tribal fish and conservation laws and regulations.

(ii) It is unlawful for any person to attempt to commit, solicit another to commit, or cause to be committed, any offense listed in this special rule.

(2) What activities do we allow? In the following instances you may take this species in accordance with applicable State, National Park Service, and Native American Tribal fish and wildlife conservation laws and regulations, as constituted in all respects relevant to protection of bull trout in effect on November 1, 1999:

(i) Educational purposes, scientific purposes, the enhancement of propagation or survival of the species, zoological exhibition, and other conservation purposes consistent with the Act; or

(ii) Fishing activities authorized under State, National Park Service, or Native American Tribal laws and regulations;

(3) How does this rule relate to State protective regulations? Any violation of applicable State, National Park Service, or Native American Tribal fish and wildlife conservation laws or regulations with respect to the taking of this species is also a violation of the Endangered Species Act.

EXHIBIT 101 TO MCINTOSH DECLARATION
Page 23 of 54

consultation, the Hatchery defined the agency action as the operation and maintenance of the Hatchery from 2006 through 2011. According to the 2008 BiOp, the Hatchery selected a five-year period because it planned two modifications to Hatchery operations during and soon after that period that would require it to reinitiate formal consultation: (1) replacement of the water intake system, expected to be completed by 2010, and (2) the habitat restoration project, projected to begin in 2013.[2]

As to the Service's scheme for evaluating the impact of an action on the survival and recovery of the bull trout, the Service recognizes five bull trout population segments, which it terms "interim recovery units." Each unit contains several local populations, grouped into geographic "core areas." The Icicle Creek bull trout population is one of seven local populations in the Wenatchee River core area. This core area, in turn, is part of the Columbia River interim recovery unit, which contains about 90 core areas and 500 local populations, making it the largest by far of the five recovery units. The Service conducts its jeopardy determinations for the bull trout at the interim recovery unit level. See Determination of Threatened Status for Bull Trout, 64 Fed.Reg. at 58,930.

One of the major problems in this case was the limited scope of the relevant biological opinions ("biops"):

We consider first whether the Service permissibly defined the scope of the action as the operations and management of the Hatchery for a period of five years. The Conservancy objects to framing the operation of an ongoing project as a short-term action, arguing that the Service's choice of the action's scope allowed it to avoid considering whether the operations of the Hatchery would lead to the extirpation of the Icicle Creek bull trout population at some point beyond the five-year period, as well as whether that loss, if it occurred, would compromise the interim recovery unit. The Service maintains that its choice of the five-year term was not arbitrary and capricious because, as the 2008 BiOp states, the Hatchery anticipated that the replacement of its water intake system in 2010 (now delayed, as we have noted) would require it to reinitiate section 7 consultation.[5]

Evaluating the scope of an agency action can be significant in determining the adequacy of a biological opinion. "[T]he scope of the agency action is crucial because the ESA requires the biological opinion to analyze the effect of the entire agency action." Conner v. Burford, 848 F.2d 1441, 1453 (9th Cir.1988). We "interpret the term 'agency action' broadly," because "caution can only be exercised if the agency takes a look at all the possible ramifications of the agency action." Id. (internal quotation marks and alterations omitted).

Conner rejected biological opinions addressing only the first, preliminary stage in a multistage project. The case involved the federal government's issuance of more

[628 F.3d 522]

than 700 leases for oil and gas exploration in two national forests. Before the leases were issued, the Service prepared a biological opinion for each forest. Concluding that there was "insufficient information available to render a comprehensive biological opinion beyond the initial lease phase," id. at 1452, the Service considered the effects only of the leases themselves, not of the oil and gas activity to follow on the leased land. Id. at 1453. Instead of comprehensive biological opinions at the leasing stage, the Service included in the leases stipulations requiring additional environmental consultation prior to any "surface-disturbing activities." Id. at 1455.

We held that the limited scope of the biological opinions violated the ESA. The Service's obligation, we said, was "to analyze the effect of the entire agency action." Id. at 1453. Because "[p]umping oil and not leasing tracts is the aim of congressional mineral leasing policy," the agency action necessarily encompassed "not only leasing but leasing and all post-leasing activities through production and abandonment." Id. (internal quotation marks and alterations omitted). The Service's proposal to conduct "incremental-step consultation" was an inadequate alternative. That approach might result, for example, in the "piecemeal chipping away of habitat" for endangered species. Id. at 1454. The Service was thus "required to prepare, at the leasing stage, a comprehensive biological

5

EXHIBIT 101 TO MCINTOSH DECLARATION
Page 24 of 54

opinion" considering "all phases of the agency action." Id. Because it had not done so, the biological opinions were invalid.

The Service contends that Conner is inapposite because the five-year term of operations and management is the entire agency action.[6] What the Service's argument does not acknowledge is that the Hatchery has been operating for seventy years and is expected to continue operating into the future. The Hatchery simply made a decision, endorsed by the Service, to define the action as a five-year term of operations, when it might as easily have chosen a thirty-year term or a one-year term.

The delineation of the scope of an action can have a determinative effect on the ability of a biological opinion fully to describe the impact of the action on the viability of the threatened species, here the bull trout. For example, limiting the analysis of the Hatchery's impact on the bull trout to a one-month term of operations would almost certainly be arbitrary and capricious. The time period under study would likely be too short to capture any effects on the bull trout, even though, as the 2008 BiOp under review recognizes, the Hatchery will have a negative impact over a five-year period.

The Hatchery must ensure that it does not "engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery" of the bull trout in the Columbia River interim recovery unit. 50 C.F.R. § 402.02. The artificial division of a continuing operation into short terms can undermine the consulting agency's ability to determine accurately the species' likelihood of survival and recovery, as the example just given illustrates.

This problem is exacerbated by the fact that the ESA regulation requires consideration of whether the action will "reduce appreciably the likelihood of both the survival

[628 F.3d 523]

and recovery" of the affected species. Id. (emphasis added). There could be some impact, but not an appreciable impact, in each of several subdivided periods of operation that, in cumulation, have an undeniably appreciable impact. For instance, if the Service were to analyze ongoing Hatchery operations as a series of ten five-year actions, it might find a likely net decrease of five to ten bull trout over each five-year period, and might conclude that an incremental reduction in the local population of that magnitude would not appreciably reduce the likelihood of survival and recovery of the interim recovery unit. But if instead the Service were to consider the entire reduction in the local population over fifty years, it might then find an appreciable impact on the interim recovery unit.[7]

One reason for the potential discrepancy in outcomes depending on the temporal scope of the analysis is that, in conducting its jeopardy analysis, the Service considers the effects of the action "that will be added to the environmental baseline." Id. The baseline includes "the past and present impacts of all Federal, State, or private actions and other human activities in the action area." Id. Thus, if the Service conducts a series of short-term analyses, the baseline effectively resets at the beginning of each period. While the Service must consider the baseline in its analysis, "[a]gency action can only 'jeopardize' a species' existence if that agency action causes some deterioration in the species' preaction condition." Nat'l Wildlife Fed'n, 524 F.3d at 930. In other words, "an agency only 'jeopardize[s]' a species if it causes some new jeopardy." Id.

To illustrate the problem: If the Service were to project that Hatchery operations over a fifty-year term would result in the extirpation of the Icicle Creek bull trout population, the loss of that local population, depending on the role it played in the larger interim recovery unit, might be significant enough to "reduce appreciably the likelihood of both the survival and recovery" of the interim recovery unit. A series of short-term analyses, on the other hand, could mask the long-term impact of Hatchery operations. If the Service were to determine in year 45, for example, that Hatchery operations over the next five years would eradicate the local bull trout population, the local population in year 45—the baseline year—might already have become so small, and its role in the interim recovery

6

EXHIBIT 101 TO MCINTOSH DECLARATION
Page 25 of 54

unit therefore so diminished, that its loss could not be said to reduce appreciably the likelihood of survival and recovery of the interim recovery unit.

As we observed in other circumstances in National Wildlife Federation, "[u]nder this approach, a listed species could be gradually destroyed, so long as each step on the path to destruction is sufficiently modest. This type of slow slide into oblivion is one of the very ills the ESA seeks to prevent." Id.; see also Am. Rivers v. U.S. Army Corps of Eng'rs, 271 F.Supp.2d 230, 255 (D.D.C.2003) ("If FWS were allowed to apply such a limited scope of consultation"—in that case, one year—"to all agency activities, any course of agency action could ultimately be divided into multiple small actions, none of which, in and of themselves, would cause jeopardy.").[8] Although

[628 F.3d 524]

it is not for us to dictate precisely how long the term of the analysis should be in this case, it must be long enough for the Service to make a meaningful determination as to whether the ongoing operation of the Hatchery "reasonably would be expected ... to reduce appreciably the likelihood of both the survival and recovery" of the Columbia River interim recovery unit. 50 C.F.R. § 402.02 (emphasis added). Particularly given the long life of this facility and the absence of any indication that the Hatchery might close down altogether in the foreseeable future, five years is not sufficient.

The Service maintains that the choice of a five-year term of operations was justified in this case because the Hatchery plans to reinitiate Section 7 consultation after replacing its water intake system sometime in the near future. But the 2008 BiOp does not explain why the Hatchery's proposed infrastructure improvement project should relieve the Service of the obligation to prepare a "comprehensive biological opinion[ ] considering all stages of the agency action." Conner, 848 F.2d at 1454. The 2008 BiOp estimates that the current water intake system, which is poorly screened, is likely to kill one bull trout per year and injure another. See 2008 BiOp at 92. Additionally, the intake dam—along with the boulder field—is one of two barriers encountered by bull trout who successfully pass upstream of dams 2 and 5. Thus, the water intake system has a comparatively minor effect on bull trout. The far greater threat is the closure of dams 2 and 5, which is expected to injure as many as twenty migratory bull trout per year by "significantly disrupting their breeding behavior," in turn preventing an indeterminate number of births. 2008 BiOp at 92; see also id. at 67-68. Although the 2008 BiOp asserts that the new water intake system "will result in major changes to [operations and maintenance]," id. at 14, it makes no suggestion as to what those changes will entail, including whether there will be any effects on fish passage.[9]

Additionally, although the Service suggests that including the effects of the new water intake system in the 2008 BiOp would have been entirely speculative because there was no "concrete proposal" to consider, that suggestion is not accurate. On the contrary, the 2008 BiOp states that the Service and the Bureau of Reclamation had already approved a "preferred alternative

[628 F.3d 525]

design for the new water intake system" and set aside funding "for implementation of this alternative." Id. at 14. Thus, the Service had enough information about the proposed new system to include a meaningful analysis of its potential effects, including any anticipated changes in the operation of dams 2 and 5 as a result of the new system, in the 2008 BiOp.  [start here]

Moreover, regardless of any uncertainty regarding the proposed infrastructure improvement, it was incumbent on the Service "to use the best information available to prepare [a] comprehensive biological opinion[ ] considering all stages of the agency action." Conner, 848 F.2d at 1454. We concluded in Conner that "incomplete information about post-leasing activities does not excuse the failure to comply with the statutory requirement of a comprehensive biological opinion using the best information available." Id. (citing 16 U.S.C. § 1536(a)(2)). We held that the Service was required to "develop projections of oil and gas activities which may indicate potential conflicts between development and the preservation of protected species." Id. Likewise, in this case, the Service was

7

EXHIBIT 101 TO MCINTOSH DECLARATION
Page 26 of 54

required to use the best information available, including information about future infrastructure improvements, to consider the effects of the Hatchery's ongoing operations on the bull trout.

The Hatchery and the Service remain under a continuing duty to reinitiate consultation "[i]f new information reveals effects of the action that may affect listed species ... in a manner or to an extent not previously considered," or "[i]f the ... action is subsequently modified in a manner that causes an effect to the listed species ... that was not considered in the biological opinion." 50 C.F.R. § 402.16(b), (c); see Conner, 848 F.2d at 1458 n. 42; see also N. Alaska Envtl. Ctr. v. Kempthorne, 457 F.3d 969, 981 (9th Cir.2006) (upholding a biological opinion relying on a "reasonable and foreseeable oil development scenario" and noting that "[i]f future actions differ from the 2008 BiOp assumptions, BLM must reinitiate consultation with the FWS" (citing 50 C.F.R. § 402.16(b))). The duty to reinitiate consultation in the future, however, does not diminish the Service's obligation to prepare a comprehensive biological opinion now.

To give meaning to the ESA's exhortation that agencies ensure that their actions are "not likely to jeopardize the continued existence of any endangered species or threatened species," 16 U.S.C. § 1536(a)(2), the Service was required to issue a comprehensive biological opinion taking a long view of the Hatchery's effects on the bull trout, or to explain adequately why any such effort would be unproductive in assessing the long-term impact of the Hatchery's operations on the bull trout. Here, the Service did neither. The decision to limit the analysis in the 2008 BiOp to a five-year term of operations and management was therefore arbitrary and capricious.

The relevant issue for management of CENWP hatcheries is that CENWP hatchery programs must operate in a way that does not threaten or endanger listed ESA fish species.

TYPICAL MAJOR IMPACTS OF ESA LITIGATION

ESA routinely significantly impacts federal agencies' normal missions and activities. For the Forest Service and Bureau of Land Management (BLM) in the Pacific Northwest, spotted owl ESA listings have significantly reduced federal timber harvests to about a third of what they were previously, in order to protect spotted owl habitat. For BOR in California, the Delta ESA litigation has had huge impacts on normal water deliveries to California water districts by BOR, as listed ESA fish needs take priority in water allocations.

Similarly, in *Salazar, supra,* the operation of the Leavenworth, Wash. hatchery for production of mitigation Chinook salmon for Grand Coulee Dam has been altered by the courts' injunctions that the hatchery be modified to allow successful passage of migratory bull trout, in order to prevent extinction of this particular biological unit of migratory bull trout.

Even more complex results have been ordered in several recent Delta cases to protect the various ESA listed species there. See *S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.* (E.D. Cal., 2011); *The Consol. Salmonid Cases and Luis & Delta–mendota Water Auth. v. Locke,* 791 F.Supp.2d 802 (E.D. Cal., 2011); *California State Grange v. National Marine Fish.,* 620 F.Supp.2d 1111 (E.D. Cal., 2008); and similar cases since 2008.

HARVEST IS NOT AN ESA GOAL

One of the most significant impacts of ESA on federal fish programs is its priority on CONSERVATION OF WILD SPECIES and its disregard and concern for HATCHERY and HARVEST goals.  Recovery in all ESA fish cases is measured SOLELY upon raising the numbers of listed wild fish runs -- with no priority or concern

EXHIBIT 101 TO MCINTOSH DECLARATION
Page 27 of 54

for lost harvest opportunities.   In fact, harvest of listed ESA species is NOT LEGALLY POSSIBLE WITHOUT AN INCIDENTAL TAKE PERMIT under ESA.

THE RESTRICTED USE OF HATCHERY FISH UNDER ESA

The most significant overall holding of these cases is that wild ESA-listed fish are the fish species to be recovered and protected  under ESA, with hatchery fish tolerated only to protect the wild fish runs from becoming extinct.  What is more remarkable is that this necessary court holding has NOT BEEN CHALLENGED in the Delta cases listed above – and becomes a matter of collateral estoppel in subsequent 9th Circuit anadromous fish litigation against the usual pool of federal fish agencies, including the Corps.

On March 9, 2012, local environmental groups filed *Native Fish Society v. NMFS* in US District Court in Portland against NMFS and Oregon Dept. of Fish and Wildlife (ODFW) for their alleged illegal operations on the Sandy River under the Mitchell Act, 16 USC 755-757, the 1938 Columbia River dams fish mitigation program.  The heart of the case is that NMFS and ODFW have been flooding the Sandy River basin with 1300 hatchery salmon for every single wild ESA-listed salmon.  NMFS, recognizing its liabilities, responded by temporarily and immediately terminating all Mitchell Act funding for the relevant source hatcheries, including the NMFS 55% share of the joint Corps-NMFS Bonneville Hatchery funding, with no advance notice to anyone, including its cost-share partner CENWP.

While this was an extreme measure, it demonstrates the criticality of reviewing and bringing all CENWP hatchery programs into full ESA compliance, including compliance with the several federal court decisions issued since 2008, when the CENWP last updated its biops for its hatchery operations.

FISH PASSAGE PRIORITIES

In addition, both *Salazar, supra,* and the Delta cases all involved court orders to improved fish passage at dams, including Corps dams.

When it comes to achieving fish passage at Corps dams, CENWP has a host of federal law that is applicable:

**1848 OREGON TERRITORY ACT – FISH PASSAGE AUTHORITY:**

Sec. 12 of this Oregon Territory Act of Aug. 14, 1848 provided:

> "That the rivers and streams of water in said Territory of Oregon in which salmon are found, or to which
> they resort, shall not be obstructed by dams or otherwise, unless such dams or obstructions are so
> constructed as to allow salmon to pass freely up and down such rivers and streams."

**1888 RIVER AND HARBOR ACT – FISH PASSAGE AUTHORITY:**

**33 USC § 608 Construction of fishways**
    SUBCHAPTER IV - PARTICULAR WORK OR IMPROVEMENTS

EXHIBIT 101 TO MCINTOSH DECLARATION
Page 28 of 54

Whenever river and harbor improvements shall be found to operate (whether by lock and dam or otherwise), as obstructions to the passage of fish, the Secretary of the Army may, in his discretion, direct and cause to be constructed practical and sufficient fishways, to be paid for out of the general appropriations for the streams on which such fishways may be constructed.

(Aug. 11, 1888, ch. 860, Sec. 11, 25 Stat. 425; July 26, 1947, ch. 343, title II, Sec. 205(a), 61 Stat. 501.)

## FLOOD CONTROL ACT OF MAY 17, 1950 AND ITS COMPANION HOUSE DOCUMENT 531 OF 1949

House Document 531, authorized by the Flood Control Act of 1950, is the Columbia River Basin's 8-volume encyclopedic civil works and related agencies authorizations for dams and related works, including fish passage and fish hatcheries. It was drafted jointly by Portland and Seattle Districts, along with input from more than a dozen other federal and state entities, to serve as the master Columbia River Basin plan for the Corps, BOR, and other federal agencies, as well as Canadian partners. House Document 531 discussed fish passage and fish mitigation , including hatcheries, in many places. The following quotations highlight its conclusions and recommendations that Congress adopted and authorized.

Para. 531 (p. 1824 of H. Doc. 531) at p. 35 Part 3 also states that

"531. At the present time, successful means or devices for passing migratory fish over high dams have not been devised, and the artificial propagation of spring Chinook salmon and steelhead trout has not accomplished the desired results. The proposed reservoirs, drainage projects, and other improvements would have both adverse and beneficial effects on the wildlife of the area. Apparently a need exists for the development, by means of research and experimentation, of facilities for passing anadromous fish over high dams, new hatchery techniques and methods of hatchery operations, and ways and means to mitigate the losses that might be incurred by fish and wildlife resulting from the proposed plan of development. Such a program should be effected by cooperative efforts of Federal, State, and local agencies and is proposed as a future project for additional study and investigation." (p. 1824)

From these paragraphs, it is clear that Congress was advised to and did authorize continued study, research and development (R&D) of solutions to the challenge of successful fish passage over the high-head dams of the Willamette Valley Project. The history of the Willamette Valley Project shows numerous such attempts over many years – attempts that never succeeded in better than 75% passage and often well under 50% passage. However, the authority to continue study and R&D efforts to solve successful fish passage at the Willamette Valley Project dams remains as part of the authorized activities of the project.

## THE 1976 MAGNUSSON-STEVENS ACT (MSA), 16 USC 1801 ff.

This act directed among many other things the protection of "essential fish habitat." 16 USC 1855(b) of this act has been amended to create and place significant restrictions on areas designated as "essential fish habitat".

(b) Fish habitat

10

EXHIBIT 101 TO MCINTOSH DECLARATION
Page 29 of 54

(1)(A) The Secretary shall, within 6 months of October 11, 1996, establish by regulation guidelines to assist the Councils in the description and identification of essential fish habitat in fishery management plans (including adverse impacts on such habitat) and in the consideration of actions to ensure the conservation and enhancement of such habitat. The Secretary shall set forth a schedule for the amendment of fishery management plans to include the identification of essential fish habitat and for the review and updating of such identifications based on new scientific evidence or other relevant information.

(B) The Secretary, in consultation with participants in the fishery, shall provide each Council with recommendations and information regarding each fishery under that Council's authority to assist it in the identification of essential fish habitat, the adverse impacts on that habitat, and the actions that should be considered to ensure the conservation and enhancement of that habitat.

(C) The Secretary shall review programs administered by the Department of Commerce and ensure that any relevant programs further the conservation and enhancement of essential fish habitat.

(D) The Secretary shall coordinate with and provide information to other Federal agencies to further the conservation and enhancement of essential fish habitat.

(2) Each Federal agency shall consult with the Secretary with respect to any action authorized, funded, or undertaken, or proposed to be authorized, funded, or undertaken, by such agency that may adversely affect any essential fish habitat identified under this chapter.

(3) Each Council -

(A) may comment on and make recommendations to the Secretary and any Federal or State agency concerning any activity authorized, funded, or undertaken, or proposed to be authorized, funded, or undertaken, by any Federal or State agency that, in the view of the Council, may affect the habitat, including essential fish habitat, of a fishery resource under its authority; and

(B) shall comment on and make recommendations to the Secretary and any Federal or State agency concerning any such activity that, in the view of the Council, is likely to substantially affect the habitat, including essential fish habitat, of an anadromous fishery resource under its authority.

(4)(A) If the Secretary receives information from a Council or Federal or State agency or determines from other sources that an action authorized, funded, or undertaken, or proposed to be authorized, funded, or undertaken, by any State or Federal agency would adversely affect any essential fish habitat identified under this chapter, the Secretary shall recommend to such agency measures that can be taken by such agency to conserve such habitat.

(B) Within 30 days after receiving a recommendation under subparagraph (A), a Federal agency shall provide a detailed response in writing to any Council commenting under paragraph (3) and the Secretary regarding the matter. The response shall include a description of measures proposed by the agency for avoiding, mitigating, or offsetting the impact of the activity on such habitat. In the case of a response that is inconsistent with the recommendations of the Secretary, the Federal agency shall explain its reasons for not following the recommendations.

Due to the impacts of this statute on Corps programs, guidance has been provided concerning the integration of ESA and MSA, and is set forth in a footnote[3].

---

[3] MEMORANDUM RE: ENDANGERED SPECIES ACT (ESA) VERSUS          3 Sep 1999
MAGNUSSON-STEVENS ACT

11

EXHIBIT 101 TO MCINTOSH DECLARATION
Page 30 of 54

1. The Endangered Species Act (ESA) contains its principal federal agency coordination and implementation provisions at 16 USC 1536 ("Section 7"). The Magnusson-Stevens Act (MSA) contains its principal federal agency coordination provisions at 16 USC 1855 ("Section 305").

2. ESA requires that:

   a. "All other Federal agencies shall, in consultation with and with the assistance of the Secretary, utilize their authorities in furtherance of the purposes of this chapter by carrying out programs for the conservation of endangered species and threatened species listed pursuant to section 1533 of this title." (16 USC 1536(a)(1)).

   b. "Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical . . ." (16 USC 1536(a)(2)).

3. MSA provides that:

   a. "The Secretary shall coordinate with and provide information to other Federal agencies to further the conservation and enhancement of essential fish habitat." (16 USC 1855(b)(1)(D)).

   b. "Each Federal agency shall consult with the Secretary with respect to any action authorized, funded, or undertaken, or proposed to be authorized, funded, or undertaken, by such agency that may adversely affect any essential fish habitat identified under this chapter." (16 USC 1855 (b)(2)).

   c. "If the Secretary receives information . . .or determines from other sources that an action authorized, funded, or undertaken, or proposed to be authorized, funded, or undertaken, by any State or Federal agency would adversely affect any essential fish habitat identified under this chapter, the Secretary shall recommend to such agency measures that can be taken by such agency to conserve such habitat." (16 USC 1855 (b)(4)(A))."

   d. "Within 30 days after receiving a recommendation under Subparagraph (A), a Federal agency shall provide a detailed response in writing to any Council commenting under paragraph (3) and the Secretary regarding the matter. The response shall include a description of measures proposed by the agency for avoiding, mitigating, or offsetting the impact of the activity on such habitat. In the case of a response that is inconsistent with the recommendations of the Secretary, the Federal agency shall explain its reasons for not following the recommendations." (16 USC 1855(b)(4)(B)).

4. There are significant differences between the statutes. ESA addresses the existence of a species. MSA only addresses, inside ocean waters, essential habitat for anadromous fish. ESA has been held by the Supreme Court to be a very dominant statute in the case of statutory conflicts. MSA has been held to be subject to other law, *Parravano v. Babbit*, 70 F.3d 539 (9th Cir. 1995)(prior to amendment creating 16 USC 1855 sections listed above) – a case that recognized that ocean catch harvests had to be managed consisted with Indian fishing treaty rights. *United States v. Oregon*, 913 F,2d 576 (9th Cir. 1990) also interpreted MSA to protect Indian fishing treaty rights. ESA is, as regards other federal agencies, a strong, authorizing statute, that allows spending agency funds on ESA

12

EXHIBIT 101 TO MCINTOSH DECLARATION
Page 31 of 54

**THE 1980 PACIFIC NORTHWEST POWER PLANNING ACT, 16 USC 839**

---

needs. MSA, on the other hand, is merely a consulting statute for other federal agencies, and provides no authority to spend money on conservation beyond the required consultation.

5. 50 CFR 600.920 (e) specifies that consulting and commenting under MSA  "should be consolidated, where appropriate, with interagency consultation, coordination, and environmental review procedures required by other statutes such as the National Environmental Policy Act (NEPA), the Fish and Wildlife Coordination Act, Clean Water Act, Endangered Species Act (ESA), and Federal Power Act. The consultation requirements of section 305(b)(2) of the Magnuson-Stevens Act can be satisfied using existing or modified procedures required by other statutes if such processes meet the following criteria:
(i) The existing process must provide NMFS with timely notification of actions that may adversely affect EFH. . . .
(ii) Notification must include an assessment of the impacts of the proposed action on EFH . . .
(iii) NMFS must have made a finding pursuant to paragraph (e)(3) of this section that the existing process satisfies the requirements of section 305(b)(2). . . ."

6. 50 CFR 600.920 (a) also states that consultation under MSA is not required for completed actions.
Dec. 19, 1997 was the date that these MSA regulations were published.

7. While NMFS has created separate definitions for critical habitat under ESA and essential habitat under MSA, the number of anadromous fish listed under both statutes is few, and the discussion of habitat under ESA would normally be sufficient to meet the requirements of MSA. Moreover the fact that ESA and MSA seek to conserve and protect the same anadromous fish (when a species is listed under both statutes) requires that NMFS consolidate its review under each statute as a matter of economy and efficiency of government as well as meeting its duty to give the best protection it can to the listed species. Duplicative or separate procedures for the same species would run the real risk of inconsistent results, something neither ESA nor MSA fosters or supports.

8. With regard to the priorities of other federal agencies,  ESA as an authorizing statute gives other federal agencies a priority that would overrule MSA, only a consulting statute,  if a conflict developed between the two statutes for other federal agencies. With coordinated consultation by NMFS, conflict on the same ESA species should not occur.

9.  As for conflict among species, ESA species always have priority under ESA.  Thus ESA species would have priority over other only-MSA species, if a habitat conflict arose.  In this regard it is noted that many of the potential habitat conflicts involve non-native species [see details of ESA listings on Pacific Northwest fish], often introduced by persons including state and federal  fish managers who did not realize the impacts of introducing non-native species.  The fish agencies, as the federal fish managers, have the responsibilities for correcting the consequences and problems that result from their moving species around.  Federal statutes and regulations on protecting native species from invasive species apply to all federal agencies.

13

EXHIBIT 101 TO MCINTOSH DECLARATION
Page 32 of 54

While Bonneville Power Administration (BPA) is the lead federal agency for the Pacific NW Power Planning Act, the Act's provisions also apply to BOR and the Corps as Columbia River basin hydropower dam operators.

[1]16 USC

(h) Fish and wildlife

(1)(A) The Council shall promptly develop and adopt, pursuant to this subsection, a program to protect, mitigate, and enhance fish and wildlife, including related spawning grounds and habitat, on the Columbia River and its tributaries. Because of the unique history, problems, and opportunities presented by the development and operation of hydroelectric facilities on the Columbia River and its tributaries, the program, to the greatest extent possible, shall be designed to deal with that river and its tributaries as a system.

(B) This subsection shall be applicable solely to fish and wildlife, including related spawning grounds and habitat, located on the Columbia River and its tributaries. Nothing in this subsection shall alter, modify, or affect in any way the laws applicable to rivers or river systems, including electric power facilities related thereto, other than the Columbia River and its tributaries, or affect the rights and obligations of any agency, entity, or person under such laws.

(2) The Council shall request, in writing, promptly after the Council is established under either subsection (a) or (b) of this section and prior to the development or review of the plan, or any major revision thereto, from the Federal, and the region's State, fish and wildlife agencies and from the region's appropriate Indian tribes, recommendations for -

(A) measures which can be expected to be implemented by the Administrator, using authorities under this chapter and other laws, and other Federal agencies to protect, mitigate, and enhance fish and wildlife, including related spawning grounds and habitat, affected by the development and operation of any hydroelectric project on the Columbia River and its tributaries;

(B) establishing objectives for the development and operation of such projects on the Columbia River and its tributaries in a manner designed to protect, mitigate, and enhance fish and wildlife; and

(C) fish and wildlife management coordination and research and development (including funding) which, among other things, will assist protection, mitigation, and enhancement of anadromous fish at, and between, the region's hydroelectric dams.

*********************

(4)(A) The Council shall give notice of all recommendations and shall make the recommendations and supporting documents available to the Administrator, to the Federal, and the region's, State fish and wildlife agencies, to the appropriate Indian tribes, to Federal agencies responsible for managing, operating, or regulating hydroelectric facilities located on the Columbia River or its tributaries, and to any customer or other electric utility which owns or operates any such facility. Notice shall also be given to the public. Copies of such recommendations and supporting documents shall be made available for review at the offices of the Council and shall be available for reproduction at reasonable cost.

*********************

(5) The Council shall develop a program on the basis of such recommendations supporting documents, and views and information obtained through public comment and participation, and consultation with the agencies,

14

EXHIBIT 101 TO MCINTOSH DECLARATION
Page 33 of 54

tribes, and customers referred to in subparagraph (A) of paragraph (4). The program shall consist of measures to protect, mitigate, and enhance fish and wildlife affected by the development, operation, and management of such facilities while assuring the Pacific Northwest and adequate, efficient economical, and reliable power supply. Enhancement measures shall be included in the program to the extent such measures are designed to achieve improved protection and mitigation.

(6) The Council shall include in the program measures which it determines, on the basis set forth in paragraph (5), will -

(A) complement the existing and future activities of the Federal and the region's State fish and wildlife agencies and appropriate Indian tribes;

(B) be based on, and supported by, the best available scientific knowledge;

(C) utilize, where equally effective alternative means of achieving the same sound biological objective exist, the alternative with the minimum economic cost;

(D) be consistent with the legal rights of appropriate Indian tribes in the region; and

(E) in the case of anadromous fish -

(i) provide for improved survival of such fish at hydroelectric facilities located on the Columbia River system; and

(ii) provide flows of sufficient quality and quantity between such facilities to improve production, migration, and survival of such fish as necessary to meet sound biological objectives.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

(10)(A) The Administrator shall use the Bonneville Power Administration fund and the authorities available to the Administrator under this chapter and other laws administered by the Administrator to protect, mitigate, and enhance fish and wildlife to the extent affected by the development and operation of any hydroelectric project of the Columbia River and its tributaries in a manner consistent with the plan, if in existence, the program adopted by the Council under this subsection, and the purposes of this chapter. Expenditures of the Administrator pursuant to this paragraph shall be in addition to, not in lieu of, other expenditures authorized or required from other entities under other agreements or provisions of law.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

(C) The amounts expended by the Administrator for each activity pursuant to this subsection shall be allocated as appropriate by the Administrator, in consultation with the Corps of Engineers and the Water and Power Resources Service, among the various hydroelectric projects of the Federal Columbia River Power System. Amounts so allocated shall be allocated to the various project purposes in accordance with existing accounting procedures for the Federal Columbia River Power System.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

(11)(A) The Administrator and other Federal agencies responsible for managing, operating, or regulating Federal or non-Federal hydroelectric facilities located on the Columbia River or its tributaries shall -

15

EXHIBIT 101 TO MCINTOSH DECLARATION
Page 34 of 54

(i) exercise such responsibilities consistent with the purposes of this chapter and other applicable laws, to adequately protect, mitigate, and enhance fish and wildlife, including related spawning grounds and habitat, affected by such projects or facilities in a manner that provides equitable treatment for such fish and wildlife with the other purposes for which such system and facilities are managed and operated;

(ii) exercise such responsibilities, taking into account at each relevant stage of decisionmaking processes to the fullest extent practicable, the program adopted by the Council under this subsection. If, and to the extent that, such other Federal agencies as a result of such consideration impose upon any non-Federal electric power project measures to protect, mitigate, and enhance fish and wildlife which are not attributable to the development and operation of such project, then the resulting monetary costs and power losses (if any) shall be borne by the Administrator in accordance with this subsection.

(B) The Administrator and such Federal agencies shall consult with the Secretary of the Interior, the Administrator of the National Marine Fisheries Service, and the State fish and wildlife agencies of the region, appropriate Indian tribes, and affected project operators in carrying out the provisions of this paragraph and shall, to the greatest extent practicable, coordinate their actions.

This section has dual importance to the Portland District. First, it provides an additional authority in support of District fish and wildlife actions. Secondly, under a 1986 amendment in the 1986 Water Resources and Development Act, Pub. L. 99-662, Sec. 1146, 33 USC 2286:

"The Secretary is authorized to accept funds from any entity, public or private, in accordance with the Pacific Northwest Electric Power Planning and Conservation Act [16 USC Sec. 839 et seq] to be used to protect, mitigate, and enhance fish and wildlife in connection with projects constructed and operated by the Secretary. The Secretary may accept and use funds for such purposes without regard to any limitation established under any other provision of law or rule of law."

This means that, if a fish and wildlife conservation measure that the District would like to accomplish is in the NW Power Planning Council's Fish and Wildlife Plan, then BPA (or other entity)  can directly fund the District to perform the work under 33 USC 2286 above.  This funding augmentation authority has great potential benefit, when the Council, BPA, and the District all agree on a specific fish and wildlife conservation measure and BPA agrees to fund such measure. Given the critical shortage of appropriated funds for fish and wildlife conservation measures, this funding augmentation authority has great potential significance.  This authority has been used several times.

## THE COLUMBIA RIVER FISH MITIGATION (CRFM) PROGRAM LEGISLATION (1986-2007)
CONGRESSIONAL DIRECTION AND GUIDANCE ON COLUMBIA RIVER FISH PASSAGE AND MITIGATION, 1986 – 2002

**1986**    HOUSE REPORT 99-670, July 15, 1986

CONSTRUCTION GENERAL APPROPRIATIONS

*"John Day Lock and Dam, Oregon and Washington.* – The Committee supports the ongoing construction of fish passage facilities at the John Day Lock and Dam, which will ensure the passage of juvenile salmon and steelhead around this project. Therefore, the Committee supports the transfer of available

16

EXHIBIT 101 TO MCINTOSH DECLARATION
Page 35 of 54

construction funds into the John Day project, if required, to complete the construction of the fish passage facilities."

SENATE REPORT 99-441, Sep. 15, 1986

CONSTRUCTION GENERAL APPROPRIATIONS

"*John Day Lock and Dam, Oregon and Washington.* – The Committee supports the ongoing construction of fish passage facilities at the John Day Lock and Dam, which will ensure the passage of juvenile salmon and steelhead around this project. Therefore, the Committee supports the transfer of available construction funds into the John Day project, if required, to complete the construction of the fish passage facilities."

**1987** SENATE REPORT 100-159, Sep. 16, 1987

CONSTRUCTION GENERAL APPROPRIATIONS

"*Columbia River Basin Fish bypass Program.*—The Committee is strongly supportive of efforts to insure adequate juvenile salmon and steelhead fish passage facilities on the Columbia and lower Snake River Dams. The Committee is also disturbed that the administration and the Corps of Engineers has not placed a higher priority on this work in its budget request. Given the importance and the benefits to be derived from enhanced fish runs in the Columbia and Snake Rivers, the Committee again strongly urges the Secretary of the Army to place a higher budget priority on this work in fiscal 1989.

The Committee has provide additional funds for 1988 for raising the emergency intake closure gates, gantry cranes, and fish barges at Lower Granite and Little Goose Dams; detailed design of collection and bypass facilities at Lower Monumental Dam, including fish screens; design of fish screens and collection and transport channels at Ice Harbor Dam; and construction and testing of standard fish screen and design of prototype longer fish screens at The Dalles Dam."

PUBLIC LAW 100-371, ENERGY & WATER DEVELOPMENT APPROPRIATIONS ACT, JULY 19, 1988;

***************THE ORIGINAL CRFM STATUTORY AUTHORIZATION**********

CONSTRUCTION, GENERAL

". . . *Provided further,* That the Secretary of the Army acting through the Chief of Engineers is directed to use, immediately upon enactment of this Act $8,700,000 previously appropriated in Public Law 100-202 [1988 Omnibus Fiscal Year Appropriations Act] , and $9,600,000 of the total sum appropriated for design, testing, and construction in fiscal year 1989 of juvenile fish passage facilities at the Little Goose, Lower Granite, McNary, Lower Monumental, Ice Harbor, and The Dalles projects on the Columbia and Snake Rivers as directed in the report accompanying this Act . . . ."

17

EXHIBIT 101 TO MCINTOSH DECLARATION
Page 36 of 54

<u>1988</u>    SENATE REPORT 100-381, June 9, 1988

CONSTRUCTION GENERAL APPROPRIATIONS

"*Columbia River Basin Fish bypass Program.* – The Committee continues to support the program to improve juvenile fish runs at the mainstem dams on the Columbia and Snake Rivers.

The Committee recommendation includes $9,600,000 in fiscal 1989 for design and construction of fish passage facilities in the Columbia Basin. The additional funds are for the following activities: $4,700,000 to construct permanent gate raise modifications and improved collection and transport facilities at Little Goose Dam; $1,600,000 for permanent gate raise modifications, deflector screens, and an expansion of collection facilities at Lower Granite Dam; $1,200,000 is included for construction and testing of longer screens and design of holding and loading facilities at McNary Dam; $1,000,000 is provided for construction of a bypass system at Lower Monumental Dam; $400,000 is for continued design of bypass facilities at Ice Harbor; and $700,000 for continued design of bypass facilities at The Dalles project."

<u>1989</u>    HOUSE REPORT 101-96, June 20, 1989

"*Juvenile Fish Bypass Facilities, Oregon and Washington.*—The bill includes a total of $9,900,000 to continue the program for improving juvenile fish survivability at the Corps of Engineers multiple purpose projects on the Columbia and Snake Rivers. Those funds are to be utilized as follows:

| | |
|---|---:|
| The Dalles L/D, fish screens and bypass system | $1,000,000 |
| McNary L/D, extended length fish screens | 1,600,000 |
| Ice Harbor L/D, fish screens and bypass system | 100,000 |
| Lower Monumental L/D, fish screens and bypass system | 100,000 |
| Little Goose L/D, permanent gate raise and new transportation facilities | 4,100,000 |
| Lower Granite L/D, permanent gate raise and fixed deflector test | 3,000,000 |

*Lower Snake River Fish and Wildlife Compensation Plan, Washington, Oregon, and Idaho.*— The Committee has provided an additional $861,000 for the wildlife component of the Lower Snake River Fish and Wildlife Compensation Plan. These funds are available for the purchase of off-project lands in the State of Washington."

SENATE REPORT 101-83, July 25, 1989

CONSTRUCTION GENERAL

"*Columbia River Basin Fish Bypass Program.* – The Committee strongly supports the program to install new and improved juvenile fish passage facilities at all the mainstem dams on the

18

EXHIBIT 101 TO MCINTOSH DECLARATION
Page 37 of 54

Columbia and Snake Rivers as soon as possible. Given the importance of and the benefits to be derived from enhanced fish runs in the Columbia and Snake Rivers, the Committee directs the Secretary of the Army to proceed with fiscal year 1990 activities and again strongly urges the Secretary to place a higher budget priority on this work in fiscal year 1991 and beyond.

The Committee has provided additional funds totaling $9,900,000, the same as that provided by the House for design, testing, and construction of fish bypass facilities in the Columbia Basin. The Secretary , acting through the Chief of Engineers, is directed to obligate and expend these Funds in fiscal year 1990 for the following activities: $4,100,000 to construct permanent gate raise modifications and improved collection and transport facilities at Little Goodse Dam; $3,000,000 for permanent gate raise modifications, deflector screens, and an expansion of collection facilities at Lower Granite Dam; $1,600,000 for construction and testing of longer screens at McNary Dam; $100,000 to complete plans and specifications and begin construction of screens and a bypass system, which is expected to be completed by 1993, at Lower Monumental Dam; $100,000 for screens and bypass at Ice Harbor Dam; and $1,000,000 for screens and bypass at The Dalles project. The Corps may reallocate resources among projects as may be necessary subject to prior approval of the Subcommittee on Energy and Water Development of the House and Senate."

**1990**    HOUSE REPORT 101-536, Jun. 13, 1990

CONSTRUCTION GENERAL

"*Columbia River Juvenile Fish Mitigation, Washington, Oregon, and Idaho.* – The Committee is pleased that the President's budget request included $15,800,000 for construction of juvenile fish bypass facilities on the Columbia and Snake Rivers. However, the budget failed to include funds to continue design efforts at Ice Harbor Dam and The Dalles Dam. Therefore, the Committee has provided an additional $600,000 for preparation of plans and specifications of bypass facilities at Ice Harbor Dam, $300,000 to perform model studies at The Dalles, and $800,000 to continue development of prototype screens at The Dalles. In addition, the Committee believes that further analysis of the fish bypass program is unnecessary and directs that the $1,000,000 included in the budget for that request for that purpose be redirected to fund additional prototype testing and to determine the potential role of the ice and trash sluiceway at Ice Harbor Dam."

SENATE REPORT 101-378, July 19, 1990

ENDANGERED SPECIES ACT PETITIONS

"*Columbia and Snake River salmon petition.*—This spring, petitions were filed with the National Marine Fisheries Service of the Department of Commerce to declare five species of Columbia and Snake River salmon as threatened or endangered under the Endangered Species Act. Those include the Snake River sockeye, the lower Columbia River coho, and the spring, summer, and fall Chinook Snake River runs. These actions triggered the beginning of a 2-year scientific and administrative review process which, upon completion in the spring of 1992, may result in a determination that a listing is not warranted. If

19

EXHIBIT 101 TO MCINTOSH DECLARATION
Page 38 of 54

the listing of even just one of the salmon runs is deemed to be warranted, the result could be devastating, not just to the Pacific Northwest, but the Federal Government, as well.

For the Pacific Northwest the worst-case scenario of a salmon lsiting could implicate nearly 6,000 megawatts of hydro electric power, a great deal of which is sold to California over the Pacific intertie. It could affect some or all of the nearly $6,000,000,000 of commerce or trade which is transported on the Columbia and Snake River system annually. As well, a listing would impact nearly $1,500,000,000 in agricultural crops grown on nearly 52,000 farming units within Federal reclamation projects in the region.

While the regional economic impacts could be severe, the impacts on the Federal Government would be no less onerous. The Federal Government owns and operates 30 flood control, irrigation, and multipurpose water projects on the Columbia and Snake River system. It goes without saying that if a listing were to occur, construction of new projects in the basin would be curtailed. More importantly, under section 7 of the Endangered Species Act, Federal agencies operating existing facilities may be forced to seek a no jeopardy determination from the National Marine Fisheries Service prior to undertaking any of the routine operating activities of those projects, if a listing were to occur.

Of equal consideration for the Federal Government is that initial construction costs and upgrades for these facilities are being repaid to the US Treasury, with interest, on an annual basis. In 1989 alone, the Bonneville Power Administration repaid the Treasury $606,400,000 in principle and interest toward the costs allocated to electric generation at these projects. If operations of the Federal facilities were limited or curtailed due to an endangered salmon listing, there is little question that increased expenditures for fisheries enhancement would be accompanied by a curtailment of the financial revenues that are now derived from those facilities.

Finally, because the species for which these petitions have been filed are anadromous salmon runs whose range include international waters, the Federal Government might be faced with the awkward task of having to renegotiate several international treaties with Canada and native American tribal interests who have been apportioned salmon harvest allocations. The U.S. Attorney's office already is negotiating on Indian harvest levels under the *United States v. Oregon* case, and the Commerce Department, Interior Department, and State Department all are comanaging implementation of the United States-Canada Salmon Treaty which was ratified by Congress in 1985.

It is not the intent of the Committee to prejudge the outcome of the scientific review process which, admittedly, will attempt to answer questions never before raised in the public policy arena. Nevertheless, if a listing decision is warranted by the scientific findings the implications could be severe for both regional and national interests.

Therefore the Committee strongly recommends that the Secretary of the Army on behalf of the Corps of Engineers, the Secretary of the Interior on behalf of the Bureau of Reclamation, and the Secretary of Energy on behalf of the Bonneville Power Administration , cooperate with their regional offices in providing any additional staff or budgetary resources, or in making minor changes in operating procedures, in order to deal with this matter. Given our experience thus far with other endangered species petitions in the Pacific Northwest, this early involvement at the headquarters level will help

20

EXHIBIT 101 TO MCINTOSH DECLARATION
Page 39 of 54

assure that all available options have been fully explored at the regional level prior to making its way to Washington, DC."

**

CONSTRUCTION GENERAL

*"Columbia River Basin Fish Bypass Program.* —The Committee strongly supports the program to install new and improved juvenile fish passage facilities at all the mainstem dams on the Columbia and Snake Rivers as soon as possible.  Given the importance of and the benefits to derived from enhanced fish runs in the Columbia and Snake Rivers, the Committee directs the Secretary of the Army to proceed with fiscal year 1991 activities and again strongly urges the Secretary to place a higher budget priority on this work in fiscal year 1992 and beyond.

TheCommittee has provide funds totaling $18,500,000, which is $2,700,000 over the budget request.  The funds recommended for 1991 are for design, testing, and construction of fish bypass facilities in the Columbia Basin.  The Committee commends the administration for including funding in the fiscal 1991 budget for modifications to four Columbia River projects which will increase passage and survival of juvenile anadromous fish at the dams.  Priority should be given to the development of extended length screens at Mcnary Dam and installation and operation of new bypass facilities at Lower Monumental Dam in time for the fish migration in the spring of 1992.

The Committee strongly supports the development, testing, and installation of bypass facilities at Ice Harbor and The Dalles Dams.  The Secretary of the Army, acting through the Chief of Engineers, is directed to obligate and expend the funds provided by the Committee to proceed with these two projects.  A total amount of $1,600,000 is provided to complete plans and specifications and to start construction of screens and transport channels at Ice Harbor Dam.  The Committee has provide another $1,100,000 to continue screen development, to perform model studies, and to continue the general design memorandum on the bypass system for The Dalles Dam.

The Committee has provided $1,000,000, as requested, for the Corps to undertake a mitigation analysis.  The Corps is directed to proceed with this work in such a way that does not delay or stretchout the other activities outlined above and which recognizes the current importance of bypass for endangered salmon petitions pending in the region."

**1991**    HOUSE REPORT 102-75, May 22, 1991

CONSTRUCTION GENERAL

*Columbia and Snake Rivers Ports Dredging, Oregon and Washington.* – The Committee recognizes the importance of alleviating migration impediments to anadrOmous fish in light of the April 5, 1991, proposed listing of the Snake River Sockeye Salmon by the National Marine Fisheries Service (NMFS)

21

EXHIBIT 101 TO MCINTOSH DECLARATION
Page 40 of 54

and the petitions with NMFS to list the Sanek River spring, summer, and fall chinook salmon and the lower Columbia River coho salmon under the Endangered Species Act.

The Committee understands that the US Army Corps of Engineers in cooperation with Bonneville Power Administration, Bureau of Reclamation, Indian tribes and other affected rivers users have developed a plan designed to facilitate the out-migration of anadromous fish which includes the operation of the projects on both the Snake and Columbia Rivers for extended periods of time at or near minimum pool. The committee is concerned that the operation of the projects on the Columbia/Snake River system at these lower pool levels may prohibit navigation access to port facilities from the channel. Therefore, the Committee has included language in the bill providing for, on a one-time basis, maintenance of port access on the Columbia /Snake River system to a depth commensurate with the main navigation channel."

SENATE REPORT 102-80, 1991

CONSTRUCTION GENERAL

*Columbia River endangered salmon, Oregon and Washington.* – Within the funds provided for Corps construction, the Committee directs that the Corps spend $500,000 for environmental studies and other investigations associated with the pending salmon petitions and the salmon summit."

**1992**    SENATE REPORT 102-344, July 27, 1992

COLUMBIA RIVER BASIN SALMON ENDANGERED SPECIES

"In the past year significant progress has been made in addressing the problem of declining salmon stocks in the Columbia River basin. On November 14, 1991, the Secretary of Commerce listed the Snake River sockeye salmon as an endangered species, and on April 17, 1992, the Snake River spring/summer and fall chinook species were listed as threatened species.

Fortunately, the region has taken numerous actions to prepare for such listings. In November 1991, the Northwest Power Planning Council completed the phase II amendment process to its Fish and Wildlife Program. These amendments have provided a framework addressing a comprehensive set of actions to reverse the decline in stocks at risk. In phase III the council is identifying additional measures which will round out the comprehensive program. Implementation of the council program has begun already.

The Bonneville Power Administration, Corps of Engineers, and Bureau of Reclamation have altered the Columbia River 1992 hydroelectric system operations to be consistent with the council's program amendments. These actions have been submitted to the National Marine Fisheries Service (NMFS) for its review, and NMFS has concluded that the operation of the hydroelectric system in 1992 is not likely to jeopardize the continued existence of the listed species.

In addition, reductions in harvest are being accomplished consistent with the council amendments.

22

EXHIBIT 101 TO MCINTOSH DECLARATION
Page 41 of 54

The actions taken to date have been extremely useful in providing mechanisms to improve the salmon stocks at risk while minimizing the cost to the region's economy. The Committee believes , however, that there are significant issues remaining to be addressed and encourages all the parties to continue their efforts to develop a comprehensive regional solution including allocation of costs to carry out the recovery plan. Only through a comprehensive approach can this problem be resolved. The comprehensive approach must deal with the management of harvest, habitat, in-river flows, and other survival measures and hatchery management.

NMFS has named a recovery team to develop a proposed recovery plan for the listed salmon stocks. It is expected that the recovery team will provide guidance for recovery actions including the potential for a permanent annual drawdown of the four lower Snake River reservoirs. In the phase II amendments to the Fish and Wildlife Program, the Northwest Power Planning Council called for the Corps of Engineers , Bureau of Reclamation, and Bonneville Power Administration to investigate an annual drawdown of the lower Snake River hydroelectric projects as a means of addressing the needs of anadromous fish. Some parties have suggested that there are significant biological, environmental, and economic issues associated with the drawdown of these reservoirs, and the alternatives to drawdown, which need to addressed. The Committee encourages the Federal agencies with responsibility for the Columbia River hydroelectric system operations to initiate appropriate environmental analyses on a full range of actions, including the drawdown, which might be included in the final recovery plan. By getting an early start on such analysis, the Committee believes that some of the legal difficulties which have plagued the spotted owl issue may be avoided. The Committee encourages the responsible Federal agencies to look for opportunities to include this analysis in ongoing environmental reviews, such as the system operation review environmental impact statement, if it can lead to accelerating the schedule while still providing rigorous biological and economic review of the alternatives. The Committee expects substantial progress to be made in fiscal year 1993 such that this review can be completed as quickly as possible.

The Committee also believes it is critical that the Federal agencies give significant consideration to the need to coordinate their activities with respect to improving declining salmon stocks. Now that notices of intent to file lawsuits have been received, it is of particular importance that the Federal agencies not pursue narrow self interests. The Federal agencies are strongly encouraged to develop a comprehensive approach to consultation which will provide the courts with assurance that all factors affecting the salmon's decline are taken into account consistent with the requirements of the Endangered Species Act.

The Committee urges the Corps of Engineers to give a greater emphasis to the development of improved technologies relating to the transportation, collection, and release of migrating juvenile salmon."

CONSTRUCTION GENERAL

*Columbia River juvenile fish mitigation, Washington, Oregon and Idaho.* —The Committee has included $2,000,000 in the bill to compensate for direct damages to public and private property resulting from the test drawdown of the Lower Granite and Little Goose Reservoirs in March 1992. The Committee emphasizes that this does not create a precedent for how costs associated with any future drawdown

23

EXHIBIT 101 TO MCINTOSH DECLARATION
Page 42 of 54

or other fish mitigation effort in the Columbia River basin will be paid for or allocated. In addition, the Committee encourages the implementation of a regional solution to the salmon crisis which identifies a method of paying for recovery measures equitably spread among the various river user groups.

The regional salmon recovery program developed in the Pacific Northwest calls for lowering John Day Reservoir to speed juvenile fish migration and reduce predation. Current studies by the Corps of Engineers evaluate facility modifications and impact mitigation requirements associated with this juvenile fish mitigation activity. The Committee includes $2,000,000 for advanced planning and design and other activities that enable continued progress toward operation of John Day Reservoir at minimum operating pool during juvenile fish migration. Obligation of these funds should be consistent with the findings of the Corps' study, to be completed in November 1992, that will evaluate impacts on other uses and resources including a hatchery facility and a wildlife refuge. Consistent with current policy, the costs of this activity shall not be allocated until the conclusion of the mitigation analysis."

[The proposed John Day drawdown never occurred. Such a drawdown would have significantly disrupted the very salmon mitigation efforts it was supposed to help. The fish and wildlife refuge, established under special 1962 legislation that allowed the Corps to acquire the rest of Crow Butte – half of which is part of the fish and wildlife refuge – would have had all of its shallow-water salmon spawning habitat dried out and destroyed. And the drawdown would similarly have left the salmon hatchery high and dry – and unusable without costly modifications. It is contrary to the Endangered Species Act to destroy the habitat of the endangered species.]

__1993__   SENATE REPORT 103-147, Sep. 23, 1993

CONSTRUCTION GENERAL

*Columbia River juvenile fish mitigation, Oregon and Washington.* – The Committee is pleased that the Corps continues to request funds for the juvenile fish bypass program, and that significant progress is being made at several of the Columbia and Snake hydroelectric projects. The Committee emphasizes that the high cost of the program makes it imperative that the bypass facilities at each project are effective once they operational. Accordinlgly, the Corps is urged to carefully develop and review its design for the planned facilities at The Dalles. In addition, the Committee is aware of recent improvements in advanced underwater sound generating acoustic guidance systems, and underwater strobe lighting guidance systems, and urges the Corps to review these technologies, as well as advanced mechanical guidance systems, for possible application at The Dalles.

The Committee is pleased that the Corps is moving forward with its analysis of options for configuring and operating the Columbia River hydrosystem in the interest of improving conditions for migrating salmon and steelhead, of which some stocks are listed as threatened and endangered. The Committee has heard considerable testimony on the advantages and disadvantages of lowering John Day Reservoir and drawing down lower Granite Reservoir to

24

EXHIBIT 101 TO MCINTOSH DECLARATION
Page 43 of 54

help speed juvenile migration, but does not believe that sufficient information is yet available to make a judgment on the merits of these proposals. In the interest of resolving this uncertainty, the Committee directs the Corps to expedite its studies and activities at both the John Day and lower Granite projects. The Committee has provided $1,000,000 to continue advanced planning and design and other activities at John Day, and up to $6,000,000 for biological test drawdown activities at lower Granite. It is the Committee's intent that the Corps streamline its process to the greatest extent possible to arrive at a decision on implementation at the earliest possible date. Consistent with last year's direction by the Committee, the costs of this activity shall not be allocated until the conclusion of the mitigation analysis. Furthermore, the Corps is directed to submit a report to the House and Senate Appropriations Committees, prior to the hearings on the fiscal year 1995 budget, on the Corps ' methodology and recommendations for allocating the costs associated with these activities at the John Day and lower Granite projects.

The Committee has provided an additional $1,200,000 over the budget request for extended fish screens at John Day Dam."

<u>1994</u>    SENATE REPORT 103-291, June 23, 1994

In connection with the Energy and Water Development Appropriation Bill, 1995, **Senate Report 103-291, 103rd Congress, 2nd Session, June 23, 1994**, stated at p. 6:

"COLUMBIA RIVER BASIN ENDANGERED SALMON

The Committee continues to support efforts to recover the threatened and endangered salmon runs in the Columbia River basin. Three of the Federal agencies under the Energy and Water Development Subcommittee's jurisdiction, the US Army Corps of Engineers, the Bureau of Reclamation, and the Bonneville Power Administration, are responsible for funding the majority of recovery measures currently being implemented.

The Committee notes that both the Northwest Power Planning council's strategy for salmon and the Snake River salmon recovery team's final recovery recommendations call for a broad range of recovery measures that cover hydroelectric operations, habitat improvements, hatchery reform, changes in harvest allocations and methods, and a revised oversight structure. The administration's primary focus on recovery activities has been on the hydroelectric system, and significant changes in hydro operations are being made.

While the Committee supports these measures, it believes that salmon restoration will occur only if a broad-based strategy is implemented that addresses each aspect of the salmon life cycle. Salmon are adversely affected by natural and human-caused factors beyond those inflicted by the hydroelectric system. The Committee has no intention of requiring the agencies under the jurisdiction of the Energy and Water Development Subcommittee to should the entire funding burden for recovery activities, and expect the administration to begin proposing significant reform efforts in other critical recovery areas, including hatcheries, harvest, and habitat."

CONSTRUCTION GENERAL

25

EXHIBIT 101 TO MCINTOSH DECLARATION
Page 44 of 54

*"Columbia River juvenile fish mitigation, Oregon and Washington.* – The Committee commends the Corps of Engineers for requesting funds to continue the Juvenile Fish Bypass Program. Significant progress is being made on improving fish survival at several of the Columbia and Snake River hydroelectric projects. The Committee urges the Corps to move forward as quickly as possible with planned modifications and other improvements, including the adult fishways, to the projects. The Committee directs the Corps to use additional appropriations and current year unobligated balances to aggressively improve effectiveness and efficiency of the bypass systems, reduce predator mortality, and enhance passage conditions. Improvements to the fish bypass systems include: dispersed release sites, new flumes, PIT-tag facilities, spillway/stilling basin modifications, installation of extended-length screens, testing of sound and light guidance technology, and testing of surface flow bypass systems.

The Committee remains committed to development of the most effective bypass system for The Dalles project and installation at the earliest possible date. There is growing evidence, however, that surface-oriented juvenile fish bypass systems may be more effective and cost less than screened bypass, particularly at The Dalles project. Therefore, the Committee directs the Corps to design and test a prototype surface flow system at The Dalles no later than 1996. The Committee is aware that the Grant County PUD is proposing to test a prototype surface flow bypass system at Wanapum Dam on the Columbia River in the spring of 1995.

The Committee has included funding for planning, engineering, and design of a drawdown of John Day Reservoir to minimum operating pool. However, the Committee is aware that studies conducted by the Corps, the Snake River Salmon recovery team, and a consultant to the Northwest Power Planning Council have all drawn various conclusions about the potential effectiveness of the John Day drawdown as a salmón recovery measure. The Committee urges the Corps to work with the Power Council to thoroughly evaluate the John Day drawdown in light of these studies.

The Northwest Power Planning Council will consider these and other mainstem survival improvements in a rulemaking this year. The Corps should maintain the capability to respond to any changes that may be adopted by the council program. The Corps should continue to closely follow these developments and consult regularly with the council and other regional, State, and tribal interests.

The Committee is aware of interest within the region to study the potential development and use of net pen barges for the transportation of juvenile salmon. The Committee directs the Corps to review the concept of net pen barges and report to the Committee on the feasibility of this technology by no later than January 1, 1995."

<u>1995</u>    HOUSE REPORT 104-479, 1995
        CONSTRUCTION GENERAL
        *Columbia River Juvenile Fish Mitigation, Washington, Oregon, and Idaho.*--The Committee
has reduced the Administration's request for the Columbia River Juvenile Fish Mitigation program by $10,000,000
to $68,800,000. The amount appropriated for this activity in fiscal year 1995 was $36,300,000. The Committee is
extremely concerned about the seemingly uncontrolled growth of this program. In fiscal year 1994, the Corps of
Engineers reported that the total estimated cost of the program was $345,000,000. In this year's budget request, the

26

EXHIBIT 101 TO MCINTOSH DECLARATION
Page 45 of 54

Corps reported the total estimated cost as $583,600,000. The Committee is concerned that the Columbia/Snake River salmon recovery efforts have become a black hole for money even though there appears to be no consensus among all the parties involved in this effort about what needs to be done to restore the salmon runs.

The Committee has not included any funding for the continuation of advanced planning and design for public and private facilities affected by the operation of the John Day project at minimum pool levels. There is no regional consensus on this project, the cost of implementation would be exorbitant, and any improvement in fish mortality is expected to be marginal. The Corps should move ahead expeditiously in testing, and where applicable, installation of surface collection and bypass systems which do have regional consensus and may help salmon pass hydropower dams more successfully than conventional bypass systems. The final construction decision on the conventional bypass system at The Dalles should be held pending completion of surface bypass testing at that project.

## SENATE REPORT 104-120, 1995

## COLUMBIA RIVER BASIN ENDANGERED SALMON

The Committee continues to support efforts to recover the threatened and endangered salmon runs in the Columbia River basin. Three of the Federal agencies under the Energy and Water Development Subcommittee's jurisdiction, the U.S. Army Corps of Engineers, the Bureau of Reclamation, and the Bonneville Power Administration, are responsible for funding the majority of recovery measures currently being implemented.

The Committee notes that both the Northwest Power Planning Council's strategy for salmon and the Snake River salmon recovery plan call for a broad range of recovery measures that cover hydroelectric operations, habitat improvements, hatchery reform, changes in harvest allocations and methods, and a revised oversight structure. The administration's primary focus on recovery activities has been on the hydroelectric system, and significant changes in hydro operations are being made.

The Committee believes that salmon restoration will occur only if a broad-based strategy is implemented that addresses each aspect of the salmon life cycle, including the other critical recovery areas, including hatcheries, harvest, and habitat.

**

### CONSTRUCTION GENERAL

*Columbia River juvenile fish mitigation, Washington, Oregon, and Idaho-* The Committee has provided $78,800,000, the full budget request, for the Corps to continue activities and work on the Columbia River juvenile fish mitigation project in Oregon and Washington.

The Committee commends the Corps of Engineers for requesting funds to continue the Juvenile Fish Bypass Program. Significant progress is being made on improving fish survival at several of the Columbia and Snake River hydroelectric projects. The Committee urges the Corps to move forward as quickly as possible with planned modifications and other improvements to the projects, including the adult fishways. The Committee directs the Corps to aggressively improve the effectiveness and efficiency of the bypass systems, reduce predator mortality, and enhance passage conditions. Improvements to the fish bypass systems include: dispersed release sites, new flumes, PIT-tag facilities, spillway/stilling basin modifications and testing and installation of surface flow bypass systems. The Committee remains committed to development of the most effective bypass system for the Dalles project, and its installation at the earliest possible date. There is growing evidence, however, that surface-oriented juvenile fish bypass systems may be more effective and cost less than screened bypass systems, particularly at the Dalles project. Therefore, the Committee directs the Corps to give priority continued testing of a prototype surface flow system at the Dalles. This should lead to an expeditious decision in 1996 on further bypass system development at the Dalles, independent of progress on surface bypass at the other projects.

To help broaden evaluations of fish survival in the Columbia River system, passive integrated transponder tag (PIT tag) detectors must be installed at John Day and Bonneville projects. Completion of these facilities must be of the highest priority to the Corps. The facilities should be completed as soon as possible by the following dates: John Day--spring 1997; Bonneville--spring 1998.

The Committee supports the development of a comprehensive monitoring program to ensure that spill is carefully monitored and its effects on dissolved gas levels and fish survival are fully evaluated. This program must be in place before the provision of additional spills. In addition, it is critical that dissolved gas abatement technologies such as slotted or baffled gates and flip lips be installed without further delay to reduce dissolved gas levels from both intentional and unintentional spill. Flip lips or flow deflectors shall be designed and installed at John Day and Ice Harbor projects by spring 1997. Another modification, identified by both Federal and private engineers, is baffled or slotted spillway gates. Experience from non-Federal Columbia River dams indicates that slotted spillway gates could improve fish passage efficiency and reduce dissolved gas levels, as well as the cost of the spill program. The

27

EXHIBIT 101 TO MCINTOSH DECLARATION
Page 46 of 54

Committee directs the Corps to immediately test, evaluate, and construct spillway gate modifications on at least two projects by the spring of 1996. An additional two projects should be improved by 1997. The Corps is encouraged to use private sector engineering firms and any other available means to accelerate the work as necessary to assist in completing this effort at the earliest possible date. The Committee directs the Corps to reallocate funds within this program, if necessary, from studies, design, and even construction of extended length screens and related activities in order to provide adequate funds in fiscal year 1996 to meet this schedule on gas abatement technologies.
The Committee has included funding for advanced planning and design of a drawdown of John Day Reservoir to minimum operating pool. The Committee, however, is concerned about the costs and justification for the proposed John Day drawdown as an effective method for salmon recovery. The Committee is aware that studies conducted by the Corps, the Snake River Salmon Recovery Team, the National Marine Fisheries Service, and a consultant to the Northwest Power Planning Council have all drawn various conclusions about the potential effectiveness of this salmon recovery measure. Because of these divergent views, the power council, using an independent scientific panel, has initiated a review and reevaluation of the science underlying the John Day drawdown measure. In light of these studies and the current reevaluation of the scientific information available, the Committee urges the Corps to continue to work with the National Marine Fisheries Service and the power council on this drawdown measure and consult regularly with the council and other regional, State, and tribal interests. The Committee urges the administration to furnish the scientific justification for the John Day drawdown as an effective means of recovery, or abandon the proposal altogether.
The Committee is pleased that the Corps is evaluating options for improving the efficiency of hydroelectric units at its Snake and Columbia River powerhouses in order to improve juvenile salmon survival. The Committee urges the Corps to continue its efforts in concert with other interested agencies and organizations.

## 1996 WRDA NEW AUTHORITY WITH 1999 WRDA AMENDMENT

**Section 511 of Public Law 104-303, Oct. 12, 1996, the Water Resources and Development Act of 1996 (WRDA 1996)** provided as follows:

"SEC. 511 RESEARCH AND DEVELOPMENT PROGRAM TO IMPROVE SALMON SURVIVAL

(a) SALMON SURVIVAL ACTIVITIES. –

   (1) IN GENERAL. – The Secretary shall accelerate ongoing research and development activities, and may carry out or participate in additional research and development activities, for the purpose of developing innovative methods and technologies for improving the survival of salmon, especially salmon in the Columbia River Basin.

   (2) ACCELERATED ACTIVITIES. – Accelerated research and development activities referred to in paragraph (1) may include research and development related to –

      (A) impacts from water resources projects and other impacts on salmon life cycles;

      (B) juvenile and adult salmon passage;

      (C) light and sound guidance systems;

      (D) surface-oriented collector systems;

      (E) transportation mechanisms; and

      (F) dissolved gas monitoring and abatement.

   (3) ADDITIONAL ACTIVITIES. – Additional research and development activities referred to in paragraph (1) may include research and development related to –

      (A) marine mammal predation on salmon;

      (B) studies of juvenile salmon survival in spawning and rearing areas;

28

EXHIBIT 101 TO MCINTOSH DECLARATION
Page 47 of 54

(C) estuary and near-ocean juvenile and adult salmon survival;

(D) impacts on salmon life cycles from sources other than water resources projects; and

(E) other innovative technologies and actions intended to improve fish survival, including the survival of resident fish.

(4) COORDINATION. – The Secretary shall coordinate any activities carried out under this subsection with appropriate Federal, State, and local agencies, affected Indian tribes, and the Northwest Power Planning Council.

(5) REPORT . – [omitted; required in 1999]

(6) AUTHORIZATION OF APPROPRIATIONS.—There is authorized to be appropriated $10,000,000 to carry out research and development activities under paragraph (3).

(b) ADVANCED TURBINE DEVELOPMENT. –

(1) IN GENERAL. – In conjunction with the Secretary of Energy, the Secretary shall accelerate efforts toward developing innovative, efficient, and environmentally safe hydropower turbines, including design of "fish-friendly" turbines, for use on the Columbia River hydrosystem.

(2) AUTHORIZATION OF APPROPRIATIONS.—There is authorized to be appropriated $12,000,000 to carry out this subsection.

(c) IMPLEMENTATION..—Nothing in this section affects the authority of the Secretary to implement the results of the research and development carried out under this section or any other law.

SECTION 582 OF THE WATER RESOURCES AND DEVELOPMENT ACT OF 1999

Section 582 of the 1999 WRDA amended and totally rewrote Section 511 as follows (NEW LANGUAGE IN *ITALICS*):

"(a) SALMON SURVIVAL ACTIVITIES. –

(1) IN GENERAL. – *In conjunction with the Secretary of Commerce and the Secretary of the Interior*, the Secretary shall accelerate ongoing research and development activities, and may carry out or participate in additional research and development activities, for the purpose of developing innovative methods and technologies for improving the survival of salmon, especially salmon in the Columbia/*Snake* River Basin.

(2) ACCELERATED ACTIVITIES. – Accelerated research and development activities referred to in paragraph (1) may include research and development related to –

(A) impacts from water resources projects and other impacts on salmon life cycles;

(B) juvenile and adult salmon passage;

(C) light and sound guidance systems;

(D) surface-oriented collector systems;

(E) transportation mechanisms; and

(F) dissolved gas monitoring and abatement.

(3) ) ADDITIONAL ACTIVITIES. – Additional research and development activities referred to in paragraph (1) may include research and development related to –

29

EXHIBIT 101 TO MCINTOSH DECLARATION
Page 48 of 54

[DELETED: (A) marine mammal predation on salmon;]

(A) studies of juvenile salmon survival in spawning and rearing areas;

(B) estuary and near-ocean juvenile and adult salmon survival;

(C) impacts on salmon life cycles from sources other than water resources projects;

(D) *cryopreservation of fish gametes and formation of a germ plasma repository for threatened and endangered populations of native fish;* and

(E) other innovative technologies and actions intended to improve fish survival, including the survival of resident fish.

(4) COORDINATION.-- – The Secretary shall coordinate any activities carried out under this subsection with appropriate Federal, State, and local agencies, affected Indian tribes, and the Northwest Power Planning Council.

(5) REPORT. – [omitted – report required by 2002]

(6) AUTHORIZATION OF APPROPRIATIONS. – There is authorized to be appropriated $10,000,000 to carry out research and development activities under paragraph (3).

(b) ADVANCED TURBINE DEVELOPMENT –

(1) IN GENERAL.—In conjunction with the Secretary of Energy, the Secretary shall accelerate efforts toward developing *and installing in Corps of Engineers-operated dams* innovative, efficient, and environmentally safe hydropower turbines, including the design of fish-friendly turbines, for use on the Columbia/*Snake* River hydrosystem.

(2) AUTHORIZATION OF APPROPRIATIONS. – There is authorized to be appropriated *$35,000,000* to carry out this subsection.

*(c) MANAGEMENT OF PREDATION ON COLUMBIA/SNAKE RIVER SYSTEM NATIVE FISHES.—*

*(1) NESTING AVIAN PREDATORS.—In conjunction with the Secretary of Commerce and the Secretary of the Interior, and consistent with a management plan to be developed by the United States Fish and Wildlife Service, the Secretary shall carry out methods to reduce nesting populations of avian predators on dredge spoil islands in the Columbia River under the jurisdiction of the Secretary.*

*(2) AUTHORIZATION OF APPROPRIATIONS. – There is authorized to be appropriated $1,000,000 to carry out research and development activities under this subsection.*

(d) IMPLEMENTATION. -- Nothing in this section affects the authority of the Secretary to implement the results of the research and development carried out under this section or any other law.

30

**EXHIBIT 101 TO MCINTOSH DECLARATION**
**Page 49 of 54**

<u>**1996**</u>    HOUSE REPORT 104-679, 1996

CONSTRUCTION GENERAL

*Columbia River Juvenile Fish Mitigation, Washington, Oregon, and Idaho-* Last year the Committee referred to this program as 'a black hole for money.' That characterization was based on two concerns. First, the total estimated cost of the program had grown from $345,000,000 in fiscal year 1994 to $583,600,000 in fiscal year 1996. Second, in spite of the enormous sums of money being spent on the program, there appeared to be no consensus among all the parties involved in the effort about what needed to be done to restore the salmon runs. This year, the Corps of Engineers estimates that the total cost of this program will be almost $1,400,000,000 and there still appears to be no consensus about what steps need to be taken to restore the salmon runs. In a response to a question at this year's hearings about the changing cost of the program, the Corps of Engineers North Pacific Division Engineer stated that 'the total cost will be relatively firm when final decisions are made on the long-term configuration and operation of the Federal Columbia River Power System to restore anadromous fish runs. At this time, we expect these decisions to be made near the turn of the century.' The Committee believes that it would be appropriate to slow down spending for this program until a definite plan for recovery of the fish runs can be developed. Accordingly, the Committee recommendation for the Columbia River Juvenile Fish Mitigation program is $78,800,000, which is the same as the amount appropriated in FY 1996 and $28,200,000 below the budget request. The Administration should be aware that in these times of declining budgets for discretionary programs it is unlikely that this line item will receive a significant increase in the future. The Administration should work to priorize its efforts in salmon recovery within a budget which is justified considering current and future fiscal constraints.

The Committee supports the testing and installation of surface bypass facilities at several of the Corps projects and understands that they may hold great promise for improving fish survival in the system. It is important, however, for the Corps to design, construct and install the surface bypass prototypes at the lowest possible cost. The recently installed surface bypass prototype at Lower Granite Dam cost more than twice as much as a surface bypass facility at a public utility district-owned project on the mid-Columbia River. While the configurations of the Federal and non-Federal projects on the Columbia and Snake rivers are all unique, and comparisons among them are difficult to make, the Committee is concerned that the Corps is over-designing its prototypes, and encourages the Corps to review its procedures in order to lower the cost of future facilities.

The Corps is directed to continue its work on gas abatement measures, including the construction of spillway flip lips at Ice Harbor and John Day dams. The Committee encourages efforts to continue improving monitoring of dissolved gas levels at the projects, and directs the Corps to work with the National Marine Fisheries Service, the states and the tribes to further improve the current physical gas monitoring and reporting system.

In addition, the Committee supports the construction of Passive Integrated Transponder (PIT) tag detectors at the John Day and Bonneville projects. The Committee understands that the Corps' cost estimate for the construction of the John Day PIT tag facility has been revised upward due to recently discovered problems at the construction site. The Committee considers this facility to be a high priority, and directs the Corps to allocate sufficient funds within the overall program to ensure that the facility is completed no later than October 1997.

In accordance with the Administration's request, no funds have been provided for the advanced planning and design for public and private facilities affected by the operation of the John Day project at minimum pool levels.

<u>**1997**</u>    HOUSE REPORT 105-190, 1997

CONSTRUCTION GENERAL

*"Columbia River Fish Mitigation, Washington, Oregon, and Idaho.* – The Committee has

31

EXHIBIT 101 TO MCINTOSH DECLARATION
Page 50 of 54

previously expressed concern about the level of spending for Pacific Northwest salmon recovery efforts and the lack of clear evidence of benefits resulting from that spending. Moreover, the budget request appears to reflect the pursuit of multiple restoration strategies, some of which may not be adopted.  Accordingly the Committee has recommended $85,000,000 for the Columbia River Fish Mitigation Program – $42,000,000 below the budget request."

<u>1998</u>      HOUSE REPORT 105-581, 1998

CONSTRUCTION GENERAL

*"Columbia River Fish Mitigation, Washington, Oregon, and Idaho.* –The Committee has previously expressed its deep concerns regarding the vast sums of taxpayer dollars pouring into this project with little apparent effect.  For all its reliance on technological fixes and fish barging, there is no clear evidence that the salmon recovery efforts in the Pacific Northwest are, or will become, successful.  A decision on fish recovery options in the lower Snake River, expected in 1999, may have drastic impacts on mitigation measures currently being pursued.  Accordingly the Committee has recommended $3,730,000 to continue the John Day drawdown study and $4,028,000 to continue the lower Snake River feasibility study."

<u>1999</u>      HOUSE REPORT 106-253, 1999

CONSTRUCTION GENERAL

*"Columbia River Fish Mitigation, Oregon and Idaho.*

The Committee banned spending any money on Phase II of the John Day drawdown study -effectively killing the John Day drawdown proposal – and also banned spending any money on a similar drawdown study for McNary Dam.  This ended the drawdown studies.

<u>2000</u>   This year most of the appropriations were consolidated into a single appropriation act.

**<u>2000 NEW AUTHORITIES:</u>**

**THE ESTUATIES AND CLEAN WATERS ACT OF 2000, 33 USC 2901 note**

This statute in Title I puts the Secretary of the Army in charge of a national estuary restoration program, including Corps of Engineers grants from the newly created Estuary Habitat Restoration Council.  This

32

**EXHIBIT 101 TO MCINTOSH DECLARATION
Page 51 of 54**

program is still in its infancy and it is too soon to measure its effect on fishery resources.  See notice of solicitation for project applications at 70 Federal Register 33453 (June 8, 2005).

**SECTION 536 OF PUBLIC LAW 106-541, DEC. 31, 2000, WRDA 2000**

Section 536 of WRDA 2000 is a separate general authority to "conduct studies and ecosystem restoration projects for the lower Columbia River and Tillamook Bay estuaries, Oregon and Washington." The relationship of Sec. 536 to salmon programs is that salmon and salmon habitat are essential parts of the lower Columbia River ecosystem, sought to be protected and restored under Sec. 536.  Sec. 536 also has the same cast of consultants as the fish programs above, the States of Oregon and Washington, appropriate Indian tribes, and the Corps' federal partners, EPA, USFWS, NMFS, and the US Forest Service.  Sec. 536, somewhat uniquely, allows cost-shared projects to be done with a wide range of sponsors, including only with other federal agencies.   Sec. 536 also has its estuary on the Columbia River defined as any waters or tributaries downstream of Bonneville Dam. This large area under Sec. 536 was meant to cover the Columbia River eastward until other, similar legal authorities tied to the dam reservoirs applied, providing – as is common with Portland District Columbia River projects – complete coverage from west to east.

**2001**   There was nothing on Columbia River Fish Mitigation Program in House and
             Senate reports for this year.

**2002**   HOUSE REPORT 107-681, 2002

          CONSTRUCTION GENERAL

          *"Lower Columbia River Ecosystem"*
          $2,000,000
          "These funds are intended only to help fulfill the estuary restoration actions required by
           the 2000 Federal Columbia River Power System biological opinion and for no other
           purpose."

          SENATE REPORT 107-220, 2002

          CONSTRUCTION GENERAL

*Columbia River Fish Mitigation, WA, OR, and ID-* The Committee recommendation includes $87,000,000 to continue efforts associated with Columbia River Fish Mitigation. This is an $11,000,000 reduction from the budget request, but should in no way be considered any diminution of interest or support for these vitally important mitigation projects by the Committee. Rather it reflects the fiscal constraints with which the Committee is faced with. The Committee recommendation is $6,000,000 above fiscal year 2002 funding enacted for this project.

33

EXHIBIT 101 TO MCINTOSH DECLARATION
Page 52 of 54

Within the funds provided, the Committee recommendation includes $300,000 for a reconnaissance level investigation of Columbia River flood control operations to determine what changes, if any, would benefit endangered species, particularly salmon. Evaluation beyond the reconnaissance phase is subject to agency review and congressional notification.

WRDA 2007    121 STAT. 1041 PUBLIC LAW 110–114—NOV. 8, 2007

121 STAT. 1184 PUBLIC LAW 110–114—NOV. 8, 2007

**SEC. 4073. ECOSYSTEM RESTORATION AND FISH PASSAGE IMPROVE-MENTS, OREGON.**
(a) STUDY.—The Secretary shall conduct a study to determine the feasibility of undertaking ecosystem restoration and fish passage improvements on rivers throughout the State of Oregon.
(b) REQUIREMENTS.—In carrying out the study, the Secretary shall—
(1) work in coordination with the State of Oregon, local governments, and other Federal agencies; and
(2) place emphasis on—
(A) fish passage and conservation and restoration strategies to benefit species that are listed or proposed for listing as threatened or endangered species under the Endangered Species Act of 1973 (16 U.S.C. 1531 et seq.); and
(B) other watershed restoration objectives.
(c) PILOT PROGRAM.—
(1) IN GENERAL.—In conjunction with conducting the study under subsection (a), the Secretary may carry out pilot projects to demonstrate the effectiveness of ecosystem restoration and fish passages.
(2) AUTHORIZATION OF APPROPRIATIONS.—There is author-ized to be appropriated $5,000,000 to carry out this subsection.

Original Hatchery Authorizations that are still valid:
The hatchery programs described herein were originally authorized as follows:
JOHN DAY DAM HATCHERY PROGRAM: Flood Control Act of 1950 (H.Doc.531)
25,000 in-kind, in-place adult returning salmon to The Dalles &  John Day Reservoirs ;

WILLAMETTE VALLEY PROJECT (13 Dams):
Flood Control Act of 1938 – 5 dams
Flood Control Act of 1950 (H. Doc. 531) – 7 dams
Flood Control Act of 1960 – Foster Dam
4 mitigation hatcheries for Spring Chinook salmon on N.Santiam (Detroit-Big Cliff Dams- single project);
S. Santiam (Green Peter & Foster Dams), McKenzie (Cougar & Blue River Dams); and Middle Fork
(Lookout Point-Dexter Dams – single project; Fall Creek Dam; Hills Creek Dam); and a 5th hatchery for

34

EXHIBIT 101 TO MCINTOSH DECLARATION
Page 53 of 54

resident rainbow trout (H. Doc. 531 as amended by Flood Control Act of 1960); exact quantities of mitigation fish not specified in original authorization reports;

ROGUE RIVER PROJECT (2 dams): Flood Control Act of 1963 (H. Doc 566)
single hatchery for 1500 Spring Chinook & 500 winter steelhead for Lost Creek Dam, and for 500 Coho salmon and 2000 steelhead at Applegate – Elk Creek Dam breached/notched and original fish passage restored

This completes this part of the Legal Opinion – the general statement of fish authorities applicable to CENWP.  Part B discusses in a separate document the application of the law to specific CENWP projects.

35

EXHIBIT 101 TO MCINTOSH DECLARATION
Page 54 of 54