Peter M.K. Frost (OSB #911843)
Western Environmental Law Center
1216 Lincoln Street
Eugene, Oregon 97401
Tel: 541-359-3238
Fax: 541-485-2457
Email: frost@westernlaw.org

Attorney for Plaintiffs

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
EUGENE DIVISION

| | |
|---|---|
| MCKENZIE FLYFISHERS, STEAMBOATERS,<br><br>    Plaintiffs,<br><br>vs.<br><br>BRUCE MCINTOSH, SCOTT PATTERSON, OREGON DEPARTMENT OF FISH AND WILDLIFE, JOHN EISENHAUER, U.S. ARMY CORPS OF ENGINEERS,<br><br>    Defendants. | Case No. 6:13-cv-02125-TC<br><br>**PLAINTIFFS' RESPONSE TO STATE DEFENDANTS' OBJECTIONS TO ENTRY OF THE CONSENT DECREE** |

Pursuant to the Court's Order of September 17, 2014, Plaintiffs McKenzie Flyfishers et al. hereby respectfully file this response to the objections of State Defendants Bruce McIntosh et al. (ODFW) to the consent decree proposed for the Court's approval by Plaintiffs and Federal Defendants U.S. Army Corps of Engineers et al. (Corps). The consent decree between Plaintiffs and the Corps settles the dispute between those parties as to the Corps' potential liability for causing jeopardy to, and unlawful take of, spring Chinook salmon by its ownership and funding of the McKenzie River Hatchery, and is substantively fair and violates no public policy. Accordingly, the Court should approve the consent decree.

## Background.

A.  Chinook Salmon in the McKenzie River.

Chinook salmon (*Oncorhynchus tshawytscha*) that migrate upstream from the ocean in the spring have inhabited the McKenzie River at least since recorded time. Historically, among anadromous fish, only those that migrated upstream during high flows could ascend Willamette Falls to reach the McKenzie River. Administrative Record (A.R.) 040558 (Dkt. #46). The timing of the run to ascend the falls "led to significant genetic adaption relative to other Columbia River spring Chinook salmon." A.R. 038535. There are seven demographically independent runs of spring Chinook in the Upper Willamette River: in the Clackamas, Molalla, Calapooia, North Santiam, South Santiam, Middle Fork Willamette, and McKenzie Rivers. A.R. 037643. In 2008, the National Marine Fisheries Service (NMFS) found that five of seven of the runs "are facing critically high extinction risks," including in the Molalla, Calapooia, North Santiam, South Santiam, and Middle Fork Willamette Rivers. A.R. 035092. Only the Clackamas and McKenzie River basins still "contain sufficient habitat that is still accessible and of sufficient quality to produce significant numbers of natural-origin spring Chinook." A.R. 038438-39.

Among these two runs, the McKenzie River basin alone may now account for fully one-half of all wild spring Chinook in the Upper Willamette River basin. A.R. 040575; A.R. 000134. "Wild" or "natural origin" fish are distinguished from hatchery origin fish of the same species by having an intact adipose fin, whereas the adipose fin is clipped off hatchery fish before they are released into the wild. 70 Fed. Reg. 37,160, 37,167 (June 28, 2005). From the standpoint of

genetics, the wild spring Chinook population in the McKenzie River is the sole "genetic legacy" population in the Upper Willamette River basin, and a "primary" population, meaning it is "of the highest biological significance." A.R. 033395; A.R. 033406; A.R. 038538. But the number of wild spring Chinook has decreased dramatically in the last decade: between 2002 and 2012, the annual abundance of wild Chinook spawning in the basin ranged from an estimated 5,000 down to 1,200 fish, for an average of about 2,500 wild fish. A.R. 040983. For the past five years, the average has dropped to an estimated 1,500 wild fish. Id. Last year, NMFS noted that "[t]he status of natural-origin spring Chinook salmon in the McKenzie River has declined recently to probably the lowest levels on record . . . ." A.R. 003325.

On June 28, 2005, NMFS listed wild and hatchery-bred spring Chinook salmon in the Upper Willamette River evolutionarily significant unit (ESU) as threatened with extinction under the Endangered Species Act (ESA). 70 Fed. Reg. 37160 (June 28, 2005) (codified at 50 C.F.R. § 223.102(c)(6)).[1] A reason NMFS listed hatchery fish too was to gain federal control over these artificially-produced fish, i.e., because NMFS "may need to approve the take of listed hatchery stocks to manage the number of naturally spawning hatchery fish to limit potential adverse effects on the local natural population[s]." Id. at 37195. However, under the ESA, recovery of spring Chinook in the McKenzie River basin is "focused on the development and conservation of self-sustaining naturally-produced populations." A.R. 037634; see Trout Unlimited v. Lohn, 559 F.3d 946, 957 (9th Cir. 2009) (the "primary goal" of recovery "is to preserve the ability of natural populations to survive in the wild.").

Several factors have contributed to the decline of spring Chinook in the McKenzie River basin. The Corps' construction of Cougar Dam on the South Fork McKenzie River and Blue River dam on Blue River together eliminated about 37 miles of Chinook habitat. A.R. 035454; A.R. 033491. Harvest from commercial and recreational anglers has contributed to the species' decline. A.R. 035476. Third, fish hatcheries are among the "primary limiting factors" for spring Chinook in the basin, in part because "large numbers of hatchery-origin fish spawning with those

---

[1] NMFS first listed wild spring Chinook alone in 1999. 64 Fed. Reg. 14308 (March 24, 1999).

of natural origin have created a risk of genetic introgression." A.R. 035107-08; see Trout Unlimited, 559 F.3d at 949 ("Interbreeding poses particular risks to natural salmon populations because it can result in decreased genetic differentiation.").

On the McKenzie River, the Corps owns the McKenzie Hatchery, and provides funds to ODFW to operate it. A.R. 035850. ODFW collects adult spring Chinook at the hatchery, breeds them, and releases spring Chinook smolts. A.R. 000024.[2] ODFW intends to release 840,000 smolts from the hatchery in 2015. Declaration of Bruce McIntosh ¶ 4 (Dkt. #60).

The term "pHOS" is used in fisheries management as a proxy for genetic introgression of hatchery genes into wild fish populations. A.R. 029813. The pHOS is the proportion of hatchery origin fish that spawn among the wild fish population, id., and "is a key metric in determining the effects of a hatchery's operations on wild populations." Native Fish Soc'y v. Nat'l Marine Fisheries Serv., 992 F. Supp. 2d 1095, 1102 (D. Or. 2014). In 2013, the pHOS in the McKenzie River basin was about 46%. A.R. 040987. Over the last seven years, average annual pHOS has been above 40%, with spikes above 60%. A.R. 029815; A.R. 041166.

B.      Background on the ESA.

The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." Tenn. Valley Auth. v. Hill, 437 U.S. 153, 180, 184 (1978). "The plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost." Id. The ESA "reflects a conscious decision by Congress to give endangered species priority over 'primary missions' of federal agencies." Cal ex rel. Lockyer v. U.S. Dep't of Agric., 575 F.3d 999, 1018 (9th Cir. 2009). To achieve these goals, the ESA "provides both substantive and procedural provisions designed to protect endangered

---

[2]  In 1994, ODFW began outplanting (meaning to physically transplant) some adult Chinook that returned to the hatchery into the South Fork McKenzie above Cougar Dam. A.R. 000013. Some of these outplants successfully spawned, and some offspring successfully migrated downstream through the reservoir and dam, re-creating a run of spring Chinook. A.R. 036924. In 2008, NMFS found that this run is "of critical importance" to the overall recovery of wild Chinook in the basin. A.R. 034895.

species and their habitats." Am. Rivers v. Nat'l Fisheries Serv., 126 F.3d 1118, 1121 (9th Cir. 1997).

Under Section 7, federal agencies shall not jeopardize the continued existence of a listed species. Wild Fish Conservancy v. Salazar, 628 F.3d 513, 518 (9th Cir. 2010). Under Section 9, no entity – federal, state, or private – may "take" members of an endangered species. Oregon Natural Resources Council v. Allen, 476 F.3d 1031, 1033 (9th Cir. 2007) (Section 9 "establishes a blanket prohibition" on taking). Under Section 4(d), NMFS may extend the take prohibition to threatened species, 16 U.S.C. § 1533(d), and it has done so for spring Chinook in the McKenzie River basin. 65 Fed. Reg. 42, 477, 47, 475-81 (July 10, 2000); 70 Fed. Reg. at 37,194 (amending 2000 rule) (codified at 50 C.F.R. § 223.203). However, the 2005 Section 4(d) rule amendment applies the Section 9 take prohibition and other Section 4(d) protections only to members of the threatened species with an intact adipose fin—that is, to wild fish that spawn naturally. 70 Fed. Reg. at 37,167. NMFS determined that, because most hatchery fish are produced for harvest and are adipose fin-clipped so they may be distinguished, protecting them from take is not necessary to the conservation of listed species that comprise both hatchery and wild fish. Id.

NMFS has also established exceptions to the Section 9 take prohibition called "4(d) Limits." See Native Fish Soc'y, 992 F. Supp. 2d at 1102. Limit 5 creates an exemption for otherwise unlawful take of anadromous fish caused by a fish hatchery's artificial propagation program, so long as the hatchery complies with an approved Hatchery and Genetics Management Plan (HGMP). Id. (citing 50 C.F.R. § 223.203(b)(5)).

C.   The McKenzie Hatchery and Management of Spring Chinook.

In 2008, NMFS issued a BiOp under Section 7 of the ESA, finding that the federal projects in the Upper Willamette River basin (including the McKenzie Hatchery) jeopardize the continued existence of spring Chinook, and destroy or adversely affect their critical habitat. A.R. 035792. NMFS found: "Currently, the [Upper Willamette River] Chinook ESU is at a high risk of extinction. Numbers of natural-origin spawners are low and long- and short-term productivity trends are negative. Five of the seven populations are at very high risk of extinction." A.R. 035107. For the McKenzie River, NMFS found: "[A] substantial portion of the Chinook that

migrated upstream of Leaburg dam were of hatchery-origin." A.R. 034909-10. NMFS stated: "Genetic introgression of hatchery fish into the wild populations in the McKenzie River is of significant concern and is the most critical hatchery issue in this consultation." A.R. 034909.

When it issued its jeopardy BiOp, NMFS also issued a reasonable and prudent alternative (RPA) for federal projects in the Upper Willamette River basin that in its opinion would avoid jeopardy. A.R. 035117-035230. To address genetic introgression in the McKenzie River basin, the RPA provides that the Corps will "fund the design, construction, and operation of a sorting facility" at Leaburg Dam, "so that the area above Leaburg Dam will be for natural-origin Chinook only." A.R. 035182; A.R. 034814. The RPA states: "If an acceptable sorting facility at this site is deemed infeasible . . . then the [Corps] will take alternative actions to reduce hatchery fish straying [pHOS] to less than 10% of the total population spawning in the wild." Id.

In July 2012, the Corps and ODFW entered into a "Cooperative Agreement" related to the Corps' funding of seven fish hatcheries, including the McKenzie Hatchery. A.R. 032381-434. The agreement provides that the Corps will provide funds to ODFW to operate the McKenzie Hatchery to "release hatchery mitigation production of spring Chinook [] into the McKenzie River or other water bodies pertinent to fulfilling Government mitigation requirements for said projects (Cougar and Blue River Projects). Maximum levels for mitigation shall not exceed 80,800 pounds." A.R. 032442. The agreement states that any such releases must "comply with applicable State and Federal law (i.e., ESA, CWA, etc)." A.R. 032438. The agreement states that the Corps and ODFW will meet annually to "review and adjust" mitigation release numbers to "[m]eet mitigation program goals, adjusted to account for given improvements for fish passage at [Willamette Valley Project] dams, and to comply with ESA." A.R. 032443. The agreement summarizes legal requirements for hatcheries, A.R. 032451, and states:

> One of the most significant impacts of ESA on federal fish programs is its priority on CONSERVATION OF WILD SPECIES and its disregard and concern for HATCHERY and HARVEST goals. Recovery in all ESA fish cases is measured solely upon raising the numbers of listed wild fish runs – with no priority or concern for lost harvest opportunities.

A.R. 032408 (capitals original).

In May 2012, the Corps, NMFS, and other agencies concurred that it is infeasible to build a collector/sorter at Leaburg Dam to collect hatchery Chinook to remove them from the wild. A.R. 029804.

In December 2013, Plaintiffs filed this suit, alleging that the Corps has violated Section 7 of the ESA, because it has authorized, funded, or carried out operations at the McKenzie Hatchery that jeopardize the continued existence of spring Chinook salmon. (Dkt. #1). Plaintiffs also allege that the Corps has violated Section 7 of the ESA and its implementing regulations by failing to reinitiate consultation with NMFS as to the effects of the McKenzie Hatchery, given current excessive pHOS rates in the river. Id. Plaintiffs also allege that the Corps and ODFW have violated Section 9 of the ESA, by causing the illegal "take" of wild spring Chinook. Id.

In February 2014, the Corps, the Bonneville Power Administration, and ODFW submitted to NMFS a proposed HGMP for the McKenzie Hatchery. A.R. 00004-99. The proposed HGMP states that up to 787,000 hatchery smolts will be released annually from the McKenzie Hatchery during January, February and March. AR 000018 & AR 000020. Of this total, the HGMP states that 360,000 smolts are "required for broodstock and conservation needs," meaning for outplanting adults primarily above Cougar Dam, and to enable the hatchery to have enough adults for broodstock. AR 000018. The remaining 427,000 smolts would be released primarily so1,000 adult hatchery bred Chinook return to the McKenzie to be available for fishing. Id. There is no approved HGMP for the McKenzie Hatchery. Corps Ans. ¶ 38 (Dkt. #20). NMFS has not begun the National Environmental Policy Act process required to do so. See Native Fish Soc'y, 992 F. Supp. 2d at 1107-1111 (ruling that the Environmental Assessment NMFS prepared before approving an HGMP for the Sandy Hatchery violated NEPA).

In August 2014, Plaintiffs and the Corps filed a consent decree and proposed order that includes provisions related to the number of smolts released from the McKenzie Hatchery and fish passage at Cougar Dam and Reservoir. (Dkt. #56). Under the consent decree, neither party admits a claim or defense, and Plaintiffs would dismiss their ESA claims against the Corps. Id.

On September 22, 2014, ODFW filed objections to the consent decree. (Dkt. #59). ODFW objects to one provision of the decree: "Until NMFS approves an HGMP for the McKenzie River Hatchery pursuant to 50 C.F.R. § 223.205(b)(5), no more than 360,000 hatchery-bred spring Chinook smolts shall be released annually into the McKenzie River basin from the McKenzie River Hatchery." Id. at 4-9.

Standard of Review.

The decision whether to approve a consent decree is "is committed to the sound discretion of the trial judge." S.E.C. v. Randolph, 736 F.2d 525, 529 (9th Cir. 1984) (citation omitted). A court should enter a consent decree "if it determines that it is fair, reasonable and equitable and does not violate the law or public policy." Sierra Club v. Elec. Controls Design, Inc., 909 F.2d 1350, 1355 (9th Cir. 1990) (citation omitted). The court must "be satisfied that the decree represents a 'reasonable factual and legal determination.'" United States v. Oregon, 913 F.2d 576, 581 (9th Cir. 1990) (citation omitted).

Although the court's discretion should be exercised in favor of the strong policy favoring voluntary settlement of litigation, Ahern v. Cent. Pac. Freight Lines, 846 F.2d 47, 48 (9th Cir. 1988), when reviewing a consent decree, the court must avoid "rubber stamp approval." United States v. Montrose Chem. Corp. of Cal., 50 F.3d 741, 747 (9th Cir. 1995) (citation omitted). If the consent decree "comes within the general scope of the case made by the pleadings, furthers the objectives upon which the law is based, and does not violate the statute upon which the complaint was based, the agreement should be entered by the court." Sierra Club, 909 F.2d at 581 (internal quotations omitted). Further, when "a government agency charged with protecting the public interest 'has pulled the laboring oar in constructing the proposed settlement,' more deference to the parties' agreement is due because the district court 'must refrain from second-guessing the Executive Branch.'" Montrose Chem., 50 F.3d at 746 (citation omitted).

Argument.

A. The Consent Decree Binds Only the Corps, and Is Fair and Reasonable.

Plaintiffs agree with ODFW that "[a] consent decree binds only the consenting parties." Keith v. Volpe, 118 F.3d 1386, 1392 n.9 (9th Cir. 1997). Accordingly, to constrain ODFW from

releasing whatever number of hatchery smolts it may ultimately seek to release if the Court approves the consent decree, Plaintiffs must successfully prosecute their Section 9 claim against ODFW, and obtain an injunction against such releases.

By contrast, the consent decree binds the Corps (alone), as Section 7 anticipates, from authorizing or funding releases of more than 360,000 smolts from the McKenzie Hatchery, in the period before NMFS approves an HGMP for the hatchery. It cannot be disputed that the Corps owns the hatchery, and has funded the capture, breeding, and release of hatchery smolts from it. Under the consent decree, however, the Corps' funding or other authorization is capped at 360,000 smolts. ODFW's notion that the Corps cannot figure out what it costs to produce that many smolts, and to limit its funding accordingly, has no basis in principle, nor in any evidence ODFW has presented.[3] The Corps may also have authority related to its ownership of the McKenzie Hatchery the consent decree would implicate. But the fact that the Corps has chosen to settle Plaintiffs' claims against it based on a term that constrains only the federal agency (since the decree binds only it) does nothing to establish that entry of the decree is improper in any respect.

As the record proves, it is the Corps, as one of the federal "action agencies" under Section 7 of the ESA that NFMS determined has caused jeopardy to spring Chinook salmon in the Upper Willamette River basin, and NFMS has established an RPA to those federal actions. A.R. 035117-035230. In the context of this case, it is the Corps alone that has legal exposure for any violation of its substantive duties under Section 7. San Luis & Delta-Mendota Water Auth. v. Jewell, 747 F.3d 581, 642-43 (9th Cir. 2014). In Plaintiffs' view, the Corps' choice to settle the claims against it by limiting its role (or, consistent with the terminology of the ESA, its federal "actions") related to the McKenzie Hatchery to a certain number of smolts is a fair and reasonable approach to settling the claims against it. The Ninth Circuit has held that when a federal agency chooses to settle claims against it based on federal law, "more deference to the

---

[3] Submission of evidence is appropriate in a contested proceeding whether to approve a consent decree. See e.g., United States v. Oregon, 913 F.2d at 581 (noting that proponents of a decree submitted expert declarations to prove that is fair and reasonable).

parties' agreement is due," and the Court "'must refrain from second-guessing the Executive Branch.'" Montrose Chem., 50 F.3d at 746 (citation omitted). This is particularly true when the federal agency is tasked with implementing the ESA, as the Corps is under its obligation to avoid jeopardizing spring Chinook salmon. Compare Coal. for a Sustainable Delta v. McCamman, No. 1:08–cv–00397 OWW GSA, 2011 WL 1332196, at *5 (E.D. Cal. Apr. 6, 2011) (noting that no deference was due to position of state agency because it was not tasked with implementing the ESA, and adopting a consent decree over the objections of the non-settling parties).

Moreover, the consent decree is imminently fair and reasonable. There is no approved HGMP for the McKenzie Hatchery, even though it has been operating continuously since NFMS first listed wild spring Chinook in the McKenzie River in 1999. The consent decree caps the federal involvement of the Corps as to the number of released Chinook smolts only in the period before NMFS decides whether to approve an HGMP, and on what terms and conditions. See United States v. Oregon, 913 F.2d at 584 (affirming approval of a consent decree in part because it had a three-year duration). Ultimately, NMFS will determine the appropriate number of smolts that should be released into the basin in the context of its duty to recover wild spring Chinook, because NMFS will be required to engage in consultation with itself under Section 7 of the ESA. Native Fish Soc'y, 992 F. Supp. 2d at 1102 (NMFS is "both the action agency and the consultation agency" when considering whether to approve an HGMP). Meantime, the consent decree would plainly "further[]the objectives upon which the [ESA] is based." Sierra Club, 909 F.2d at 581 (internal quotations omitted). Finally, the consent decree serves the public interest by avoiding protracted litigation between Plaintiffs and the Corps, thereby conserving resources. Citizens for a Better Environment v. Gorsuch, 718 F.2d 1126, 1117 (D.C. Cir. 1983) ("Not only the parties, but the general public as well, benefit from the saving of time and money that results from the voluntary settlement of litigation.").

B.   None of ODFW's Objections Has Merit.

ODFW objects to entry of the consent decree on various bases, but none has merit.

1.   The Court Need Not Rule that Any Law Has Been Violated to Enter the Decree.

ODFW "does not dispute the extent of the federal court's power and authority to remedy violations of federal law—and even to affect the contract rights of third parties in the process. . . ." Objs. at 6. Nonetheless, ODFW asserts that the Court's "exercise of that power is limited to situations in which the court makes findings establishing a violation of federal law." Id. (citations omitted). ODFW is incorrect. The Court may approve a consent decree where no party admits a claim or defense, and without ruling that any law was actually violated. A consent decree "is not a decision on the merits or the achievement of the optimal outcome for all parties, but is the product of negotiation and compromise." United States v. Oregon, 913 F.2d at 580; Sierra Club, 909 F.2d at 1352 ("In the consent judgment ECD did not admit any violation, and none was established."). The point of a consent decree is to settle all or parts of a case before an adjudication on the merits. S.E.C. v. Randolph, 736 F.2d 525, 528 (9th Cir. 1984) ("The use of consent decrees encourages informal resolution of disputes, thereby lessening the risks and costs of litigation.").

ODFW asserts that "parties cannot settle federal claims by agreeing to terms that . . . violate state law," and that the Ninth Circuit has held that a "settlement agreement approved by the Court to be invalid because it authorized municipality to circumvent municipal law where the court did not find a violation of federal law." Objs. at 6 (citing League of Res. Neigh. Adv. v City of Los Angeles, 498 F.3d 1052 (2007)). In League, the Ninth Circuit ruled that a city could not enter into a consent decree to allow a synagogue to be built in a residential zone in violation of its zoning laws. Id. at 1056-57. The Ninth Circuit noted, however, that in approving the decree, the district court should also have determined whether requiring the city to comply with its zoning laws would violate a federal law (the Religious Land Use and Institutionalized Persons Act). Id. at 1058. The Ninth Circuit stated: "Before approving any settlement agreement that authorizes a state or municipal entity to disregard its own statutes in the name of federal law, a district court must find that there has been or will be an actual violation of that federal law." Id. (emphasis original).

League makes sense given the facts in that case but does not change the rule that a court need not decide the merits of federal claim before entering a consent decree to dismiss those

claims. ODFW does not argue nor prove that the consent decree will violate any state or, indeed, federal law. And here, the Corps does not seek to disregard the ESA by entering into the consent decree; by contrast, it seeks to further the objectives of the ESA.

        2.      <u>The Consent Decree is Consistent with the Cooperative Agreement</u>.

At the same time ODFW "does not dispute the extent of the federal court's power and authority to remedy violations of federal law—and even to affect the contract rights of third parties in the process," it repeatedly relies on its Cooperative Agreement with the Corps as a basis for the Court to disapprove of the decree. This is inappropriate for numerous reasons. First, no entity can agree (or contract) to actions that violate federal law. <u>National Wildlife Federation v. Espy</u>, 45 F.3d 1337, 1342 (9th Cir. 1995) (voiding contract for federal agency sale of land executed in violation of federal law). Second, if Plaintiffs and the Corps did not settle Plaintiffs' claims against the Corps, and if Plaintiffs proved that the Corps violated its duties under Sections 7 or 9, there is no question that those parties' agreement would not prevent the Court from ordering relief that it deems appropriate; including, <u>e.g.</u>, that there will be no more than 360,000 smolts released from the McKenzie Hatchery before NMFS approves an HGMP for it. <u>See</u> <u>e.g.</u>, <u>Klamath Siskiyou Wildlands Center v. Boody</u>, 468 F.3d 549, 552 (9th Cir. 2006) (enjoining a timber sale contracted between the Forest Service and a lumber company); <u>Metcalf v. Daley</u>, 214 F.3d 1135, 1139 (9th Cir. 2000) (ordering federal agency to prepare a new NEPA analysis despite the agency having committed itself contractually to allow a Tribe to hunt for whales); <u>Save the Yaak Comm. v. Block</u>, 840 F.2d 714, 716-18 (9th Cir. 1988) (enjoining road construction and related timber sales because the U.S. Forest Service violated NEPA, despite the existence and partial execution of existing contracts).

Nonetheless, ODFW asserts that "the Corps would violate its contract with ODFW by performing paragraph 3." Objs. at 8. ODFW fails to disclose that the cooperative agreement explicitly states that actions taken under it must be consistent with federal law, including the ESA. A.R. 032442 (mitigation releases shall "comply with applicable State and Federal law (i.e., ESA, CWA, etc).").  The agreement also includes a "Statutory Authority" section that states that the Corps is "authorized" to mitigate for lost habitat, but that "[s]ubsequent federal legislation

directs" it to "operate and maintain the hatcheries in compliance with federal laws for the protection and enhancement of fish and wildlife . . . ." A.R. 032450-51. Judge King recently held that similar contractual language permits a federal agency to modify an action to prevent harm to a protected resource. Or. Natural Res. Council Action v. U.S. Forest Serv., 445 F. Supp. 2d 1211, 1219-21 (D. Or. 2006).

Importantly, ODFW does not assert that the consent decree is inconsistent with or would somehow violate the ESA. If the consent decree "comes within the general scope of the case made by the pleadings, furthers the objectives upon which the law is based, and does not violate the statute upon which the complaint was based, the agreement should be entered by the court." Sierra Club, 909 F.2d at 581.

### 3. Ownership of Spring Chinook Does Not Matter.

ODFW asserts that because "wildlife is the property of the state," then "the Corps cannot agree to limit the releases because the Corps does not own the smolts and does not control numbers of smolts or their release." Objs. at 7 (citation omitted). But the consent decree does not speak to nor implicate who owns what as to these fish, and the Court need not reach that question. ODFW can perceive that it alone owns the fish it produces at the hatchery. But ODFW misses the important point that the spring Chinook are listed under the ESA, precisely to "manage the number of naturally spawning hatchery fish to limit potential adverse effects on the local natural population[s]." 70 Fed. Reg. at 37195. Under the ESA, ODFW does not have impunity to do whatever it wants with federally-listed fish; it must manage "its" fish without violating the ESA. The remaining and separate proceeding in this case will determine whether ODFW can release these hatchery smolts and, if so, in what amounts. For the purposes of the consent decree, however, it limits only the Corps' role in authorizing, funding, or carrying out certain releases.

### Conclusion.

The consent decree results from significant and principled work on the part of Plaintiffs and the Corps, with the assistance of Magistrate Judge Clarke, to settle the dispute between them.

The consent decree is in all respects fair and reasonable, and would further the goals of the ESA. The Court should approve the decree.

Date:  September 29, 2014.    Respectfully submitted,

/s/ Peter M.K. Frost
Peter M.K. Frost (OSB # 911843)
Attorney for Plaintiffs