ELLEN F. ROSENBLUM
Attorney General
CHRISTINA L. BEATTY-WALTERS  #981634
CARLA A. SCOTT #054725
Assistant Attorneys General
Department of Justice
1515 SW Fifth Ave, Suite 410
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Email: Tina.BeattyWalters@doj.state.or.us
       Carla.A.Scott@doj.state.or.us

Attorneys for Defendants Bruce McIntosh, Scott Patterson and Oregon Department of Fish and
Wildlife

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| MCKENZIE FLYFISHERS; STEAMBOATERS, <br><br> Plaintiffs, <br><br> v. <br><br> BRUCE MCINTOSH, SCOTT PATTERSON, OREGON DEPARTMENT OF FISH AND WILDLIFE, JOHN EISENHAUER, U.S. ARMY CORPS OF ENGINEERS, <br><br> Defendants. | Case No.  6:13-cv-02125-TC <br><br> STATE DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT |

<p style="text-align: center;">**TABLE OF CONTENTS**</p>

MOTION..................................................................................................................... 1

MEMORANDUM IN SUPPORT OF MOTION ......................................................... 1

I.     INTRODUCTION ............................................................................... 1

II.    NATURE OF THE CASE AND CASE HISTORY ............................. 3

III.   BACKGROUND ................................................................................. 4

      A.    Listing decisions ................................................................. 5

      B.    HGMP submissions ........................................................... 6

      C.    2008 Willamette Project BiOp........................................... 6

      D.    Leaburg Sorter History ....................................................... 8

      E.    Outplanting History ............................................................ 9

      F.    History of Hatchery Releases, pHOS, and ODFW Actions to Reduce Below-Cougar-Dam pHOS............................................... 9

IV.   SUMMARY JUDGMENT STANDARD ....................................... 10

V.     ARGUMENT..................................................................................... 11

      A.    Plaintiffs Fail to Meet Their Burden to Prove that ODFW's Planned Release of Hatchery Smolts Would Result in a "Take" of Wild Spring Chinook Salmon.............................................................. 11

           1.    To Prove Take By Habitat Modification Caused by Release of Hatchery Smolts, Plaintiffs Must Submit Evidence of a Population Effect on Wild Spring Chinook Salmon in the McKenzie ...................... 12

           2.    Plaintiffs' Evidence Is Insufficient to Prove a Population Level Effect............................................................................... 14

                a.    The General Principle that Hatchery Fish Pose Risks to Wild Fish Does Not Prove Take By Habitat Modification Here................................................................................ 15

                b.    pHOS Above 10% does Not Prove Take ..................................... 16

                c.    There is No Evidence of Any Permanent Decline in the Wild Chinook Population in the McKenzie Basin Caused by Hatchery Fish ........................................................................ 18

                d.    Studies Performed on Other Species in Other Basins Do Not Prove that Hatchery Chinook Cause a Population Level Effect on Wild Spring Chinook in the McKenzie......................... 19
</p>

<p style="text-align: center;">Department of Justice
1515 SW Fifth Ave, Suite 410
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000</p>

e.       Hatchery Chinook Can Benefit Wild Chinook in the McKenzie .................................................................................... 19

B.     The State is Immunized From Any Take Liability Under the ITS ...................... 20

     1.    An ITS Protects non-federal entities from Take Liability ........................ 20

     2.    The ITS in the BiOp Contemplates ODFW's Operation of the McKenzie Hatchery ................................................................................ 22

     3.    ODFW Operates the McKenzie Hatchery in Compliance with the ITS ................................................................................................................ 22

          a.       HGMP Compliance and Integration ............................................ 22

          b.       Hatchery Fish Marking ................................................................. 23

          c.       Release Strategy Adjustment ....................................................... 23

          d.       Collection Facility Improvement ................................................. 24

          e.       Research, Monitoring and Evaluation........................................... 24

          f.       Outplanting ................................................................................... 25

          g.       Leaburg Dam Sorter...................................................................... 26

                i.      ODFW is complying with NMFS-approved actions ........ 26

                ii.     ODFW is taking actions to achieve 10% pHOS below Cougar Dam .......................................................... 28

C.     Plaintiffs Are Not Entitled To An Injunction Because They Have Not Proved That Ongoing Hatchery Releases Will Cause Irreparable Harm To Wild Spring Chinook .......................................................................................... 31

     1.    Plaintiffs do not meet their burden to show irreparable harm to the population of Spring Chinook.................................................................. 32

     2.    Consideration of an ESA injunction must examine all effects of requested relief on the protected species ................................................ 34

     3.    Any Injunction Must Be Narrowly Tailored............................................ 35

VI.    CONCLUSION.................................................................................................... 35

Department of Justice
1515 SW Fifth Ave, Suite 410
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

# TABLE OF AUTHORITIES

## Cases

*American Bald Eagle v. Bhatti*, 9 F.3d 163 (1st Cir. 1993) ............................................................ 11

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505 (1986) ...................................... 11

*Animal Welfare Institute v. Martin*, 668 F. Supp. 2d 254 (D. Me. 2009) .................................. 13

*Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt.*, 273 F.3d 1229 (9th Cir. 2001) ........................................................................................................................ 20

*Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,* 515 U.S. 687 (1995) ............................................................................................................................................ 12

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................................ 10

*Coalition for a Sustainable Delta, v. John McCamman,* 725 F. Supp. 2d 1162 (E.D. Cal. 2010) ............................................................................................................................................ 12

*Defenders of Wildlife v. Bernal*  204 F.3d 920 (9th Cir. 2000)............................................ 12, 32

*Friends of the Wild Swan v. Babbitt*, 168 F.3d 498 (9th Cir. 1999) ............................................ 21

*Hawksbill Sea Turtle v. FEMA*, 11 F Supp 2d 529 (D. Vir. Isl. 1998) ........................................ 13

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 131 (2010)...................................................... 32

*Morrill v. Lujan*, 802 F Supp 424 (S.D. Ala. 1992)..................................................................... 13

*Native Fish Soc. v. Nat'l Marine Fisheries Serv.*, 2014 WL 1030479 (D. Or. 2014) ................. 35

*Nat'l Wildlife Fed'n v. Burlington N. R.R., Inc.*, 23 F.3d 1508 (9th Cir. 1994) ..................... 32, 33

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 839 F. Supp. 2d at 1129 .......................... 34

*Natural Res. Def. Council, Inc. v. Winter*, 508 F.3d 885 (9th Cir. 2007) ................................... 32

*Oregon Natural Desert Ass'n v. Tidwell,* 716 F.Supp.2d 982 (D. Or. 2010)............................... 17

*Ramsey v. Kantor,* 96 F.3d 434 (9th Cir.1996).......................................................................... 21

*Salix v. U.S. Forest Serv.*, 944 F. Supp. 2d 984 (D. Mont. 2013)................................................ 32

*Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978 (9th Cir.2007)................................................ 10

*Strahan v. Holmes*, 595 F. Supp. 2d 161 (D. Mass. 2009) .......................................................... 33

*Thomas v. Peterson*, 753 F.2d 754 (9th Cir 1985)...................................................................... 34

*Trout Unlimited v. Lohn*, 559 F.3d 946 (9th Cir. 2009)......................................................... 14, 19

Department of Justice
1515 SW Fifth Ave, Suite 410
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

**United States Code**

16 U.S.C. § 1532(19) ............................................................................................... 11

16 U.S.C. § 1536(a)(2) ............................................................................................. 20

16 U.S.C. § 1536(b)(4)(C) .................................................................................... 6, 21

**Rules and Regulations**

46 Fed. Reg. 54750 .................................................................................................. 13

50 CFR § 17.3 ........................................................................................................... 11

70 Fed. Reg. 37215 .................................................................................................... 5

Fed. R. Civ. P. 56(c) ............................................................................................... 10

Federal Rules of Evidence 702 ............................................................................... 29

Department of Justice
1515 SW Fifth Ave, Suite 410
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

## MOTION

State Defendants Bruce McIntosh, Scott Patterson, and Oregon Department of Fish and Wildlife ("ODFW" or "State") move for the entry of summary judgment on two grounds: (1) Plaintiffs have not created and cannot create a material issue of fact about whether release of more than 360,000 hatchery spring Chinook smolts annually will violate the Endangered Species Act ("ESA") Section 9 "take" standard, and (2) ODFW is protected from liability under Section 9 for its McKenzie Hatchery operations by the 2008 Willamette Project Biological Opinion ("BiOp") issued by National Marine Fisheries Service ("NMFS"). This motion is supported by the following memorandum of law. Pursuant to LR 7-1, the parties made a good faith effort through personal or telephone conferences to resolve the dispute and have been unable to do so.

## MEMORANDUM IN SUPPORT OF MOTION

## I.    INTRODUCTION

ODFW understands that there are risks associated with hatcheries. That is why ODFW has recently taken and continues to take numerous actions to reduce interactions between natural-origin and hatchery-origin spring Chinook in the McKenzie River. That is why ODFW works closely with the ESA administrator, NMFS, on improvements to hatchery operations. ODFW has made significant hatchery program changes to benefit natural origin fish, including making hatchery improvements to increase attraction for returning hatchery fish, reintroducing spring Chinook above impassable dams in the basin to increase natural production, and reducing the hatchery program size.

Moreover, Plaintiffs present no evidence that unique maladaptive genes exist in the McKenzie hatchery fish or that any harmful genetic introgression has actually occurred. ODFW scientists have studied the genetic diversity of McKenzie River salmon and found no evidence that there are any maladaptive genes in McKenzie River hatchery fish that did not exist originally in their wild counterparts. They found remarkable genetic similarity between hatchery and

Department of Justice
1515 SW Fifth Ave, Suite 410
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

natural-origin fish. Plaintiffs' reliance on generalized risks alone is insufficient to prove take under the ESA, so Plaintiffs' motion for summary judgment should be denied. ODFW's evidence, however, is specific to the McKenzie River and proves that it is entitled to judgment as a matter of law.

ODFW is entitled to judgment in its favor for another reason as well. ODFW's operation of the McKenzie Hatchery is fully protected from Section 9 liability by the BiOp and its accompanying Incidental Take Statement ("ITS"). Hatchery operations are covered by the BiOp because they were expressly included as a subject of consultation and decision in the BiOp and because ODFW is in compliance with its terms. The one BiOp provision plaintiffs contend ODFW has not met is contained in Reasonable and Prudent Alternative ("RPA") 6.1.4. The provision requires the federal agencies to design and construct facilities at Leaburg Dam to sort hatchery fish from natural origin fish. If neither an automatic sorting facility nor an alternative sorting facility design is found to be feasible and agreed to by NMFS, a third alternative is described: "the Action agencies will take alternative actions to reduce hatchery fish straying to less than 10% of the total population spawning in the wild." The BiOp gives no deadline for either the alternative actions or the achievement of the 10% goal. However, NMFS has expressly approved specific alternative actions as sufficient to comply with RPA 6.1.4, including a reduction in hatchery smolt releases. Yet, ODFW has gone even further than required by NMFS by further reducing planned hatchery-origin releases in 2015 and 2016 (and likely beyond). And evidence submitted with this motion demonstrates that the reduction in releases is designed and is likely to meet the 10% standard described in RPA 6.1.4. Moreover, ODFW has taken and continues to take additional actions designed to lower the stray rate, including actions that increase attraction of adult hatchery fish back to the hatchery where they can be removed from the river. ODFW's operation of the hatchery is fully protected from Section 9 liability.

Plaintiffs rely heavily on a variety of U.S. Army Corps of Engineers ("Corps")-generated or commissioned documents in its motion. However, a recurring strategy of the Corps since the

Department of Justice
1515 SW Fifth Ave, Suite 410
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

listing decisions has been to minimize the significance of the impacts of its dams and to avoid incurring obligations for capital projects, thus minimizing the expenses it must incur to benefit listed fish. The Corps is a dam operator with no administrative authority under the ESA, not a fish manager or an administrator whose opinions are entitled to some weight. All Corps-generated comments should be viewed with that in mind.

## II.     NATURE OF THE CASE AND CASE HISTORY

Plaintiffs allege that the State is violating Section 9 by operating the McKenzie Hatchery because they contend hatchery fish harm wild fish by breeding with them and causing harmful genetic introgression. Plaintiffs seek an injunction limiting the State to a release of a maximum of 360,000 smolts annually until the State reaches 10% pHOS, or proportion of hatchery origin spawners, in the McKenzie River basin.[1]

The State denies take liability and denies that the plaintiffs are entitled to any injunctive relief. The State has also asserted as an affirmative defense that it is not liable for any take because its activities are covered by the Incidental Take Statement (ITS) in the BiOp.

Originally, plaintiffs asserted Section 9 "take" and ESA Section 7 claims against the Corps as well. The Corps owns and partially funds the operation of the hatchery and owns and operates the largest dam in the McKenzie River basin, the Cougar Dam, as well as the Blue River Dam. Plaintiffs resolved their claims against the Corps by a consent decree. (ECF # 65). As part of the settlement, plaintiffs and the Corps agreed that the Corps would be responsible for the release of a maximum of 360,000 smolts annually from the McKenzie River Hatchery until the National Marine Fisheries Service approves a Hatchery Genetic Management Plan ("HGMP"). (ECF # 65.) The Corps did not admit liability.

---

[1]Although Plaintiffs allege some direct take by handling or trapping wild fish at the hatchery, they do not seek to enjoin those activities, and so that alleged take presents no issues for this Court to address. (See ECF #. 73 at 20.)

Department of Justice
1515 SW Fifth Ave, Suite 410
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

### III. BACKGROUND

Natural-origin spring Chinook primarily spawn in the upper McKenzie River basin above Leaburg Dam. (Declaration of Cameron Sharpe ("Sharpe Dec."), ¶10.) Juveniles generally outmigrate from their natal streams to the ocean about a year after emerging from the gravel. They enter the ocean after smolting, which is a physiological change that prepares the fish to enter salt water. Spring Chinook remain in the ocean for two or three years before they return to their natal streams to spawn as four or five-year-old fish. (Sharpe Dec., ¶ 3.)

The McKenzie River basin contains four dams: Cougar Dam, Leaburg Dam, Blue River dam, and Trail Bridge Dam. The Corps' Cougar Dam on the South Fork McKenzie River is nearly 500 feet tall and completely blocks access to about 25% of the historic spring Chinook spawning habitat in the McKenzie River basin. (Sharpe Dec., ¶ 10.) Historically, up to 7000 or 8000 adult spring Chinook salmon returned annually to the South Fork McKenzie River, most having been produced in the area above the present site of Cougar Dam. (Sharpe Dec., ¶ 10.) Both the Blue River Dam and Trail Bridge Dam also block habitat. Leaburg Dam is on the mainstem McKenzie River and contains two fish ladders on either side of the dam that enable returning adults to pass the dam. (Sharpe Dec., ¶¶ 16, 18, 34.)

In 2011, in the Upper Willamette River Conservation and Recovery Plan for Chinook Salmon and Steelhead ("Recovery Plan"), NMFS and ODFW (co-authors) evaluated the impediments to recovery of spring Chinook in the McKenzie River basin. They assigned relative values to the limiting factors: 49% hydro flood control (dams); 26% freshwater habitat loss and degradation; 13% hatchery impacts; 5% harvest; and 5% other species. (*See* Upper Willamette River Conservation and Recovery Plan, p. 6-40 (2011), available at:

http://www.nmfs.noaa.gov/pr/pdfs/recovery/chinook_steelhead_upperwillametteriver.pdf

("Recovery Plan".) The latest population assessment was performed for the Recovery Plan in 2011, and the McKenzie run was found to be at low risk of extinction. (*Id.* p. 4-7.)

Department of Justice
1515 SW Fifth Ave, Suite 410
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

The McKenzie Hatchery is owned by the Corps and operated by ODFW under a cooperative agreement. (Declaration of Steve Marx ("Marx Dec."), ¶ 2.) This hatchery (or its predecessor) began releasing hatchery spring Chinook in the McKenzie River in 1902. Declaration of Jeffrey Ziller ("Ziller Dec."), ¶ 6 & Recovery Plan, *supra* at p. 4, at p. 5-9.) The hatchery is operated as an integrated program. Its originating stock was local wild spring Chinook salmon and, until 2013, ODFW has operated the hatchery by integrating a small percentage of natural-origin fish into the broodstock to maintain genetic diversity within the hatchery population. (Sharpe Dec., ¶ 6.) The hatchery has several current purposes: to mitigate for the loss of natural production and fisheries impacts from construction and operation of the Corps' dams, and to serve conservation purposes by providing fish to assist with evaluation of passage alternatives and reintroduction of fish above impassable dams. (Marx Dec., Ex. 3, p. 8 (Dec. 2014 HGMP).)

A. **Listing decisions.**

NMFS listed natural-origin Upper Willamette River spring Chinook salmon in March 1999 and listed hatchery-origin Upper Willamette River spring Chinook in 2005. NMFS' policy for considering hatchery-origin fish in listing determinations requires that NMFS include hatchery fish in any listing of an evolutionary significant unit ("ESU") when hatchery fish have "a level of genetic divergence relative to the local natural population(s) that is no more than what occurs within the ESU." 70 Fed. Reg. 37215. NMFS' policy highlights the benefits hatchery fish can have for the ESU: "The presence of hatchery fish within the ESU can positively affect the overall status of the ESU, and thereby affect a listing determination, by contributing to increasing abundance and productivity of the natural populations in the ESU, by improving spatial distribution, by serving as a source population for repopulating unoccupied habitat, and by conserving genetic resources of depressed natural populations in the ESU." 70 Fed. Reg. 37215. Negative effects are also possible if hatchery programs are not managed well. *Id.*

Department of Justice
1515 SW Fifth Ave, Suite 410
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

**B.      HGMP submissions.**

The Corps, with input from ODFW, has submitted several versions of the McKenzie HGMP to NMFS for consultation.  Sometimes the Corps has chosen to accept ODFW input and sometimes the Corps has chosen to reject it.  When the Corps has rejected ODFW's input, ODFW has made comments directly to NMFS. (Marx Dec., ¶¶ 3, 6.)

For example, in January 2014, ODFW commented on a draft HGMP containing a number that purported to be the required program size for broodstock and conservation needs.  The Corps contended the required program size is 360,000 smolts.  ODFW disputed that broodstock and conservation needs could be met with a release of 360,000 smolts and deleted the figure. (Marx Dec., ¶ 3.)  The Corps rejected ODFW's comment and submitted the HGMP with the incorrect broodstock and conservation requirements.  ODFW again corrected the 360,000 smolt number in comments later made directly to NMFS.  (Marx Dec., ¶ 6.)  Later versions of the HGMP do not include the incorrect 360,000 smolt number.  (Marx Dec., ¶ 6.)

The Corps submitted the latest version of the HGMP formally to NMFS for consultation on December 11, 2014.  (Marx Dec., Ex. 3.)  ODFW thereafter submitted suggested revisions to the HGMP directly to NMFS.  (Marx Dec., ¶ 7.)

**C.      2008 Willamette Project BiOp.**

Following the expiration of a 2000 Biological Opinion that covered the operation of the McKenzie Hatchery, among other projects and facilities, the federal agencies that own and operate the 13 Willamette Project dams and reservoirs in the Upper Willamette River basin sought to initiate consultation again with NMFS on the impact of their projects on listed fish. NMFS ultimately issued the 2008 Willamette Project BiOp.  The BiOp expressly includes the operation of the McKenzie Hatchery as part of the proposed action on which consultation was sought.  BiOp, 2.10.4 (AR 35875.)  NMFS found that a set of Reasonable and Prudent Alternatives ("RPAs") should be implemented to avoid jeopardy to the species.  *See* 16 U.S.C. § 1536(b)(4)(C).  Some of the RPAs relate to operation of the Upper Willamette River basin

hatcheries, including the McKenzie Hatchery. The 2008 BiOp includes an Incidental Take Statement ("ITS"), which constitutes an exemption from liability under Section 9. BiOp, Ch. 11 (AR 35235). As NMFS has explained, "The incidental take of listed Chinook salmon is covered in the 2008 Opinion and Incidental Take Statement." (Marx Dec., Ex. 10.)

Several RPAs relate to the operation of the McKenzie Hatchery, but two are central to this dispute. First, RPA 6.1.4 requires actions that are expected to decrease the hatchery stray rate and thereby decrease the proportion of hatchery-origin spawners in the McKenzie River above Leaburg Dam. BiOp 9.6.1.4 (AR 35182.) The RPA establishes three alternatives. First, the federal agencies are directed to study and design an automatic sorting facility to be installed at Leaburg Dam that would sort hatchery fish from natural-origin fish without human handling. But, if an automatic sorting facility is determined not to be feasible, then the federal agencies are directed to seek NMFS' approval on an alternative sorting facility design. That alternative design was to be completed by December 2013 "and begin operation in time for the spring Chinook upstream migration in 2014." A third alternative is also presented: "If an acceptable sorting facility at this site is deemed infeasible by the Working Group and agreed to by NMFS, then the Action Agencies will take alternative actions to reduce hatchery fish straying to less than 10% of the total population spawning in the wild." Notably, the RPA provides no timeline by which either the alternative actions must be implemented or the identified goal must be achieved. Moreover, the language NMFS used for the third alternative indicates that the 10% standard is a pHOS goal for those fish in the basin that are not intentionally used for outplanting. This is because those outplanted fish did not "stray" above Cougar Dam; they were placed there intentionally in an effort to boost natural production and reseed historical habitat. (Sharpe Dec., ¶¶ 14 & 36-37.)

Second, RPA 6.2.3 requires the continuation of the adult Chinook outplanting program above Willamette Project dams, including Cougar Dam. Chapter 2 of the BiOp describes the existing program of outplanting hatchery adults above Cougar Dam in order to re-seed the

Department of Justice
1515 SW Fifth Ave, Suite 410
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

historical Chinook spawning habitat that is now blocked by dams.  *See* BiOp 2.10.1.2 (AR 35853-56.)  RPA 6.2.3 requires that the action agencies "Continue the existing Adult Chinook Salmon Outplanting program, capturing spring Chinook salmon below USACE projects and transporting them into habitat that is currently inaccessible above the following dams: . . .in the South Fork McKenzie, above Cougar Dam."   The RPA specifically directs the hatchery programs to use hatchery fish.  *See* RPA 6.2.3 (AR 35186-87 (noting that the "use of hatchery fish is more appropriate in many cases than using natural-origin fish").)

Other RPAs also establish requirements for the McKenzie Hatchery program to meet. Those include complying with an approved HGMP, conducting ongoing monitoring activities, integrating natural origin fish into broodstock, marking hatchery fish, adjusting the smolt release strategy, and improving collection facilities.

### D.     Leaburg Sorter History.

The Corps evaluated designs for a sorting facility but determined that it was not feasible to construct.  To ODFW's knowledge, NMFS did not concur with this conclusion formally or in writing.  (Marx Dec., ¶¶ 13-14.)  Yet, in early April 2014, the Corps sought NMFS' approval of a set of alternative actions to satisfy the third (10% pHOS below Cougar Dam) alternative described in RPA 6.1.4.  (Marx Dec., Ex. 8)  Among the actions contemplated was a reprogramming of fish raised at McKenzie Hatchery for release outside the McKenzie River basin.  By spring of 2014, ODFW had already completed that action and had reprogrammed over 30% of the McKenzie smolt releases to alternative locations.  (Marx Dec., ¶¶ 9, 14, Ex. 8.)

The Corps proposed three additional actions:  (1) The Corps would improve attraction of hatchery adults to the hatchery by redistributing a unique water source from Cogswell Creek and by redesigning the hatchery ladder entrance.  The Corps proposed to make those changes in 2017 to be operational in 2018.  (Marx Dec., Ex. 8.)  (2) reduction in federal production at the McKenzie Hatchery of 861,000 smolts by 74,000 smolts so that only 787,000 smolts would be released annually starting in 2015.  (3)  The Corps proposed to pursue actions to improve

downstream fish passage at Cougar Dam, including in 2015, seeking Congressional

appropriations for the project.  (Marx Dec., Ex. 8.)

NMFS *expressly* approved the Corps' proposed actions as sufficient to comply with

RPA 6.1.4.  With respect to the first two actions (hatchery modifications and reduction of releases

to 787,000 smolts), NMFS noted that the benefits of these actions will not occur until 2018.  It then

stated, "NMFS concurs that these actions satisfy the alternative in RPA action 6.1.4 to reduce the

number of hatchery fish on the natural spawning grounds."  (Marx Dec., Ex. 9.)

### E.     Outplanting History.

In 2008, when the BiOp was issued, it was unknown how many adult fish returned to

Cougar Dam from the adult fish outplanted above the dam.  (Marx Dec., ¶ 10.)  Since then, the

Corps has developed an effective trapping facility, which has enabled ODFW to calculate an adult

return rate.  The return rate for fish outplanted above Cougar Dam is low.  For every 10 adult fish

outplanted above the dam, only about 4 currently return.  (Sharpe Dec., ¶ 22.)

ODFW and NMFS have since collaborated and developed a reintroduction plan for the

Cougar Dam outplanting program.  (Marx Dec., ¶¶ 10-11.)  The plan calls for ODFW to release as

many juvenile hatchery fish as necessary for 400 adult female spring Chinook and 200 adult male

spring Chinook to return and be outplanted, with hatchery fish used to supplement the natural-

origin fish returning to the Cougar Dam.  (Marx Dec., ¶ 11 & Ex. 5.)  ODFW and NMFS

determined that this is necessary in order to reestablish a self-perpetuating population.  (Sharpe

Dec., ¶ 37.)  This is also consistent with other relevant guidance.  (*See* Marx Dec., ¶ 12.)

### F.     History of Hatchery Releases, pHOS, and ODFW Actions to Reduce Below-Cougar-Dam pHOS.

In 2011, ODFW released more than 1.2 million fish from the McKenzie Hatchery.  In

2012, recognizing that the sorter at Leaburg Dam might not be built and that pHOS was too high,

ODFW reduced the release to about one million fish.  In 2013, ODFW reduced the release again

to about 880,000 fish.  Earlier in 2014, just over 850,000 fish were released.  A total of about

Department of Justice
1515 SW Fifth Ave, Suite 410
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

605,000 are in production for release in February and March of 2015. The same number is in production for release in 2016. And the HGMP submitted to NMFS for consultation on December 11, 2014 will, if approved, authorize 604,750 smolts to be released in 2016 and 2017. Significantly, this 604,750-smolt program size will be sufficient to meet outplanting needs only about 50% of the time. (Sharpe Dec., ¶ 28.)

Below-Cougar pHOS in the McKenzie basin has been at an average of about 34% over the last 12 years. (Sharpe Dec., ¶ 36.) The Leaburg sorter contemplated by the BiOp would have effectively eliminated hatchery spring Chinook above Leaburg Dam where the core natural production areas are located. Now that it is clear that the sorter will not be built and unclear when actions will be taken to improve downstream passage at Cougar Dam, ODFW has taken additional actions to reduce the below-Cougar-Dam pHOS. In addition to reducing the size of the program to half its 2011 size, ODFW has modified the hatchery ladder to improve attraction of hatchery fish, moved production of the fish reprogrammed to the Coast Fork, and ceased fall releases in the McKenzie River. (Sharpe Dec., ¶¶ 18, 21-25.)

## IV. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). Where the movant has the burden of proof on an issue at trial, it must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir.2007).

"[S]ummary judgment will not lie if [a] dispute about a material fact is 'genuine,' that is, if the

Department of Justice
1515 SW Fifth Ave, Suite 410
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 at 248, 106 S.Ct. 2505 (1986). In ruling on a

motion for summary judgment, the district court does not make credibility determinations; rather,

the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in

his favor." *Id*. at 255.

## V.    ARGUMENT

### A.    Plaintiffs Fail to Meet Their Burden to Prove that ODFW's Planned Releases of Hatchery Smolts Would Cause a "Take" of Wild Spring Chinook Salmon.

Plaintiffs contend that ODFW's operation of the McKenzie Hatchery causes take of wild

Chinook salmon in violation of Section 9 of the ESA. Plaintiffs seek only to enjoin alleged

*indirect* "take" caused by habitat modification resulting from the release of hatchery smolts into

the McKenzie River. (ECF # 73 at 24 & 26.) They seek injunctive relief prohibiting ODFW

from releasing more than 360,000 hatchery Chinook smolts annually in to the McKenzie. *Id*.[2]

While Plaintiffs correctly recite the statutory and regulation definitions of "take" under

Section 9,[3] they misstate their burden of proof and ignore a large body of case law applying those

definitions in situations involving indirect take by habitat modification. Plaintiffs assert

incorrectly that they need only prove by a preponderance of evidence ODFW's "actions *may*

---

[2] Although Plaintiffs allege some direct take by handling or trapping wild fish at the hatchery, they do not seek to enjoin those activities, and so that alleged take presents no issues for this Court to address. (See ECF # 73 at 20.)

[3] "Take" is defined as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). To prove "take" by "harm," plaintiffs must prove that the planned release of hatchery fish would actually kill or injure wild spring Chinook salmon. An act which actually kills or injures wildlife "may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 CFR § 17.3. To prove actual harm, plaintiffs must submit evidence that an act caused or *is reasonably certain to cause* injury or death to the species at issue. *American Bald Eagle v. Bhatti*, 9 F.3d 163, 165-68 (1st Cir. 1993). Evidence must either show "that the alleged activity has actually harmed the species or if continued will actually, as opposed to potentially, harm the species." *Id*. at 166. To prove a "take" by harassment, plaintiffs must prove that release of hatchery fish creates a likelihood of injury by significantly disrupting normal behavioral patterns such as breeding, feeding, or sheltering. 50 CFR § 17.3.

cause take of 'one or more' members of a listed species." (ECF # 73 at 24 (emphasis added).)

Case law is clear, however, that the standard is *not* whether a defendant's action *may* cause take, but whether those actions *more likely than not* will *in fact* cause take. Plaintiffs' evidence does not meet this burden. Accordingly, the State is entitled to summary judgment in its favor on Plaintiff's Section 9 claim.

> **1.     To Prove Take By Habitat Modification Caused by Release of Hatchery Smolts, Plaintiffs Must Submit Evidence of a Population Effect on Wild Spring Chinook Salmon in the McKenzie.**

To prove their Section 9 claim for which they seek injunctive relief, Plaintiffs must prove by a preponderance of the evidence that release of more than 360,000 smolts annually from the McKenzie Hatchery will cause a population effect on wild Chinook salmon in the McKenzie basisn. *See, e.g., Defenders of Wildlife v. Bernal* 204 F.3d 920, 924 -925 (9th Cir. 2000) ("Harming a species may be indirect, in that the harm may be caused by habitat modification, but habitat modification does not constitute harm unless it "actually kills or injures wildlife.'") (quoting *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,* 515 U.S. 687 (1995)); *Coalition for a Sustainable Delt, v. John McCamman,* 725 F. Supp. 2d 1162 (E.D. Cal. 2010) (relying on *Babbit* in holding that proof of a population level effect on listed species is necessary to prove harm by habitat modification).

The plaintiffs in *Coalition* sought to enjoin California's regulation of striped bass, arguing that the regulation artificially inflated that species' numbers, thereby increasing predation on protected salmonids and resulting in a take under Section 9. The case concerned "harm by habitat modification" rather than "direct" harm. *Id*. The court noted that "this distinction is important, because, where direct harm and harm by habitat modification appear to differ is in their need for proof of a population-level effect." *Id*. (emphasis added). The court concluded that the "balance of the authority suggests that proof of a population level effect is necessary for harm resulting from habitat modification to be considered a take." *Id*. at 1170. The court went on to say that an

action that merely "disturbs the balance of an ecosystem" should not rise to the level of an actionable take because it would "effectively eviscerate *Sweet Home's* requirements of proximate causation and foreseeability, imposed upon cases concerning harm from habitat modification." *Id.* at 1170–71.

In addition, the regulatory definition shows that the habitat modification must cause consequent injury to the protected species that is more than a temporary disturbance. *See* 46 Fed. Reg. 54750 ("The word 'impair' was substituted for 'disrupt' [in the regulatory definition of harm] to limit harm to situations where a behavioral pattern was adversely affected and not simply disturbed on a temporary basis with no consequent injury to the protected species."). Accordingly, to show "take" due to habitat modification, Plaintiffs must submit proof of a non-temporary, population-level effect that is reasonably certain to result from (i.e., be proximately caused by) release of Chinook smolts from the McKenzie Hatchery.

District court cases outside the Ninth Circuit are consistent with *Coalition*, concluding that plaintiffs must show a decline in the population of a species to prove harm by habitat modification. In *Hawksbill Sea Turtle v. FEMA*, 11 F Supp 2d 529 (D. Vir. Isl. 1998), plaintiffs alleged that a temporary housing project would harm three protected species. The court rejected their Section 9 claims because they did not provide either direct evidence of killed or injured species or evidence that the alleged take caused a "general decline" in the species. *Id.* at 537–540, 552–555. Similarly, the plaintiffs in *Morrill v. Lujan*, 802 F Supp 424 (S.D. Ala. 1992), sought to enjoin the construction of a hotel complex due to the threat to an endangered mouse. The court rejected their Section 9 claims because it was not persuaded the project "could threaten the existence of the beach mouse." *Id.* at 432.

Similarly, a federal district court in Maine held that theoretical causation of deaths by animal traps and studies of other species in other geographical areas did not prove take by harm to an endangered lynx. *Animal Welfare Institute v. Martin*, 668 F. Supp. 2d 254, 266-71 (D. Me. 2009). In that case, the plaintiffs' expert offered a theoretical pathway by which trapping could

Department of Justice
1515 SW Fifth Ave, Suite 410
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

cause stress-based injury and death. *Id.* Additionally, plaintiffs offered studies with "an attenuated relationship" to the lynx in Maine and myriad criticisms of the defendants' evidence that trapping did not cause take by harm. *Id.* The court found that the plaintiffs could not meet their burden of proof by criticizing the defendant's "generic evidence and speculative inferences." *Id.* at 272. In total, indirect and speculative evidence was not enough to prove actual take or a reasonable certainty of future take. *Id.*

Finally, contrary to Plaintiffs' assertion that hatchery fish necessarily harm wild fish, the mere existence of a hatchery program does not *by itself* prove take of natural-origin populations. The Ninth Circuit has recognized that "the best scientific evidence available" shows that the impact of hatchery programs varies, depending on management practices. *Trout Unlimited v. Lohn*, 559 F.3d 946, 958 (9th Cir. 2009). The court reasoned that the best available evidence shows that well-managed hatchery programs can support recovery by "increasing abundance and productivity of the natural populations in the [Evolutionary Significant Unit (ESU)], by improving spatial distribution, by serving as a source population for repopulating unoccupied habitat, and by conserving genetic resources of depressed natural populations in the ESU." *Id.*

### 2. Plaintiffs' Evidence Is Insufficient to Prove a Population Level Effect.

Plaintiffs' primary "evidence" that release of hatchery Spring Chinook smolts will cause take is the general principle that hatchery fish pose *risks* of harmful genetic introgression from interbreeding with wild fish. Plaintiffs do not, however, offer any evidence of *actual* harmful genetic introgression *caused by* release of hatchery Chinook that has resulted or will resulted in a population level effect on wild Spring Chinook in the McKenzie.

Plaintiffs rely on the following sources to prove harm by habitat modification: (1) statements by NMFS in finding jeopardy posed by federal projects (dams) stating that the risk of genetic introgression of hatchery fish into the wild population is of significant concern and describing the importance of reducing pHOS; (2) testimony from Plaintiffs' expert Dr. Gordon Luikart regarding risks posed by hatchery fish to wild fish; (3) a study published by Dr. Mark

TBW/mjo/6024989-v10

Department of Justice
1515 SW Fifth Ave, Suite 410
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Christie noting the effect of hatchery steelhead trout on winter-run wild steelhead trout in the Hood River; (4) a declaration filed by head of ODFW's Fish Division in a different case arising in a completely different context describing general risks hatchery fish pose to wild fish when pHOS is over 5% and 10%; (5) deposition testimony given by ODFW employee Cameron Sharpe stating that male and female hatchery adult spring Chinook tend to be smaller than their wild counterparts; and (6) federal case law recognizing the general risks that hatchery fish pose to wild fish. While these sources may establish general risks, none proves that release of hatchery Chinook has caused any actual species-wide harm to wild Chinook in the McKenzie River.

> **a.    The General Principle that Hatchery Fish Pose Risks to Wild Fish Does Not Prove Take By Habitat Modification Here.**

ODFW agrees that there are risks associated with hatcheries. ODFW also agrees that it should achieve less than 10% pHOS as part of its approach to mitigating against those risks. General risks, however, do not prove that the McKenzie Chinook hatchery fish in fact have any harmful maladaptive genes,[4] much less that those fish will likely cause any non-temporary, species-wide harm to their wild counterparts when they return from the ocean several years after being released.

Plaintiffs offer testimony from their expert, Dr. Luikart, opining that "maladaptive genes from the hatchery Chinook will likely be transmitted and reduce the fitness of wild Chinook if hatchery Chinook are allowed to spawn in the wild . . . ." (ECF # 73 at 26-27.) This testimony is insufficient to meet Plaintiffs' burden of proof.

---

[4]Plaintiffs cite deposition testimony from ODFW's expert Cameron Sharpe for the proposition that "[h]atchery Chinook in the McKenzie River manifest maladaptive traits" because they tend to be smaller than their wild counterparts. (ECF #73 at 27.) Plaintiffs' reliance on this testimony is misplaced. As Dr. Johnson explains in his declaration, the smaller size of McKenzie hatchery Chinook has not been shown to have a genetic basis, nor has it been shown that interbreeding with hatchery Chinook transfers any maladaptive traits or results in long-term, genetic harm to wild McKenzie Chinook. (*See* Johnson Dec., ¶¶ 12-13.)

Department of Justice
1515 SW Fifth Ave, Suite 410
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

First, Dr. Luikart does not present any facts showing that harmful maladaptive genes exist in McKenzie hatchery Chinook that do not otherwise exist in their wild counterparts. Because the McKenzie Hatchery's spring Chinook salmon broodstock was founded primarily by locally-sourced, wild fish and, until recently, wild fish have been incorporated into the broodstock; therefore, there is no basis to conclude that the hatchery population contains unique "maladaptive genes." (Johnson Dec., ¶ 6.) Indeed, "empirical evidence suggests (Johnson and Friesen 2013, 2014), that the McKenzie Hatchery population of spring Chinook salmon contains the same genes that exist in the local wild population." *Id*. There is no empirical evidence of unique "maladaptive genes" existing in the McKenzie Hatchery population of spring Chinook salmon. (*Id*.)

Second, Dr. Luikart acknowledged in his deposition that (other than what is in the Banks and Johnson & Friesen studies) he can speak *only* to general risks[5] and has *no* empirical data showing that the general risks have or will materialize (or to what extent) in wild Spring Chinook in the McKenzie. (*See* Declaration of Christina Beatty-Walters ("Beatty-Walters Dec."), Ex. 1 (Luikart Dep. 35:1-12, 34: 21-25; 38:3-15; 18:7-8).) As Dr. Johnson's declaration demonstrates, neither the Banks nor the Johnson & Friesen studies contain any evidence to prove any population level effect on wild Spring Chinook in the McKenzie, or that there has been any actual harmful genetic introgression. (Johnson Dec., ¶¶ 11-13.) Indeed, as noted above, despite the risks posed by the interactions of hatchery and natural-origin fish and a high average pHOS over the last several decades in the McKenzie River, wild spring Chinook in the McKenzie River are at a *low* risk of extinction.

### b. pHOS Above 10% does Not Prove Take.

Plaintiffs rely heavily on estimates of pHOS to prove take by release of hatchery Spring Chinook in the McKenzie River. This reliance is misplaced. First, Plaintiffs ignore that even if

---

[5] Indeed, Dr. Luikart conceded that he was probably not aware of all the factors that affect the wild spring Chinook's recovery in the McKenzie basin, nor has he published any peer-reviewed papers on spring Chinook salmon. (Beatty-Walters Dec., Ex. 1 (Luikart Dep. 13:19-22; 20:7-9).)

ODFW has exceeded the 10% pHOS limit in the ITS (which as explained above, it has not) is not sufficient by itself to prove take under Section 9. *See, e.g., Oregon Natural Desert Ass'n v. Tidwell,* 716 F.Supp.2d 982, 1005 (D. Or. 2010) (explaining that "where the ITS utilizes a habitat proxy for take, as here, the exceedance of the ITS in and of itself does not establish a violation of § 9" and "*plaintiffs must still demonstrate that take has occurred*." (emphasis added)). Moreover, as Dr. Johnson's declaration makes clear, pHOS is insufficient to prove actual harm by genetic introgression, much less a population-level effect on wild spring Chinook in the McKenzie. (Johnson Decl., ¶¶ 15-20.) In short, while pHOS can and should be used by fishery managers to manage risk, it cannot and should not be equated to genetic introgression because it: (1) ignores assortative mating and (2) assumes equal reproductive success by hatchery and wild fish on spawning grounds. *Id.*, ¶ 18-20. As explained throughout Dr. Johnson's Declaration and as Plaintiffs' expert admitted in his deposition, there is *no empirical evidence* of harm from genetic introgression to the wild McKenzie River spring Chinook salmon population.

In addition, Plaintiffs inappropriately rely on a declaration filed in the Columbia River dams case by Edward Bowles, the head of ODFW's Fish Division (Bowles 2008 Declaration). Plaintiffs appear to suggest that the Bowles 2008 Declaration regarding risks posed by exceeding certain pHOS standards provides some evidence of harm to wild spring Chinook in the McKenzie. But, as Mr. Bowles explains, his 2008 declaration has little relevance in the McKenzie, and should not be used to conclude that there is a one-size-fits-all magical number to determine the extent of risk posed by stray rates in all situations. (*See* Declaration of Edward Bowles in Support of State's Cross-Motion for Summary Judgment ¶ 3.) The testimony in the Bowles 2008 Declaration addressed risks from stray hatchery fish for only certain kinds of situations, such as risks from out-of-basin (and indeed, out of state) strays in the Deschutes basin, which is not the situation in the McKenzie. The risk of harm from stray hatchery fish depends on a variety of factors, including, among other things, similarities between hatchery and wild fish, and such risk must be evaluated on a case-by-case basis. *Id.* ¶¶ 3-5. Here, there is empirical

STATE DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

TBW/mjo/6024989-v10

Department of Justice
1515 SW Fifth Ave, Suite 410
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

evidence of high genetic diversity in both hatchery and wild McKenzie River spring Chinook populations and strong genetic similarity between them.   In short, a six-year old declaration from a *different* case involving *different* fish in a *different* water body does not prove that exceedance of applicable pHOS standards has resulted or will result in any permanent harm to wild Chinook in the McKenzie basin. (*Id*.)

Finally, and perhaps most importantly, Plaintiffs fail to account for the likelihood that the significant reduction in the number of smolts ODFW plans to release annually beginning this Spring (from 1.2 million to 605,000 annually) will reduce pHOS in the coming years to below 10%.  (*See* Sharpe Dec., ¶¶ 28-36.)  Plaintiffs own expert agrees that this reduction is likely to substantially reduce pHOS.  (Beatty-Walters Dec., Ex. 1 (Luikart Dep. 44:1-43:13-25; 44:18-24).)

> **c.** **There is No Evidence of Any Permanent Decline in the Wild Chinook Population in the McKenzie basin Caused by Hatchery Fish.**

Citing Dr. Luikart's declaration, Plaintiffs assert that "the steady decline of wild Chinook in the McKenzie River basin over the last decade is entirely consistent with and . . . corroborates . . . reproductive depression associated with the huge and planned hatchery Chinook releases over that period."  (ECF # 73 at 28.).  This assertion does not support Plaintiffs' Section 9 claim.

First, Plaintiffs misquote their own expert.  Dr. Luikart did not declare that the alleged decline of wild Chinook in the McKenzie "corroborates" anything.  Rather, he merely declared: "the steady decline of wild Chinook in the McKenzie River basin over the last decade is consistent with (and expected from) reproductive depression associated with the many millions of hatchery Chinook releases over that period."  (ECF # 79, ¶ 32.)  Second, reproductive depression of the wild McKenzie River Chinook population has not been demonstrated and, therefore, cannot be corroborated.  (Johnson Dec., ¶ 14.)

Department of Justice
1515 SW Fifth Ave, Suite 410
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Third, empirical evidence does not suggest a "steady decline of wild Chinook in the McKenzie River basin." Instead, as explained in the Declaration of Jeff Ziller, the abundance of wild Chinook in the McKenzie River has fluctuated through time in a manner similar to many other (wild and hatchery) spring Chinook salmon populations. (Ziller Dec., ¶ 2.) There is no evidence that proves or suggests that these population fluctuations are caused by the release of hatchery fish in the McKenzie River. (*Id*.) Moreover, Plaintiffs ignore that any decline of wild Chinook in the McKenzie River is more directly caused by other risk factors such as dams and loss or degradation of habitat. (*See* Recovery Plan, discussed *supra* p. 4; Johnson Dec. ¶ 15.)

### d. Studies Performed on Other Species in Other Basins Do Not Prove that Hatchery Chinook Cause a Population Level Effect on Wild Spring Chinook in the McKenzie.

Plaintiffs and their expert inappropriately extrapolate findings from research on the reproductive success of other species to McKenzie River spring Chinook salmon. (ECF # 73 at 28 & ECF # 79 at ¶¶ 39-44.) Patterns of reproductive success described for hatchery and wild steelhead in other water bodies do not prove that harm from hatchery Chinook will manifest in McKenzie River, particularly when important species-level differences are known to exist. (Johnson Dec., ¶ 22.) For example, as ODFW's expert, Dr. Marc Johnson, explains, in their study of spring Chinook from the Wenatchee River, Ford et al. (2012) observed that "[i]n contrast to an earlier study of steelhead trout, we found little evidence that parental origin of the captive spawners influenced the subsequent reproductive success of their naturally spawning progeny." (Johnson Dec., ¶ 22.) As Dr. Johnson further explains, studies have shown that while hatchery effects on *steelhead* may persist into later generations, hatchery effects on spring Chinook fitness have been shown to cease after a single life cycle. *Id.*

### e. Hatchery Chinook Can Benefit Wild Chinook in the McKenzie.

Finally, the Ninth Circuit and Plaintiffs' expert recognize that hatchery fish can in fact benefit listed wild fish. *See, e.g, Trout Unlimited v. Lohn*, 559 F.3d 946, 958 (9th Cir. 2009)

TBW/mjo/6024989-v10

Department of Justice
1515 SW Fifth Ave, Suite 410
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

(acknowledging that best available evidence shows that well-managed hatchery programs can support recovery by "increasing abundance and productivity of the natural populations in the [Evolutionary Significant Unit (ESU)], by improving spatial distribution, by serving as a source population for repopulating unoccupied habitat, and by conserving genetic resources of depressed natural populations in the ESU").  Plaintiffs' expert concedes these benefits and acknowledged that they exist in the McKenzie.  (*See* Beatty-Walters Dec., Ex. 1 (Luikart dep. 17:16-25, 18:1-8; 18:15-25; 19:5-7).)

In sum, because, Plaintiffs offer no actual evidence to establish that the planned releases from the McKenzie hatchery will cause a non-temporary, species-wide, population-level effect on wild Spring Chinook, summary judgment should be granted in the State's favor on Plaintiffs' Section 9 claim.

**B.      The State is Immunized From Any Take Liability Under the ITS.**

**1.      An ITS Protects non-federal entities from Take Liability.**

Even if there were incidental take from the operation of the hatchery, the State's actions in operating the McKenzie Hatchery are protected from Section 9 liability by the 2008 BiOp and its incorporated ITS.  An ITS "functions as a safe harbor provision immunizing persons from Section 9 liability and penalties for takings committed during activities that are otherwise lawful and in compliance with its terms and conditions." *Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt.*, 273 F.3d 1229, 1239 (9th Cir. 2001).  NMFS may issue an ITS after reviewing whether an action authorized, funded, or carried out by a federal agency, referred to as the "action agency," is likely to jeopardize the continued existence of a listed species.  16 U.S.C. § 1536(a)(2).  That review is called Section 7 consultation.

If NMFS concludes after that consultation that an action authorized, funded, or carried out by a federal agency will not jeopardize the continued existence of a species (or that the action as modified by Reasonable and Prudent Alternatives (RPAs) suggested by NMFS will not result in jeopardy), then NMFS "shall provide the Federal agency and the applicant concerned, if any,"

Page 20 -  STATE DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

with an ITS that "sets forth the terms and conditions . . . that must be complied with by the federal agency or applicant[.]" 16 U.S.C. § 1536(b)(4)(C). "A 'take' occurring under an ITS is exempt from ESA Section 9 liability." *Ramsey v. Kantor*, 96 F.3d 434, 441 (9th Cir.1996).

While Section 7 refers only to the "federal agency" or "applicant" when discussing who is protected by and must comply with an ITS, the Ninth Circuit has interpreted the ESA to extend an ITS's protection to other parties. The Court held that "a party that is neither a federal agency nor an applicant can take members of a listed species without violating the ESA, provided the actions in question are contemplated by an incidental take statement issued under Section 7 of the ESA and are conducted in compliance with the requirements of that statement." *Ramsey*, 96 F.3d at 442. The Ninth Circuit reaffirmed that holding three years later in a memorandum opinion. *Friends of the Wild Swan v. Babbitt*, 168 F.3d 498 (9th Cir. 1999). Under that case, take of protected species is not prohibited under Section 9 if it is (1) "contemplated" by the ITS and (2) conducted in compliance with the terms of the ITS.

In *Ramsey*, the take in question—Oregon and Washington's authorization of salmon fishing in the Columbia River—was not prohibited because it was "clearly contemplated by the incidental take statement and thus explicitly falls within the bounds of the actions approved under that statement." *Ramsey*, 96 F.3d at 442. There, NMFS issued a BiOp and ITS to itself and other agencies. *Id.* at 440. While the BiOp did not name Oregon and Washington as recipients of the BiOp, it "clearly include[d] more than just actions to be undertaken directly" by the named agencies. *Id.* at 441. Importantly, the ITS that accompanied the BiOp explicitly analyzed fishing in the Columbia River, and stated that fishing could only take place under regulations promulgated by Oregon and Washington. *Id.* Because there appeared to be no dispute that Oregon and Washington's regulations were "in accordance" with the terms of the ITS, the state's regulations were not a prohibited take. *Id.*

Department of Justice
1515 SW Fifth Ave, Suite 410
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

### 2. The ITS in the BiOp Contemplates ODFW's Operation of the McKenzie Hatchery.

In its BiOp, NMFS plainly considered the operation of the McKenzie Hatchery among the proposed actions under consultation. The BiOp describes the operation of the hatchery. BiOp 2.10.4 (AR 35875.) The sixth RPA specifically directs the Action Agencies "to work cooperatively with the State of Oregon" to operate the Willamette Project hatchery programs and provides requirements for hatchery operations. BiOp at 9.6.1, 9.6.2 (AR 35180, 35185.) The ITS itself lists the release of hatchery fish in the McKenzie River, operation of Leaburg Dam trap, and broodstock collection by the McKenzie Hatchery program as covered activities. BiOp 11.1.7, Table 11.1-5 (AR 35265.) The BiOp and ITS were designed to cover the operations of the McKenzie Hatchery.

### 3. ODFW Operates the McKenzie Hatchery in Compliance with the ITS.

ODFW is protected from liability under Section 9 for its operation of the McKenzie Hatchery because it is operating the hatchery in compliance with the ITS and those RPAs that relate to the hatchery operation requirements.

#### a. HGMP Compliance and Integration.

RPA 6.2.1 and 6.2.2 require compliance with the HGMP once approved by NMFS and require integration into broodstock of local natural-origin fish. BiOp 9.6.2.1, 9.6.2.1.2 (AR 35185.) As noted, the McKenzie HGMP has not yet been approved, but an HGMP has been formally submitted. (Marx Dec., Ex. 3.) That HGMP is based on current hatchery practices and strategies, which were designed in close coordination with NMFS. (Marx Dec., ¶¶ 3-7.) In fact, ODFW is implementing the practices described in the submitted HGMP. (Marx Dec., ¶¶ 8-9.) For example, ODFW is planning to release only 604,750 smolts in 2015 and will only raise enough fish to release 604,750 smolts in 2016, which is what the submitted HGMP will require, if approved. The one exception to ODFW's compliance with the submitted HGMP and with the RPAs is the requirement to incorporate natural-origin fish into the broodstock.

Department of Justice
1515 SW Fifth Ave, Suite 410
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

ODFW is not using natural-origin fish currently as broodstock and will not do so until an

HGMP is approved that permits it. (Sharpe Dec., ¶ 6; *see also* Marx Dec., Ex. 10 (NMFS letter

stating that indirect, not direct, take is covered by the BiOp). The BiOp provides immunity from

liability only for indirect or incidental take, not for direct take. Therefore, integration of natural-

origin fish will only be permitted upon approval of the HGMP. ODFW is ready to begin

integrating natural-origin fish into broodstock immediately upon approval of the HGMP. (Sharpe

Decl., ¶ 6.)

### b. Hatchery Fish Marking.

RPA 9.6.1.3 requires that all hatchery fish releases be marked with an adipose-fin clip, an

otolith mark, and, if facilities exist to detect the tags when fish return, a coded wire tag or blank

tag before release. BiOp 9.6.1.3 (AR 35181.) ODFW is marking all releases with an adipose fin

clip before release so that hatchery-origin and natural-origin fish can be visually distinguished

upon return. (Sharpe Dec., ¶¶ 5, 8.) ODFW is also marking all releases with otolith marks, which

are internal marks that can be viewed under a microscope so that ODFW can determine the

hatchery or natural-origin status of recovered adult fish carcasses with partial or unclear fin clips.

Sharpe (Dec., ¶¶ 4, 6.) And ODFW is inserting coded wire tags into a portion of smolts from

each release to enable ODFW to identify the release date and location for each tagged fish

recovered. (Sharpe Dec., ¶ 5.) Because no facility was built at Leaburg Dam to automatically

sort hatchery from natural-origin fish based on coded wire tags, not all fish need to be tagged in

the McKenzie program. (See BiOp 9.6.1.3 (AR 35181); Sharpe Dec., ¶ 5.) ODFW is in

compliance with the hatchery fish marking requirements.

### c. Release Strategy Adjustment.

RPA 6.2.4 requires that actions be taken so that hatchery fish, at release, are as similar to

local natural-origin fish as possible. BiOp 9.6.2.4 (AR 35187.) Results are to be evaluated and a

plan is to be developed for future rearing and release. The purpose of this requirement is to

experiment with hatchery rearing and release strategies to align the characteristics of hatchery fish

Department of Justice
1515 SW Fifth Ave, Suite 410
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

with those of natural-origin fish, which will enhance their use for conservation purposes upon return as adults (reintroduction above impassable barriers). BiOp 9.6.2.4 (AR 35187.) ODFW has ceased releasing juvenile Chinook in the fall because ODFW studies have shown that fish released in the fall do not migrate out of the river at the same rate that they would if released in the spring. (Sharpe Dec., ¶ 24.) ODFW is leading and participating in research studies designed to describe differences between natural- and hatchery-origin smolts and develop hatchery practices to minimize the differences. (Sharpe Dec., ¶ 38.) ODFW is in compliance with this RPA.

### d.      Collection Facility Improvement.

RPA 6.1.2 requires that fish collection facilities be improved, including ladders, traps, holding facilities, and acclimation facilities associated with broodstock collection and outplanting. BiOp 9.6.1.2 (AR 35181.) To the extent it is required to satisfy this RPA, ODFW has done so. A plan to improve hatchery facilities has been proposed by the Corps and approved by NMFS. (Marx Dec., Ex. 9.) The Corps built and operates the trap at Cougar Dam. (Marx Dec., ¶ 10.) The automatic sorter at Leaburg Dam will not be built, and alternative arrangements have been made and approved by NMFS. (Marx Dec., Ex. 9.) ODFW, with materials on hand, made improvements to the hatchery ladder to improve attraction of returning adults, and those improvements appear to have been effective. (Sharpe Dec., ¶ 23.) ODFW's obligations, if any, under this RPA are satisfied.

### e.      Research, Monitoring and Evaluation.

RPA 9.5.1 requires the Action Agencies to develop and carry out research, monitoring, and evaluation to improve hatchery operations and minimize negative effects on listed fish. BiOp 9.9.5.1 (AR 35199.) The BiOp directs the agencies to monitor and evaluate five specific aspects of the spring Chinook hatchery programs, all of which ODFW monitors and evaluates. Specifically, ODFW determines collection and spawning timing of broodstock and composition of hatchery and natural-origin fish in broodstock by conducting hatchery sampling as fish are

Department of Justice
1515 SW Fifth Ave, Suite 410
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

collected and spawned. (Sharpe Dec., ¶¶ 7-12.) ODFW conducts extensive spawning surveys annually to determine pHOS as well as abundance and distribution on spawning grounds. (Sharpe Dec., ¶¶ 7-12, 14.) ODFW is conducting ongoing monitoring of prespawning mortality in connection with its outplanting program above Cougar Dam and also conducts spawning surveys above the dam. (Sharpe Dec., ¶¶ 7-12, 38.) ODFW researchers are conducting ongoing research into juvenile production by fish outplanted above dams and are also evaluating migration, behavior, and survival of outplanted hatchery fish through dams and reservoirs. (Sharpe Dec., ¶¶ 7-12, 38.) ODFW is in compliance with the RPA's research and monitoring requirements.

### f.      Outplanting.

Two RPAs provide direction about outplanting above Cougar Dam. RPA 6.2.3 directs the Action Agencies to "continue the existing" outplanting program, including above Cougar Dam.[6] BiOp 9.6.2.3 (AR 35186.) RPA 6.1.5 directs the action agencies to stop releasing hatchery fish above Cougar Dam "once sufficient numbers of wild fish can be safely collected at the rebuilt Cougar Dam trap and outplanted above the dam." BiOp 9.6.1.5 (AR 35183.) RPA 6.1.5 allows hatchery fish to be used for supplementation up to a maximum of 50%. However, that provision was written before the return rate from the Cougar Dam outplanting effort was known. (Marx Dec., ¶ 10.) The RPA also allows hatchery fish numbers for reintroduction purposes to be established by the Fish Passage and Hatchery Management Committee. ODFW and NMFS have collaborated and developed a reintroduction plan, which ODFW is following. The other members of the committee (representatives of the Corps and Bonneville Power Administration) have cooperated with ODFW's efforts to comply with this plan. (Marx Dec., ¶¶ 10-12 ; Sharpe Dec., ¶¶ 22, 37.)

The reintroduction plan requires that ODFW outplant a minimum of 400 female adults and 200 male adults with reductions made for each natural origin fish returning to the Cougar Dam

---

[6] The outplanting program above Trail Bridge Dam is also an important part of the outplanting program. (*See* Ziller Dec., ¶ 4.)

Department of Justice
1515 SW Fifth Ave, Suite 410
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

trap.  (Sharpe Dec., ¶ 22.)  ODFW coordinates closely with the Corps during the migration and spawning season about the number of natural-origin adults returning to the Cougar Dam trap. (Sharpe Dec., ¶¶ 11, 22.)  ODFW waits to outplant hatchery fish until late in the spawning season to ensure that the hatchery fish are needed for the outplanting program.  (Sharpe Dec., ¶ 22.)

Outplanted hatchery fish represent more than 50% of the outplanted fish above Cougar currently.  That is because few fish are returning to Cougar Dam as adults.  For every 100 adult fish outplanted above the dam, 38 adults return.  That is such a low return rate that failing to outplant more than 50% (and as much as the guidelines require) would rapidly prevent ODFW in from being able to continue the outplanting program above Cougar Dam at all.  (Sharpe Dec., ¶ 37.)  If ODFW were limited to outplanting 50% hatchery fish, fewer and fewer fish would return every year and eventually no fish would return, effectively ending the outplanting program. Ending the outplanting program would be inconsistent with RPA 6.1.2.3, which requires that the program be continued until sufficient numbers of natural-origin fish begin to return to Cougar Dam.  Because ODFW has continued the outplanting program and is following the reintroduction plan, ODFW is in compliance with the outplanting-related RPAs.

### g. Leaburg Dam Sorter.

#### i. ODFW is complying with NMFS-approved actions.

RPA 6.1.4, as explained above, establishes three alternative requirements.  The first two relate to evaluating and constructing sorting facilities at Leaburg Dam.  The third alternative requires that actions be taken to "reduce hatchery fish straying to less than 10% of the total population spawning in the wild."  BiOp 9.6.1.4 (AR 35182.)  The BiOp does not specify when the actions are required to be taken or when the stray rate should be achieved.  In any case, NMFS has concurred on a suite of actions that it agrees is sufficient to comply with 6.1.4.  (Marx Dec., Ex. 9.)  One of those actions is the reduction of hatchery smolt releases by 8.5% to 787,000 smolts starting in 2015.  ODFW intends to release only 604,750 smolts.  The remaining actions

Department of Justice
1515 SW Fifth Ave, Suite 410
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

approved by NMFS are to be undertaken by the Corps, and the deadlines for those actions have not yet arrived. ODFW is in compliance with RPA 6.1.4.

Plaintiffs contend that the State is not entitled to liability protection under the BiOp without strict, current compliance with the 10% standard. Although the State has not yet achieved 10% pHOS below Cougar Dam in the McKenzie River basin, immediate achievement of that standard is not required by either the letter or the spirit of the BiOp.

Requiring immediate compliance would not be a reasonable interpretation of the BiOp for three reasons. First, the BiOp itself provides no deadline, so inserting a deadline would be inconsistent with the BiOp itself. Second, RPA 6.1.4 required consideration of two alternative sorting facility designs for Leaburg Dam, and concurrence by NMFS that the facility is not feasible, before any actions were required to be agreed upon or taken to reduce pHOS. To ODFW's knowledge, NMFS apparently never formally concurred that a sorting facility was not feasible (as required in RPA 6.1.4). (Marx Dec., ¶ 13.) Third, it was not until Spring 2014 that NMFS formally approved alternative actions as sufficient to comply with RPA 6.1.4. (Marx Dec., Ex. 9.) Changes in hatchery management take time to manifest. Fish that are released do not return for several years (as four and five year old adults). (Sharpe Dec., ¶¶ 3-4.) As a result, a lag necessarily occurs between the implementation of certain program changes, such as reductions in smolt releases, and the observation of results. The 2014 McKenzie River basin pHOS is the result of releases from 2011 and 2012, before any actions were even arguably required to be taken in order to comply with the third alternative in RPA 6.1.4.

Plaintiffs cite a 2011 document to support its argument that a 10% pHOS was required by 2014. But the document must be read in its proper context. The sorter was still under consideration in 2011. (Marx Dec., ¶ 13.). And NMFS knew that any production changes would take years to bear fruit. Its comments were not even directed at ODFW. NMFS may have intended only to force the foot-dragging Corps to act. In any case, the 2011 comments are inconsistent with the April 2014 letter, inconsistent with the language of the BiOp, and

TBW/mjo/6024989-v10
Department of Justice
1515 SW Fifth Ave, Suite 410
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

inconsistent with the language of the Recovery Plan stating 10% pHOS is a goal. (*See* Marx Dec., ¶ 13, Ex. 7.) Old comments on an outdated Corps-funded study should be given no weight.

Because NMFS approved specific actions as sufficient for compliance with RPA 6.1.4, and ODFW is in compliance with those actions, ODFW is immune from liability for incidental take under the BiOp.

### ii. ODFW is taking actions to achieve 10% pHOS below Cougar Dam.

Even if NMFS had not approved alternative actions as sufficient to comply with RPA 6.1.4, ODFW would be in compliance with RPA 6.1.4. ODFW is taking action now that is designed and is likely to achieve 10% pHOS in the McKenzie River basin below Cougar Dam. ODFW employee and McKenzie River Hatchery Research, Monitoring, and Evaluation project leader Cameron Sharpe participated with NMFS in developing a model to predict what would have happened based on historical data if ODFW had released as few as 50,000 smolts or as many as 800,000 smolts. (Sharpe Dec., ¶¶ 27-30.) Based on this model, Mr. Sharpe found that a hatchery program size of about 605,000 smolts is likely to result in an average pHOS below Cougar Dam of less than 10%. (*Id.*) This program size is half the 2011 program size and is almost 200,000 smolts fewer than allowed by NMFS under RPA 6.1.4. (Marx Dec., ¶ 9.) The benefits of the reductions planned in 2015 and 2016 will become evident in the below-Cougar-Dam pHOS calculations in 2018. 2018 is the first year that all four and five-year-old fish returning will be from 604,750 smolt releases. The recently submitted HGMP also provides for releases of 604,750 smolts per year until an assessment can be made in 2018. (Marx Dec., Ex. 3.)

Significantly, a program size of about 605,000 smolts will allow ODFW to meet broodstock needs and conservation (outplanting) needs only about 50% of the time. (Sharpe Dec., ¶ 28.) Although attaining both the 10% below-Cougar-Dam pHOS goal and the continuation of the outplanting program are required in the BiOp, meeting both mandates in all years is apparently not currently possible. (Sharpe Dec., ¶¶ 27-28, Table 2.) ODFW (in informal collaboration with NMFS) has thus chosen to focus on actions that are likely to attain the pHOS

Page 28 - STATE DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

goal by choosing a program size that is likely to achieve the goal, even though outplanting needs will not be met half the time. (Sharpe Dec., ¶ 27-28.) This decision elevates the risk of not achieving conservation and recovery goals.

In their brief, Plaintiffs dispute that ODFW's program size reduction will have the effect ODFW predicts. Plaintiffs cite only to a Corps-prepared or funded conclusion in the Administrative Record that is accompanied by no testimony sufficient to support it under Federal Rules of Evidence 702 or, indeed, any testimony at all. (ECF # 73 at 35.) For that reason alone, the Court should give this Corps-drafted or funded document that Plaintiffs masquerade as expert testimony no weight. Nor should the Court give any weight to the "straightforward calculations" Plaintiffs use to justify their argument to enjoin releases above 360,000 smolts. (ECF # 73 at 32-33.) Again, these calculations are unsupported by any admissible evidence in the form of expert or other testimony that can be tested. All these arguments should be disregarded.

Plaintiffs' proffered expert, Dr. Frissell, in testimony not cited in Plaintiffs' brief, criticizes ODFW's program reduction as insufficient to reduce pHOS to the 10% goal. Notably, Dr. Frissell admitted in deposition that only 2% of his experience as a scientist touches upon hatchery issues and so there is doubt as to whether he is qualified to testify here. (Beatty-Walters Dec., Ex. 1 (Frissell Dep. 55:24-25; 56:1-2.) To the extent the Court allows Dr. Frissell's opinions into evidence,[7] they should be rejected because they are critically flawed for the following reasons:

---

[7]Dr. Frissell's opinions about the model in his declaration should also be stricken because they are new opinions that were not disclosed in his rebuttal expert report. Fed. R. Civ. P. 26(a)(2)(B) and (b)(4)(A) requires retained experts to provide a report prior to their depositions and trial detailing "a complete statement of all opinions the witness will express and the basis and reasons for them." Because Dr. Frissell's opinions about the model are new and were not disclosed in his report or at all prior to his deposition, they should be stricken, or given no weight. Accordingly, ODFW moves to strike paragraphs 26 to 32 from Dr. Frissell's declaration. ODFW responds to these paragraphs in its brief and Mr. Sharpe's declaration without waiving this objection. In fact, in his deposition, Dr. Frissell admitted that he was not asked by plaintiffs' counsel to analyze the model but looked at it only out of his own curiosity. (Beatty-Walters Dec., Ex. 1 (Frissell Dep. 42:11-12; 44:20-25; 45:1.)) Plaintiffs belatedly (beyond 30 days from the date of the receipt of Dr. Frissell's deposition transcript) provided deposition corrections that explained that he could not have analyzed the model because he lacked key information. Dr. Frissell's corrections were

Department of Justice
1515 SW Fifth Ave, Suite 410
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

- Dr. Frissell contends that the model incorporates an unreasonably large harvest goal. Although ODFW has adopted a McKenzie River 1000-fish harvest goal, that goal is not reflected in, and has nothing to do with, the model. (*See* Sharpe Dec., ¶ 30.) ODFW has, by reducing its program size, compromised its harvest goal in order to achieve the below-Cougar-Dam pHOS target and, half the time, its conservation goals. (Sharpe Dec., ¶ 28.)

- Dr. Frissell criticizes the capture efficiency rate used in the model. But he ignores the statistically significant relationship between capture efficiency and run size. (Sharpe Dec., ¶ 31.) The data demonstrate that as run sizes (program size) increase, capture efficiency decreases. (Sharpe Dec., ¶ 31.)

- Dr. Frissell also contends the model is flawed because it uses unreliable data. He is incorrect. Prior to 1996 (with the exception of 1992), ODFW did not mark all hatchery fish before release, but ODFW always marked a portion of the release so that it could extrapolate from marked returns to estimate hatchery and natural-origin returns. (Ziller Dec. ¶ 3.) Those estimates are good estimates and best available science 4563675. (Ziller Dec., ¶ 3; Sharpe Dec., ¶ 35.) Dr. Frissell also criticizes the assumption that fish would return as 5-year old fish. He, however, fails to demonstrate how or where this assumption introduces bias into the model. (*See* Sharpe Dec., ¶ 33.)

- Finally, Dr. Frissell's and Plaintiffs' pHOS calculations are flawed, which corrupts their entire argument. ODFW is required under the BiOp to outplant—meaning intentionally place—hatchery fish above impassable barriers for spawning and reseeding historic habitat. The BiOp's 10% standard applies only to fish that stray, and the outplanted fish are not stray. (*See* BiOp 9.6.1.4 (AR 35182).) Because the 10% standard refers *only* to below Cougar Dam pHOS, Plaintiffs' inclusion of outplanted fish in pHOS was an error. (Sharpe Dec., ¶ 36.)

Significantly, in addition to reducing the size of its program, ODFW has taken additional actions that are likely to lower pHOS. For example, ODFW modified the hatchery ladder, eliminated fall releases, and transferred production of fish to be released outside the McKenzie River to other locations. (Sharpe Dec., ¶¶ 23-25.) No effects from any of these additional actions are included in ODFW's model.

---

late under the rules and should not be considered. However, even if they are considered, they are belied by Mr. Sharpe's declaration and the information presented in the excel spreadsheet version of the model that counsel for ODFW transmitted to counsel for plaintiffs before Dr. Frissell's rebuttal report was due. (Sharpe Dec., ¶¶26-36; Beatty-Walters Dec., Exs. 3 & 4.) Dr. Frissell did not do the work to analyze the model before his report was due, but that was not because he lacked the information. His new opinions should be stricken or, at a minimum, given very little weight.

TBW/mjo/6024989-v10

Department of Justice
1515 SW Fifth Ave, Suite 410
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

Because ODFW's upcoming releases in 2015 and 2016 (and likely beyond)[8] are likely to result in below-Cougar-Dam pHOS of 10% or less, ODFW is in compliance with RPA 6.1.4. ODFW is in compliance with the actions required in the BiOp. As a result, the State is immune from this suit and summary judgment should be entered in the State's favor.

**C. Plaintiffs Are Not Entitled To An Injunction Because They Have Not Proved That Ongoing Hatchery Releases Will Cause Irreparable Harm To Wild Spring Chinook.**

As an initial matter, plaintiffs misstate the standard for injunctive relief. They assert that since they have proven past take caused by release of hatchery fish, the burden shifts to ODFW with respect to whether injunctive relief should be ordered: "ODFW now bears the burden of proving that any further releases of smolts will, in fact, <u>not</u> cause take in excess of the pHOS standard that represents the limit of take excepted from liability in the ITS."[9] (ECF # 73 at 30-31.) That is incorrect.

The parties' respective burdens in this case under Section 9 of the ESA are as follows: Plaintiffs bear the burden of proving take and the State bears the burden of proving their ITS affirmative defense if Plaintiffs prove take. Assuming Plaintiffs are entitled to a judgment as a matter of law on their Section 9 claim (which they are not), it then becomes *their burden* to establish irreparable harm absent narrowly tailored injunctive relief. Attempting to avoid this burden, Plaintiffs cite Section 7 cases addressing motions for preliminary injunctions that shifted the burden to a defendant who had failed to consult under Section 7 to prove that continuing their actions would pose no jeopardy. Those cases are inapposite, as there are no Section 7 claims alleged against the State. Plaintiffs cite no Section 9 cases employing such a burden shifting analysis in imposing permanent injunctive relief.

---

[8] ODFW anticipates that NMFS will act to approve its HGMP before releases in 2017, if not long before. ODFW will follow the requirements of the HGMP in effect at that time, or whatever guidance NMFS has provided in any draft revised HGMP if not yet approved.

[9] As explained above, Plaintiffs have not proven any past take.

TBW/mjo/6024989-v10

Department of Justice
1515 SW Fifth Ave, Suite 410
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

To receive a permanent injunction, Plaintiffs must demonstrate: (1) an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 131, 156-57 (2010). While the ESA may tip the balance in favor of listed species with respect to the second and third factors, it does not remove Plaintiffs' burden of establishing irreparable harm. *Nat'l Wildlife Fed'n v. Burlington N. R.R., Inc.*, 23 F.3d 1508, 1512 (9th Cir. 1994) (hereinafter *Burlington*).  Further, "[i]njunctive relief must be tailored to remedy the specific harm alleged." *Natural Res. Def. Council, Inc. v. Winter*, 508 F.3d 885, 886 (9th Cir. 2007).  Without proven irreparable harm, courts lack information necessary to tailor injunctive relief to remedy a specific harm.  *Id*.

1. **Plaintiffs do not meet their burden to show irreparable harm to the population of Wild Spring Chinook.**

Proof of a substantive ESA violation alone does not necessarily support issuance of an injunction. *Burlington*, 23 F.3d at 1512; *Salix v. U.S. Forest Serv.*, 944 F. Supp. 2d 984, 1002 (D. Mont. 2013), *appealed sub. nom. Cottonwood Envir. Law Center v. U.S. Forest Serv.*, No. 13-35624 (9th Cir., argued July 7, 2014).  Further, past takings in violation of the ESA, standing alone, do not support issuance of an injunction. *Burlington*, 23 F.3d at 1512. Without a showing of likely irreparable harm, proof of past takings did not support injunctive relief.  *Id*.  Taken together, *Burlington* and *Salix* show that even if the Plaintiffs can establish past violations of the ESA, they still have the burden to establish irreparable harm to receive their desired injunctive relief. Meeting this burden requires a showing that hatchery releases have a reasonable certainty of causing irreparable harm to the McKenzie ESU of spring Chinook. Because Plaintiffs have not carried that burden, this court should not issue the requested injunction.

In *Defenders of Wildlife*, for example, plaintiffs seeking to enjoin a licensed hunt of protected wolves were unable to establish irreparable harm. 812 F. Supp. 2d at 1206. There,

Department of Justice
1515 SW Fifth Ave, Suite 410
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

plaintiffs alleged theoretical disruptions of patterns of movement, while defendants provided scientific studies showing that hunting would not irreparably harm the survival or genetic diversity of the species. *Id*. at 1209-10. In total, the evidence did not establish irreparable harm. *Id*. Similarly, an injunction was not necessary to prevent irreparable harm to endangered whales where the mechanism of past harm (entanglement in fishing nets) was not reasonably certain to recur or cause irreparable harm if it recurred. *Strahan v. Holmes*, 595 F. Supp. 2d 161, 165 (D. Mass. 2009).

Here, Plaintiffs' *only* evidence to establish future irreparable harm is *past* pHOS numbers based on *past* releases that were more than twice as big as the current planned annual releases. (ECF # 73 at p 40.) Once again, Plaintiffs assume an inaccurate and high pHOS, fail to acknowledge already reduced hatchery releases or additional planned reduction, and also equate pHOS with actual harm, rather than an index of *potential* risk. Moreover, as explained above, pHOS by itself is insufficient to prove harm, much less irreparable harm. Best available science and empirical evidence does not tend to establish that McKenzie Chinook hatchery are likely to transmit any persistent maladaptive genes to their wild counterparts, particularly given the current and planned reductions in hatchery releases. Plaintiffs' evidence does not overcome the undisputed evidence of genetic diversity among the spring Chinook hatchery and wild spring Chinook in the McKenzie basin or show that harmful genetic introgression found in other hatchery programs is a problem here.

Moreover, the changes to the McKenzie hatchery program described above weigh against the imposition of injunctive relief because best available science indicates that ODFW is already implementing changes that are likely to bring about the 10% pHOS that Plaintiffs seek. For example, where a railroad made changes to prevent circumstances that previously led to take of endangered bears, plaintiffs were unable to show irreparable harm to the species. *Burlington*, 23 F.3d at 1512. In that case, a series of derailments spilled corn near train tracks. *Id*. at 1510. The corn attracted endangered bears, which trains struck and killed. *Id*. The railroad cleaned up the

TBW/mjo/6024989-v10

Department of Justice
1515 SW Fifth Ave, Suite 410
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

spilled corn and fixed the tracks to prevent future derailments. *Id*. Though the railroad's operation posed "some risk" to the population of bears, the historic fact of a temporary, localized taking did not support issuance of an injunction. *Id.* at 1511. In sum, while the hatchery spring Chinook below-Cougar-Dam pHOS numbers are still not down to where they should be, as described above, ODFW is actively implementing a series of concrete steps designed to bring that below-Cougar Dam pHOS down to the 10% target.

### 2. Consideration of an ESA injunction must examine all effects of requested relief on the protected species.

Plaintiffs' request for injunctive relief does not consider the potential for harm to wild Spring Chinook due to severely reduced hatchery production. Congress has established that injunctions under the ESA are not subject to a conventional balancing of hardships; rather, the balance of hardships always favors the endangered species. This does not mean that the balance of hardships favors always injunctive relief, however. *See Thomas v. Peterson*, 753 F.2d 754, 764 n. 8 (9th Cir 1985) (injunctive relief should not be granted when irreparable harm will flow from an injunction). If injunctive relief is harmful to the species, as it is in this case, an injunction should not be granted. *See Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 839 F. Supp. 2d at 1129 (a BiOp providing conservation benefits to endangered fish was not vacated based on a procedural ESA violation).

Enjoining the program to release no more than 360,000 smolts annually would negatively impact conservation goals. Indeed, annual releases of 605,000 hatchery smolts will only provide enough adults for reintroduction only half of the time. (Sharpe Dec., ¶ 28.) Further reducing releases would likely cause the mandatory reintroduction program above Cougar Dam—and the basin's best hope for recovery of spring Chinook salmon—to be severely curtailed if not entirely eliminated. That result would be inconsistent with the purposes of the ESA.

Department of Justice
1515 SW Fifth Ave, Suite 410
n DOCPROPERTY "dojCity" \*
MER GETFORMAT Portland, OR 97201

### 3. Any Injunction Must Be Narrowly Tailored

An injunction is not appropriate in this case, but even if it were, the injunction plaintiffs seek would go too far. Plaintiffs seek to limit the McKenzie Hatchery program to 360,000 smolts until 10% pHOS is reached. Aside from the problems with the 360,000 figure, and the plaintiffs' calculation of pHOS (all of which are described above), once NMFS has approved an HGMP, the regulation extending Section 9 liability to threatened species does not apply to hatchery operations. *See Native Fish Soc. v. Nat'l Marine Fisheries Serv.*, 2014 WL 1030479 *5 (D. Or. 2014) ("As discussed in this court's Opinion and Order [120], so long as the HGMPs are in place (and the court is not vacating them) the state is immunized from § 9 liability for all actions allowed under the HGMPs."); 50 CFR § 223.203(b)(5). Any injunction—even if one were appropriate—should terminate by its terms upon approval of an HGMP by NMFS.

## VI. CONCLUSION

The Willamette BiOp's ITS provides an exemption from liability for the State for operation of the hatchery because the BiOp specifically contemplates and discusses the operation of the hatchery and the State is in compliance with the terms of the ITS and RPAs. Further, even if the Court were to find that the ITS does not provide take protection to the State, Plaintiffs cannot prove harm to listed fish because the only genetic testing that has been completed (which was completed by the State) did not show genetic divergence between hatchery and wild stocks. There is no empirical evidence of any harmful, non-temporary genetic introgression. Existing evidence is, in fact, to the contrary. Additionally, the State is no longer using wild fish for

TBW/mjo/6024989-v10
                              Department of Justice
                            1515 SW Fifth Ave, Suite 410
                                 Portland, OR 97201
                         (971) 673-1880 / Fax: (971) 673-5000

broodstock, and it will not do so unless and until NMFS approves an HGMP with such authority.

For these reasons, plaintiffs cannot prove the State is taking listed fish in violation of the ESA.

DATED December  31 , 2014.

Respectfully submitted,

ELLEN F. ROSENBLUM
Attorney General


    s/ Christina L. Beatty-Walters
CHRISTINA L. BEATTY-WALTERS #981634
CARLA A. SCOTT #054725
Assistant Attorneys General
Trial Attorneys
Tel (971) 673-1880/ Fax (971) 673-5000
Tina.BeattyWalters@doj.state.or.us
Carla.A.Scott@doj.state.or.us
Of Attorneys for Defendants Bruce McIntosh,
    Scott Patterson and Oregon Department of
    Fish and Wildlife

Department of Justice
1515 SW Fifth Ave, Suite 410
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000