IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

McKENZIE FLYFISHERS,                      Case No. 6:13-cv-02125-TC
STEAMBOATERS

      Plaintiffs,                         OPINION AND ORDER

    v.

BRUCE McINTOSH, SCOTT PATTERSON,
and OREGON DEARTMENT OF FISH
AND WILDLIFE

      Defendants.
—————————————————————————

COFFIN, Magistrate Judge:

    Presently before the court is plaintiffs' McKenzie Flyfishers and Steamboaters ("McKenzie Flyfishers") Motion for Summary Judgment and Injunctive Relief and defendants' Oregon Department of Fish and Wildlife (ODFW); Bruce McIntosh, Acting Fish Division Director for ODFW; and Scott Patterson, Fish Propagation Program Manager for ODFW (collectively "defendants" or "ODFW"), Cross-motion for Summary Judgment. Defendants also move to strike certain evidence submitted by plaintiffs. Plaintiffs seek to compel defendants to comply with the Endangered Species Act (ESA)

1 - OPINION AND ORDER

in operating the McKenzie Hatchery.  Oral argument was held on March 2, 2015.  For the reasons set forth below, plaintiffs' Motion for Summary Judgment and Injunctive Relief (73) is denied, defendants' Motion to Strike is denied, and Defendants' Cross-motion for Summary Judgment (87) is granted in part, as explained infra.

BACKGROUND

The McKenzie River originates from Clear Lake in the Cascade Mountains in Oregon and flows roughly ninety miles to its confluence with the Willamette River.  The McKenzie River basin supports the largest run of wild spring Chinook salmon in the upper Willamette River basin.  The Army Corps of Engineers (Corps) built or maintains thirteen dams in the Willamette River basin, including the Cougar Dam on the South Fork of the McKenzie River, the Smith and Trail Bridge Dams on the mainstem of the McKenzie River, and the Blue River Dam on Blue River, a tributary to the McKenzie River.  AR035802, 806.  The construction of these dams eliminated spawning habitat for spring Chinook salmon that had historically returned to the areas above the dams to spawn.  AR035792.

To mitigate for this loss, the Corps funds five hatcheries that rear and release hatchery fish, including the McKenzie Fish Hatchery, where defendants spawn, raise, and release spring Chinook salmon smolts into the McKenzie River, Lower Columbia River, and Coast Fork of the Willamette River.  Id., AR035850.  Several years

2 - OPINION AND ORDER

after being released into the McKenzie River, both wild and
hatchery-bred adult spring Chinook salmon return to the McKenzie
Fish Hatchery via one of the two fish ladders that extend into the
river. AR000013. The hatchery is characterized as an "integrated"
program, meaning that it uses wild hatchery broodstock, with a goal
of using 600 fish. AR000012, 59.

Plaintiff McKenzie Flyfishers is a non-profit, membership-
based, fly fishing conservation group located in Eugene, Oregon
that seeks to protect and increase runs of wild spring Chinook
salmon in the McKenzie River basin. Plaintiff Steamboaters is also
a membership-based, fly fishing conservation group that advocates
for wild fish in the Umpqua River basin and also works to support
conservation groups that have common purposes. Plaintiffs claim
that the release of spring Chinook salmon into the McKenzie River
adversely affects the productivity and recovery of wild spring
Chinook salmon  by competing with the wild salmon for food,
habitat, and spawning space, by potentially spreading disease to
the wild salmon, and by creating offspring have reduced fitness and
reproductive success when hatchery salmon spawn with wild salmon.
Pl.'s First Am. Compl. For Decl. and Inj. Relief 1, 8.

LEGAL STANDARD

I.    Summary Judgment

Federal Rule of Civil Procedure 56 allows for the granting of
summary judgment if the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). There must be no issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

The movant has the initial burden of establishing that no genuine issue of material fact exists or that a material fact essential to the nonmovant's claim is missing. Celotex Corp. V. Catrett, 477 U.S. 317, 322-24 (1986). Once the movant has met its burden, then the burden shifts to the nonmovant to produce specific evidence to establish a genuine issue of material fact or to establish the existence of all facts material to the claim. Id.; see also, Bahn v. NME Hosp., Inc., 929 F.2d 1404, 1409 (9th Cir. 1991); Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc., 210 F.3d 1099, 1105 (9th Cir. 2000). In order to meet this burden, the nonmovant "may not rely merely on allegations or denials in its own pleading," but must instead "set out specific facts showing a genuine issue of fact for trial." Fed. R. Civ. P. 56(e).

Material facts which preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case. Anderson, 477 U.S. at 248. Factual disputes are genuine if they "properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. On the other hand, if, after the court has drawn all

reasonable inferences in favor of the nonmovant, "the evidence is merely colorable, or is not significantly probative," summary judgment may be granted. Id.

II. Injunction

The EAS provides that a court may "enjoin any person, including . . . any [] governmental instrumentality . . . who is alleged to be in violation of any provision of this Act. . .." 16 U.S.C. § 1540(g)(1). A plaintiff seeking an injunction must establish that he is likely to suffer irreparable harm, remedies such as damages are inadequate to compensate for that harm, the balance of the equities tips in his favor, and that an injunction is in the public interest." Monsanto Co. V. Geertson Seed Farms, 561 U.S. 139, 130 S. Ct. 2743, 2761 (2010). Where injury to the environment is "sufficiently likely . . . the balance of harms will usually favor the issuance of an injunction to protect the environment." Amoco Prod. Co. v. Vill. of Gambell, 480 U.S. 531, 545 (1987).

In cases involving the ESA, the balance of hardships is skewed in favor of injunctive relief even further than in other matters involving environmental harm. Nat'l Wildlife Fed'n v. Burlington N. R.R., Inc., 23 F.3d 1508, 1510-11 (9th Cir. 1994). "In cases involving the ESA, Congress removed from the courts their traditional equitable discretion in injunction proceedings of balancing the parties' competing interests." Id. at 1511

5 - OPINION AND ORDER

(citations omitted). "In Congress's view, projects that jeopardize the continued existence of endangered species threaten incalculable harm; accordingly, it decided that the balance of hardships and the public interest tip heavily in favor of endangered species" and this court "may not use equity's scales to strike a different balance." Sierra Club, 816 F.2d at 1383. However, mere allegations of ESA violations are insufficient and a plaintiff must make a showing that such violations are likely. Nat'l Wildlife Fed'n, 23 F.3d at 1511.

## DISCUSSION

Plaintiffs move the court for summary judgment and claim that defendants' operation of the McKenzie Hatchery causes "take" of threatened fish species in violation of § 9 of the ESA. Specifically, plaintiffs claim that defendants "violated and will continue to violate Section 9 of the [ESA]" by releasing hatchery spring Chinook salmon smolts in excess of ten percent proportion of hatchery-origin spawning (pHOS) into the McKenzie River basin. Pl.'s First Am. Compl. For Decl. and Inj. Relief at 1. Consequently, plaintiffs request that the court enjoin defendants from releasing more than 360,000 hatchery smolts into the McKenzie River basin until the pHOS of spring Chinook salmon is ten percent or less. Id. at 32, 35. Plaintiffs also argue that until there is an approved Hatchery and Genetics Management Plan (HGMP) in place, defendants are in violation of § 9 of the ESA by capturing,

6 - OPINION AND ORDER

collecting, and handling wild spring Chinook salmon that swim into the McKenzie Hatchery. Id. at 19.

Defendants move the court for summary judgment on two separate grounds. First, defendants argue that plaintiffs have not created and cannot create a material issue of fact about whether release of more than 360,000 hatchery spring Chinook smolts annually will violate the ESA § 9 "take" standard. Second, defendants argue their McKenzie Hatchery operations are protected from liability under § 9 by the 2008 Biological Opinion (BiOp) and its incidental take statement (ITS) issued by National Marine Fisheries Service (NMFS). State Def.'s Cross-Mot. for Summ. J. and Opp'n to Pl.'s Mot. for Summ. J. 1.

I.    Defendants' Liability Under the ESA

The Purpose of the ESA is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation" of such species. 16 U.S.C. § 1531(b).

Section 9 of the ESA states that no entity may "take" individual members of an endangered species. 16 U.S.C. § 1538(a)(1); Or. Natural Res. Council v. Allen, 476 F.3d 1031, 1033 (9th Cir. 2007) (§ 9 "establishes a blanket prohibition" on taking). The ESA defines "take" to mean "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). The ESA's

implementing regulations further define "harm" as an "act which actually kills or injures wildlife" and "may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering." 50 C.F.R. § 17.3; Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or., 515 U.S. 687, 696-700, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995) (upholding the regulatory definition of "harm").

Section 9, on its face, does not provide a blanket protection from take to "threatened" species. However, under § 4(d) of the ESA, NMFS may extend the take prohibition to threatened species. 16 U.S.C. § 1533(d). In 1999, NMFS listed spring Chinook salmon in the Upper Willamette River evolutionarily significant unit (ESU) as a threatened species under the ESA. 64 Fed. Reg. 14308 (March 24, 1999). In 2000, NMFS designated critical habitat in the McKenzie River basin below impassible natural barriers for spring Chinook salmon in the Upper Willamette River ESU. 65 Fed. Reg. 7764, 7778 (Feb. 16, 2000); 50 C.F.R. § 226.212. In 2000 and 2005, NMFS promulgated regulations under § 4(d) that extended the § 9 "take" prohibition to wild spring Chinook salmon in the Upper Willamette River ESU as a threatened species. Endangered and Threatened Species; Final Rule Governing Take of 14 Threatened Salmon and Steelhead Evolutionary Significant Units, 65 Fed. Reg. 42, 422, 47, 475-81 (July 10, 2000); 70 Fed. Reg. at 37,194 (amending 2000 rule)

(codified at 50 C.F.R. § 223.203(a); § 223.102(c)(6)).

However, NMFS also established exceptions to the § 9 take prohibition called "Section 4(d) Limits." <u>Native Fish Soc'y v. NMFS</u>, 992 F. Supp. 2d 1095, 1102 (D. Or. 2014). Limit 5 creates an exemption from § 9's prohibition against take caused by a fish hatchery's artificial propagation program, so long as the hatchery complies with an HGMP approved by NMFS. 50 C.F.R. § 223.203(b)(5).

Section 7 of the ESA imposes affirmative duties on federal agencies to conserve listed species and to ensure that they do not jeopardize the continued existence of a listed species of destroy or adversely modify its critical habitat. 16 U.S.C. § 1536(a)(2); <u>Wild Fish Conservancy v. Salazar</u>, 628 F.3d 513, 518 (9th Cir. 2010). If a federal agency's actions may affect a listed anadromous fish species, § 7 states that it is required to consult with NMFS and obtain its opinion whether the activity is likely to jeopardize the species. <u>Id</u>. If it may, NMFS then writes a BiOp that, among other things, suggests a reasonable and prudent alternative (RPA) to the agency's actions. 50 C.F.R. § 1536(b)(3).

Further, when federal action may jeopardize the continued existence of a listed species, and implementation of an RPA will cause "incidental take" of members of a species, NMFS must issue an incidental take statement (ITS) that specifies the permissible amount of such incidental taking of the species, as well as "reasonable and prudent measures . . . necessary or appropriate to

minimize such impact." Or. Natural Res. Council, 476 F.3d at 1034;
see Mt. Graham Red Squirrel v. Espy, 986 F.2d 1568, 1580 (9th Cir.
1993) ("Under section 7 of the ESA . . . limited takings may be
permitted if they are incorporated into the 'terms and conditions'
of an [RPA] drawn up in connection with the issuance of a
[BiOp]."). An ITS "acts as a safe harbor, exempting the specified
amount of incidental taking from the taking prohibition of ESA
Section 9." Wild Fish Conservancy, 628 F.3d at 530 (citing 16
U.S.C. § 1536(b)(4)); 50 C.F.R. § 402.14(I).

     Although § 7 refers only to federal agencies when discussing
who is protected by and must comply with an ITS, the Ninth Circuit
has stated that a "party that is neither a federal agency nor an
applicant can take members of a listed species without violating [§
9 of] the ESA, provided the actions in question are contemplated by
an ITS issued under § 7 of the ESA and are conducted in compliance
with the requirements of that statement." Ramsey v. Kantor, 96
F.3d 434, 442 (9th Cir. 1996). In short, "a 'take' occurring under
an ITS is exempt from § 9 liability." Ramsey, 96 F.3d at 441.

     Here, because the Corps funds the McKenzie Hatchery program,
which could potentially affect the spawning grounds of the
threatened spring Chinook salmon in the Upper Willamette River ESU,
the Corps consulted with NMFS to obtain its opinion regarding
whether the hatchery was likely to jeopardize the listed spring
Chinook salmon. On July 11, 2008, NMFS issued a BiOp, finding that

10 - OPINION AND ORDER

McKenzie Hatchery program jeopardized the continued existence of
ESA listed salmon in the Willamette River basin and adversely
modify their critical habitat. AR035792. However, in 2008, NMFS
also issued an RPA and ITS under the ESA that NMFS concluded would,
if implemented, avoid jeopardy to spring Chinook salmon in the
Upper Willamette River ESU. AR035117. The ITS expressly lists the
release of hatchery fish into the McKenzie River, broodstock
collection at the Leaburg Dam by the McKenzie Hatchery program, and
the sorting of fish at the Leaburg Dam as covered incidental take
activities under the ITS. AR035263, 265. The 2008 BiOp, RPA, and
ITS are effective through 2023. AR035792.

Although there is an active BiOp, RPA, and ITS in place
through 2023, there is not currently an active HGMP in place.
Def.'s Ans. To First Am. Compl. For Decl. And Inj. Relief ¶ 38.
However, several HGMPs have been submitted to NMFS, including the
Willamette HGMP (ODFW 2003, 2004a, 2005a, 2007a, 2008a, 2008b) for
spring Chinook, summer steelhead, and rainbow trout, as well as the
McKenzie Spring Chinook Salmon HGMP, which was submitted in October
2014. Id. Further, RPA 6.1, 6.2.1, and 6.2.2 require defendants
to comply with the aforementioned HGMPs once approved by NMFS.
AR035180, 185-86.

When NMFS issued its RPA for federal projects in the
Willamette basin, it found that incidental take would occur as a
result of, amongst other things, the Willamette Hatchery Mitigation

11 - OPINION AND ORDER

Program.  AR035239.  Accordingly, NMFS issued an ITS that lists
measures necessary to minimize incidental take and includes terms
and conditions that apply to the McKenzie Hatchery.  The ITS states
that the "authorization of the incidental and direct take of listed
Chinook from the Chinook hatcheries will be processed under limit
#5 (the artificial propagation limit) of the 4d Rule (June 28,
2005; 70 FRN 37160)."  AR 035242.  Limit 5 of Rule 4d allows
"artificial propagation programs," such as the McKenzie Hatchery,
to cause "take" of listed species, if it complies with the terms of
an approved HGMP.  50 C.F.R. § 223.203(b)(5)(I).  Moreover, NMFS
stated that "the action agencies (in cooperation with ODFW) must
ensure that listed species are taken only at the levels, by the
means, in the areas, and for the purposes stated in the Biological
Assessment, HGMPs, and the RPA."  AR035291.  Importantly, NMFS has
since clarified that "incidental take of listed Chinook salmon is
covered" in the 2008 BiOp and ITS. AR005439.  Consequently, until
an HGMP is approved by NMFS, the 2008 BiOp, RPA, and ITS, which are
effective through 2023, control.

     RPA 6.1.4 provides that defendants, in conjunction with
several other agencies (collectively the "Action Agencies"), will
construct a sorting facility at Leaburg Dam to reduce the number of
hatchery fish straying into core spring Chinook natural production
areas upstream by December 2013.  AR035182.  However, RPA 6.1.4
goes on to state that "if an acceptable sorting facility at this

site is deemed infeasible by the Working Group and agreed to by NMFS, then the Action Agencies will take alternative actions to reduce hatchery fish straying to less than ten percent of the total population spawning in the wild." AR035182.

Plaintiffs contend that the ten percent pHOS listed in PRA 6.1.4 must be achieved by 2014. In support of their position, plaintiffs refer to a letter written by NMFS on August 3, 2011, where NMFS stated that "if the co-managers and Action Agencies agree that constructing a sorting facility at Leaburg Dam is not a feasible or preferred approach, then an alternative action plan needs to be developed and carried out to accomplish the desired results by 2014." AR040960. The letter also states that "NMFS does not support, and RPA 6.1.4 does not allow, for any approach that does not meet a ten percent or less pHOS by 2014." Id. NMFS, however, also went on to state that "it is difficult to scope out an action plan to fix the straying problem without having all of the alternatives available for review" and "[u]ntil we can review the hatchery production alternatives, it is not possible to know which alternatives in the draft reports are necessary and whether or not they will be effective, individually or as a combined set of actions, at reducing straying." AR040960-61.

Contrary to the statements made by NMFS in the August 3, 2011 letter, two days later, on August 5, 2011, NMFS published the Upper Willamette River Conservation and Recovery Plan for Chinook Salmon

13 - OPINION AND ORDER

and Steelhead.   The Conservation and Recovery Plan stated that NMFS's "goal" is to "continue to reduce pHOS towards [the] <10% goal by reducing [the] number of [harvest mitigation program] fish on spawning grounds above Leaburg Dam, and if after evaluation of interim strategies shows little progress, adjust production goals." Decl. of Steven Marx in Supp. of State Def.'s Cross-Mot. for Summ. J. and Opp'n to Pl.'s Mot. For Summ. J. 139.

Additionally, in a letter written by NMFS to the Corps on April 16, 2014, NMFS expressly stated that "an 8.5 percent reduction in the number of hatchery spring Chinook salmon smolts that are annually released into the McKenzie River," or 74,000 smolts, from 861,000 to 787,000, beginning in 2015, the benefits of which, "will commence in 2018," "satisf[ies] the alternative in RPA action 6.1.4 to reduce the number of hatchery fish on the natural spawning grounds." Id. at 140-45.

Notably, defendants have continually released fewer spring Chinook salmon smolts into the McKenzie River each year since 2011. For example, in 2011, defendants released approximately 1,220,100 hatchery spring Chinook salmon smolts into the McKenzie River. Id. at 4.   Then, in 2012, defendants released approximately 1,007,800 smolts into the McKenzie River. Id. This reduction was largely due to the diversion of about 212,100 smolts from the McKenzie Hatchery into the Lower Columbia River and Coast fork of the Willamette River. Id. In 2013, defendants again diverted

14 - OPINION AND ORDER

additional smolts to the Lower Columbia River and Coast fork of the Willamette River and released only approximately 867,500 smolts into the McKenzie River. Id. In 2014, defendants released approximately 854,000 smolts into the McKenzie River. Id. Notably, in 2015, defendants plan to release only 604,750 smolts into the McKenzie River. Id. Moreover, the record reveals that on December 30, 2014, defendants already released into the Coast Fork of the Willamette River, the 235,250 excess smolts that it possessed at the McKenzie Hatchery that were in excess of the 604,750 smolts it intends to release into the McKenzie River basin in 2015. Id.

Consequently, the record reveals that defendants can release only the remaining 604,750 smolts it has into the McKenzie River Basin in 2015, some 182,250 fewer than NMFS expressly stated satisfies the alternative in RPA 6.1.4 in its April 16, 2014 letter. As such, this court finds that defendants are in compliance with RPA 6.1.4 and by extension, the 2008 BiOp and its incorporated ITS that are effective until 2023 or, pursuant to RPA 6.1, 6.2.1, and 6.2.2, until the draft HGMP supercedes RPA 6.1.4. Moreover, because the ITS expressly lists the collection, sorting, and handling of wild spring Chinook salmon at the McKenzie Hatchery as covered incidental take activities under the ITS, defendants did not violate § 9 of the ESA by their handling of wild spring Chinook

salmon at the McKenzie Hatchery or by their release of hatchery spring Chinook salmon smolts into the McKenzie River basin.

II.  Injunction

Plaintiffs request that the court enjoin defendants from releasing more than 360,000 hatchery smolts into the McKenzie River basin until the pHOS of spring Chinook salmon is ten percent or less.

To obtain injunctive relief on this claim, plaintiffs must prove by a preponderance of the evidence that the McKenzie Hatchery's operations results in a violation of the ESA by causing take of a listed species. Defenders of Wildlife v. Bernal, 204 F.3d 920, 925 (9th Cir. 2000); Palila v. Hawaii Dept. Of Land and Nat'l Resources, 639 F.2d 495, 496 (9th Cir. 1981).

As previously discussed, until NMFS approves an HGMP, so long as defendants are in compliance with RPA 6.1.4, and by extension, the 2008 BiOp and its incorporated ITS, which are effective through 2023, defendants are immunized from § 9 liability for all actions allowed under the 2008 BiOp. Moreover, because defendants plan to release fewer smolts into the McKenzie River basin than NMFS expressly authorized in its April 16, 2014 letter, there is no indication that defendants are out of compliance with the terms RPA 6.1.4. Accordingly, there is no basis for injunctive relief at this time.

///

16 - OPINION AND ORDER

CONCLUSION

Because defendants are in express compliance with RPA 6.1.4, and by extension, the 2008 BiOp and its incorporated ITS, and because the 2014 HGMP has not yet been approved by NMFS, defendants' actions in operating the McKenzie Hatchery are protected from § 9 liability. Moreover, the court has not considered the evidence defendants' moved to strike when evaluating the claims before it. As such, defendants' motion to strike certain evidence submitted by plaintiffs is denied. Further, plaintiffs' Motion for Summary Judgment and Injunctive Relief (#73) is DENIED. Defendants' Cross-motion for Summary Judgment (#87) is GRANTED, contingent upon defendants consulting with NMFS to establish a time frame for defendants to achieve a ten percent or less pHOS and submitting a proposal of the deadline to this court for approval. Defendants have ninety days to submit the proposal to the court. As such, the court declines to enter judgment until such time that it receives defendants' proposal.

To elaborate, all the players in the McKenzie Hatchery program (plaintiffs, ODFW, the Corps, and NMFS) are in general agreement that a ten percent or less pHOS is an appropriate and necessary goal to avoid harm to the wild Chinook ESU in the McKenzie basin. The management of the program is a work in progress that implicates a number of variables. The April 2011 letter from NMFS that focused on a 2014 date for the ten percent or less pHOS goal

17 - OPINION AND ORDER

appears to have been focused on a functional sorter that would have mechanically separated the hatchery from the wild salmon to expedite meeting the target. The sorter was, however, determined to be infeasible (because it would have done more harm than good to the wild Chinook) and the goal, thus, must be achieved by management practices that require greater patience. The focus in this case is on smolt releases and the resultant hatchery origin returns as the main mechanism for reducing pHOS, but those numbers take three to four years to verify.

The court is mindful, however, that a pHOS target of less than ten percent that is indefinite in terms of a time frame is too elusive to be effective as a proxy regarding harm to the wild Chinook ESU. At the hearing on the instant motions, the court inquired of the defendants as to a time line they would propose, and ODFW offered no definitive response. The defendants in this action need to understand that this can may not be kicked down the road endlessly. Accordingly, the court intends to oversee this process to ensure that the target is met in a realistic time frame.

IT IS SO ORDERED.

Dated this ___13___ day of March 2015.

_____
THOMAS M. COFFIN
United States Magistrate Judge

18 - OPINION AND ORDER